1  KAREN C. CORALLO (*pro hac vice*)
   **AKIN GUMP STRAUSS HAUER & FELD LLP**
2  1700 Pacific Avenue, Suite 4100
   Dallas, Texas 75201
3  Telephone:   214-969-2800
   Facsimile:    214-969-4343
4  E-Mail:        kcorallo@akingump.com

5
   CHAD A. STEGEMAN (SBN 225745)
6  Akin Gump Strauss Hauer & Feld LLP
   580 California St., Ste. 1500
7  San Francisco, California  94104
   Telephone:   415-765-9500
8  Facsimile:    415-765-9501
   E-Mail:        cstegeman@akingump.com
9
   Attorneys for Defendant and Counter-Plaintiff
10 THE STAYWELL COMPANY, A DIVISION OF
   MEDIMEDIA USA, INC.
11

12                    UNITED STATES DISTRICT COURT

13                   CENTRAL DISTRICT OF CALIFORNIA

14

15

16 | ROGER H. WANG, M.D., an | Case No. SACV 06-813 ODW (JTLx)
   individual,

17            Plaintiff, Counter-Defendant | Judge:   Otis D. Wright II

18        v. | **DEFENDANT  STAYWELL'S
              BRIEF IN SUPPORT OF MOTION
19 THE STAYWELL COMPANY, a | FOR SUMMARY JUDGMENT**
   Delaware corporation; and DOES 1-
20 20, inclusive, | Complaint Filed:      August 29, 2006
                     Pretrial Conference:  June 9, 2008
21            Defendants, Counter-Plaintiffs. | Trial Date:            July 8, 2008

22                                           | Hearing Date:     May 19, 2008
                                             Time:                 1:30 p.m.
23                                           | Before the Hon. Otis Wright

24

25

26

27

28

6233835 v1

1

## **TABLE OF CONTENTS**

2
I.    STATEMENT OF RELIEF.................................................................................1

3

4
II.   FACTS .........................................................................................................3

5
      A.    Quick Reference Coding Guides At Issue Derive From The
            Government ICD-9-CM Classification and Coding System. ............3
6
      B.    The Non-Exclusive License Agreement Between Dr. Wang and
            FastMark...............................................................................................5
7
      C.    The Agreed Judgment and Permanent Injunction Against Dr. Wang
            For His Misuse of FastMark's Proprietary Customer Information......6
8
      D.    FastMark Begins Creating Its Own Code Compilations.....................7
      E.    Dr. Wang's 2003 Lawsuit Against Fastmark .......................................7
9
      F.    StayWell's Purchase of FastMark.......................................................8
      G.    The Settlement Agreement and Mutual Release Between FastMark
10
            and Dr. Wang .......................................................................................9
      H.    StayWell's Sales of FastMark's QuickCoder Products After the
11
            Settlement Agreement .......................................................................12
      I.    Dr. Wang Admits That The Current Lawsuit Is Based On The Same
12
            Causes of Action He Sued On In 2003...............................................13

13
III.  ANALYSIS AND AUTHORITIES ...............................................................14

14
      A.    Standard of Review ...........................................................................14
15
      B.    The Settlement Agreement Extinguishes All Claims Asserted In This
            Case....................................................................................................15
16
      C.    The Copyright Claims Fail As A Matter of Law ..............................22
      D.    The Breach of Contract Claims Fail As A Matter Of Law................31
17
      E.    The "Unfair Competition" Claims Fail ............................................36
      F.    The Claim For Intentional Interference with Contractual Relations
18
            Fails Because Plaintiff Admits That No Contract Existed With Which
            StayWell Allegedly Interfered ...........................................................39
19
      G.    The Claim for Intentional Interference with Prospective Business
            Advantage Fails Because There is No "Wrongful Conduct." ...........40
20
      H.    StayWell Is Entitled To Judgment For Its Reasonable Attorneys' Fees
            Incurred In Defending This Action. ...................................................41
21

22
IV.   CONCLUSION.............................................................................................42

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)......................................................15

Apple Computer Corp. v. Microsoft Corp., 35 F.3d 1435 (9th Cir. 1994)......................30

Bellsouth Adver. & Publ'g Corp. v. Donnelley Information Publ'g, Inc., 999 F.2d 1436 (11th Cir. 1993)..................................................................................................26

Black's Guide, Inc. v. Mediamerica, Inc., No. C-90-0819..........................................27, 30

Cedars-Sinai Medical Ctr. v. Shewry, 137 Cal. App. 4th 964 (2006) ..............................35

Cel-Tech Commc'ns, Inc. v. L.A. Cellular Telegraph Co., 20 Cal. 4th 163 (1999) ..........37

Cole v. Doe 1 Thru 2 Officers of the City of Emeryville Police Department 387 F. Supp. 2d 1084, 1103 n.7 (N.D. Cal. 2005)  .....................................................18

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .................................................................15

Co-op. v. DIRECTTV, Inc., 319 F. Supp. 2d 1059 (C. D. Cal. 2003) .............................37

Conan Properties, Inc. v. Mattel, Inc., 712 F. Supp. 353 (S.D.N.Y. 1989) .....................36

Cooling System and Flexibles, Inc. v. Stuart Radiator, Inc., 777 F.2d 485 (9th Cir. 1985) .............................................................................................................29, 31

Dinesol Bldg. Prod., Ltd. v. Tapco Int'l Inc., 201 Fed.Appx. 764, 767 (Fed. Cir. 2006) (emphasis added) ........................................................................................16, 21

Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) .....................................24

Elte Inc. v. S.S. Mullen, Inc., 469 F.2d 1127 (9th Cir. 1972).......................................18, 20

FastMark, Inc. v. Roger H. Wang, M.D., in the Superior Court of California, County of Santa Clara (Judgment entered January 23, 2002)., UF No. 18.................................6

Feist Publ'ns, Inc. v. Rural Telegraph Srv. Co., Inc., 499 U.S. 340 (1991)...........25, 26, 29

Fire Insurance Exchange v. HAGD, Inc., No. F039989, 2003 WL. 1521898 (Cal. App. 5 Dist. March 25, 2003) ...........................................................................................18

Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197 (9th Cir. 1989)......................30

Howard v. America Online Inc., 208 F.3d 741 (9th Cir. 2000)........................................17

Id.  see also Graham v. James, 144 F.3d 229 (2d Cir. 1998) .................................................23

In re Microsoft Corp. Antitrust Litigation, 274 F. Supp. 2d 747 (D. Md. 2003)...............38

JRS Prod., Inc. v. Matsushita Electric Corp. of America, 115 Cal. App. 4th 168 (2004)40, 41

Kodadek v. MTV Networks, Inc., 152 F.3d 1209 (9th Cir. 1998) .............................38, 39

Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134 (2003)...........................40

Kregos v. Associated Press, 937 F.2d 700 (2d Cir. 1991) .................................................26

Landsberg v. Scrabble Crossword Game Players, Inc., 736 F.2d 485 (9th Cir. 1983)......29

Lee v. Internet Entertainment Group, Inc., 33 Fed. Appx. 886, 887 (9th Cir. 2002) ........21

MHP, 1990 WL. 169141....................................................................................27, 30

Manzanarez v. Low, No. A100947, 2004 WL. 363325 (Cal. App. 1 Dist. Feb. 27, 2004)19

Marder v. Lopez, 450 F.3d 445 (9th Cir. 2006).......................................................21, 25

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)...............15

McCray v. Casual Corner, Inc., 812 F. Supp. 1046 (C.D. Cal. 1992) ..............................16

National Casualty Co. v. Sovereign General Insurance Services, Inc., 137 Cal. App. 4th 812 (2006)...................................................................................................................35

New Paradigm Software Corp. v. New Era of Networks, Inc., 2002 WL. 31749396.......36

Officers of the City of Emeryville Police Department, 387 F. Supp. 2d 1084 (N.D. Cal. 2005) ..........................................................................................................................18

Ortiz-Sandoval v. Gomez, 81 F.3d 891 (9th Cir. 1996) ...............................................18, 19

Overstock.com, Inc. v. Gradient Analytics, Inc., 151 Cal. App. 4th 688 (2007) .............40

Pellett v. Sonotone Corp., 26 Cal. 2d 705, 711 (1945) ....................................................16

PIC Design Corp. v. Sterling Precision Corp., 231 F. Supp. 106 (S.D.N.Y. 1964) ..........26

Peer International Corp. v. Pausa Records, Inc., 909 F.2d 1332 (9th Cir. 1990) .............24

Puentes v. Wells Fargo Home Mortg., Inc., 160 Cal. App. 4th 638 (2008) .....................37

Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal. 4th 26 (1998)........................39, 40

Rotec Industrial, Inc. v. Mitsubishi Corp., 215 F.3d 1246 (Fed. Cir. 2000)....................15

Roth Greeting Cards v. United Card Co., 429 F.2d 1106 (9th Cir. 1970) ........................31

San Diego Hospice v. County of San Diego, 31 Cal. App. 4th 1048 (Cal. App. 4th 1995) .........................................................................................................................15

Security People v. Medeco, 59 F. Supp. 2d 1040 (N.D. Cal. 1999) ...........................20, 21

See also ETS-HOKIN v. Skyy Spirits Inc., 323 F.3d 763 (9th Cir. 2003) .......................30

Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115 (9th Cir. 1999)..............22, 23

Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137 (9th Cir. 2008).............24, 37, 38

Titan Corp. v. Aetna Casualty & Surety Co., 22 Cal. App. 4th 457 (1994) .....................20

U.S. v. Hamilton, 583 F.2d 448 (9th Cir. 1978) ...............................................................27

Winet v. Price, 4 Cal. App. 4th 1159 (Cal. App. 4th 1992)..................................16, 17, 19

Worth v. Selchow & Righter Co., 827 F.2d 569 (9th Cir. 1987)......................................30

## STATUTES

37 C.F.R. § 202.1 (West 2007) ........................................................................................26

17 U.S.C. § 101 (2005) ....................................................................................................32

17 U.S.C. § 301(a) (1998) ................................................................................................38

Cal. Civ. Code § 1638 ......................................................................................................35

Cal. Civ. Code § 1641 ......................................................................................................20

California Civil Code section 1542....................................................................................16

FED. R. CIV. P. 56(c)...................................................................................................14, 15

Professional Code, § 17200 et seq ...................................................................................36

1

## POINTS AND AUTHORITIES

2

### I.   Statement Of Relief

3       Roger H. Wang, M.D. has sued The StayWell Company ("StayWell"), for various
4  causes of action based on alleged misuse of Dr. Wang's alleged copyrighted material.
5  Those claims are (a) copyright infringement, (b) breach of a non-exclusive license, (c)
6  intentional interference with contract, (d) intentional interference with prospective
7  business advantage, and (e) unfair competition.  All of Dr. Wang's claims fail as a matter
8  of law because Dr. Wang admits that his claims in this suit are the same claims he
9  brought against StayWell's predecessor, FastMark, Inc. ("FastMark"), in a 2003 lawsuit
10  that were the subject of a Settlement Agreement and Mutual Release executed on
11  October 31, 2003.  As consideration for the settlement, Dr. Wang was also required to
12  dismiss the 2003 lawsuit with prejudice and, for that reason, is also barred from suing
13  on those same claims today.

14       Additionally, Dr. Wang's claims each *separately* fail as a matter of law for reasons
15  independent of the general release and dismissal with prejudice.  There are no genuine
16  issues of material fact and StayWell is entitled to judgment as a matter of law because
17  each of the causes of action asserted are legally deficient for one or more of the
18  following reasons:

19       1.   Copyright infringement.  The copyright infringement claims fail because
20           (a) Dr. Wang granted FastMark and then StayWell a nonexclusive license to
21           use his copyrighted material.  Under Ninth Circuit authority, a plaintiff who
22           grants a licensee a non-exclusive license waives his right to bring a
23           copyright infringement claim against the licensee for use of the copyrighted
24           material.  (b) The formatting options that Dr. Wang identified as the subject
25           of his copyright – such as the use of columns, indents, alphabetical listings,
26           bold headings, use of tables, abbreviations, symbols and acronyms, and

27

28

other standard formatting elements[1]—are not copyrightable because they are not creative expression but functional and inevitable and part of the ICD-9 classification and coding system that is in the public domain. (c) Even if these formatting options are copyrightable, the copyright is "thin" and Dr. Wang cannot meet the legal standard to establish infringement of a "thin" copyright because he has admitted that the products at issue are not virtually identical.

2. <u>Breach of non-exclusive license.</u>   This cause of action fails because StayWell did not use Dr. Wang's copyrighted material, which is defined in the non-exclusive license agreement to mean his selection of government ICD-9 codes.   It is undisputed that after acquiring FastMark, StayWell hired its own independent medical coders to select the ICD-9 codes used by StayWell in its coder products.   Because it is undisputed that StayWell did not use Dr. Wang's ICD-9 code selections (and because formatting options, as a matter of law, are not copyrightable), StayWell's product sales are not subject to the non-exclusive license agreement, and therefore, cannot be in breach of the License Agreement.

3. <u>Intentional interference with contract</u>.  This cause of action fails because Dr. Wang admits that he did not have a contract with AstraZeneca, which Dr. Wang identified as the contract with which StayWell allegedly interfered.  Because Dr. Wang cannot establish an essential element of the claim, this cause of action fails.

4. <u>Interference with prospective business advantage.</u>   This cause of action fails because Dr. Wang admits that the only wrongdoing on which he bases this claim for relief is StayWell's alleged breach of the non-exclusive

---

[1] These are listed in Dr. Wang's answers to StayWell's interrogatories. *See* Declaration of Chad A. Stegeman in Support of StayWell's Motion for Summary Judgment ("Stegeman Decl."), Ex. N.

license agreement, and the law does not permit a plaintiff to rely on a breach of contract to sue in tort.  Because Dr. Wang cannot establish this essential element of the claim, this cause of action fails.

5.   <u>Unfair competition.</u>  This cause of action fails because a breach of contract cannot be the basis of an unfair competition claim.  Nor can Dr. Wang base his unfair competition claim on alleged copyright infringement because his alleged copyright infringement claim either is precluded by the non-exclusive license agreement or, if the copyright claim is not dismissed, the Copyright Act preempts the unfair competition claim.

StayWell also seeks its attorneys' fees pursuant to its claim for declaratory relief and under the nonexclusive license and Settlement Agreement.  Because Dr. Wang's claims fail as set forth above, StayWell is entitled to judgment awarding its reasonable and necessary attorneys' fees incurred to defend these claims.

## II.   Facts

As required by Local Rule 56-1, StayWell separately submits a Proposed Statement of Uncontroverted Facts and Conclusions of Law Statement, which sets forth all undisputed material facts relevant to the dispute between the parties.  For the Court's convenience, StayWell summarizes those facts below.

### A.   Quick Reference Coding Guides At Issue Derive From The Government ICD-9-CM Classification and Coding System.

ICD-9-CM (sometimes referred to as ICD-9) stands for INTERNATIONAL CLASSIFICATION OF DISEASES, NINTH REVISION, CLINICAL MODIFICATION.  ICD-9 is the official classification and coding system in the United States for assigning numeric codes to disease, diagnoses, and procedures associated with medical treatment and hospital utilization.  The purpose of this coding system is to transform descriptions of medical conditions from words into numerical designations (the ICD-9 code) to facilitate payment of health services, to evaluate utilization patterns, and to study health care trends and costs.  Coding provides the basis for epidemiological studies and

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

research into the quality of health care.   Incorrect or inaccurate coding can lead to investigations of fraud and abuse.   Therefore, coding must be correct and consistent to produce meaningful statistics.   All official ICD-9 codes, descriptions of how the classification and coding system is designed, and guidelines for using the codes were created by the U.S. government, which also maintains and updates the codes annually.

The ICD-9 coding system used by physicians in a non-hospital setting is published in a two-volume set.   Volume 1 contains a numeric list of all ICD-9 codes arranged in multiple columns.   The numeric codes are followed by the diagnosis or diseases to which they relate.   Volume 2 contains an alphabetical list of all the diagnoses and diseases arranged in multiple columns, followed by the numeric codes assigned to them.   To demonstrate the relationship between main terms, sub-terms, groups and sub-groups, ICD-9 uses an indented format with main terms appearing in bold.   Undisputed Fact ("UF") No. 1.   Medical professionals are taught to identify the patient's condition in the alphabetical listing first (Volume 1) and then go to the numeric listing of codes in Volume 2 to code to the highest degree of certainty about a patient's condition.   The ICD-9 classification and coding system is in the public domain.   UF No. 2.

ICD-9 codes cover virtually every medical condition, potential diagnosis, and procedure.   Most practitioners, however, use only a small subset of the codes that relate to their particular medical specialty.   For that reason, a number of companies, including the American Medical Association, sell quick reference coding guides that derive from the ICD-9 coding system.   UF No. 3.   These coding guides contain a small subset of ICD-9 codes that relate to or are most often used in a particular medical specialty, such as cardiology, pediatrics, and neurology, for example.   Certified coders[2] select from the unabridged encyclopedia of ICD-9 codes the diagnostic and disease entries and the associated codes that are most often used in a particular field.   This relatively small

---

[2] A Certified Professional Coder® (CPC®) is "an individual of high professional integrity who has passed a medical coding certification examination sponsored by the American Academy of Professional Coders (AAPC)."   UF No. 4.

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

selection of entries is then presented in a convenient format (a pocket-size or letter-size laminated card, for example) and arranged in the format and following the guidelines and other conventions laid out in the ICD-9 coding and classification system itself.

Dr. Wang and StayWell also sell quick reference coding codes, as did StayWell's predecessor, FastMark.  Rapid Coder is the name of Dr. Wang's coding guides. FastMark named its coding guides QuickCoders.  After StayWell acquired FastMark, StayWell renamed FastMark's coding guides SmartCoder and ExpressCoder.  These quick reference guides that contain excerpts of the ICD-9 classification and coding system are the subject of this suit.

**B.     The Non-Exclusive License Agreement Between Dr. Wang and FastMark**

This dispute originates in the non-exclusive license signed by Dr. Wang and FastMark in March 2000, which was renewed and amended the following year (referred to collectively as the "License Agreement").  UF Nos. 5, 6.  Dr. Wang agreed to license to FastMark the non-exclusive right to use his copyrighted material and his trademark Rapid Coder to produce, market, distribute, and sell quick reference coding guides in a patented folding laminated design owned by FastMark.  UF No. 7.

The License Agreement defined Copyrighted Material to mean Dr. Wang's copyrighted "compilations of 'ICD-9 codes' used by the U.S. Government for reimbursement of doctors under government programs (the "Copyrighted Material")." UF No. 8.  The "Guides" that FastMark was permitted to produce and sell is also a defined term and means the Copyrighted Material used in FastMark's patented folding laminated format.  UF No. 9.

The License Agreement was for a 5-year term and automatically renewed for successive one-year periods unless terminated by either party.  UF No. 10.  To date, neither party has terminated the License Agreement and Dr. Wang contends that it is still in effect and covers the claims he makes today.  UF No. 11.

Because the License Agreement was non-exclusive, both Dr. Wang and FastMark remained competitors during the term of the license. UF No. 12. Dr. Wang could and did sell his Rapid Coders during the term of the License Agreement in competition with FastMark. In the 2001 amendment to the license, the parties agreed that FastMark did not have to use Dr. Wang's Rapid Coder trademark, but that FastMark could produce and sell quick reference coding guides using its own trademark, QuickCoder. UF No. 13. Similarly, the License Agreement did not prevent FastMark from developing its own compilations of ICD-9 codes and producing its own quick reference coding guides but it could not use the Rapid Coder trademark. UF No. 14.

The License Agreement also restricted Dr. Wang from using FastMark's confidential sales and customer information for his own benefit and restricted FastMark from selling "Guides" (as defined by the License Agreement) to Dr. Wang's two pharmaceutical clients, namely AstraZeneca and Procter & Gamble. UF Nos. 15, 16.

**C.    The Agreed Judgment and Permanent Injunction Against Dr. Wang For His Misuse of FastMark's Proprietary Customer Information**

In December 2001, FastMark filed suit against Dr. Wang for misusing its confidential information in violation of the License Agreement. UF No. 17. In January 2002, Dr. Wang stipulated to a judgment and a permanent injunction against him in Case No. CV 802915, styled *FastMark, Inc. v. Roger H. Wang, M.D.*, in the Superior Court of California, County of Santa Clara (Judgment entered January 23, 2002). UF No. 18. In the Agreed Judgment, Dr. Wang admitted that he "solicited FastMark's customers, and apparently used FastMark's Confidential Information to do so" and affirmed "his obligation not to misuse FastMark's Confidential Information." UF No. 19. As a consequence of his breach, Dr. Wang agreed never to sell coder products of any nature whatsoever to nine of FastMark's pharmaceutical customers. UF No. 20. [3]

---

[3] The Injunction also states that Dr. Wang is "permanently restrained and enjoined from . . . selling any product, in any format, which competes with FastMark's coding guides for ICD-9 codes and follow on coding systems . . . to the FastMark coding guide customers identified in the list attached as Exhibit A." UF No. 21.

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

SACV06-813 JVS (JTLx)

### D.     FastMark Begins Creating Its Own Code Compilations

After entry of the Agreed Judgment and Permanent Injunction against Dr. Wang, FastMark hired independent coders to develop FastMark's own code compilations.  UF No. 22.   In around 2002, FastMark began producing quick reference coding guides using its own ICD-9 codes under its QuickCoder trademark.  UN No. 23.  As a result, in 2002 and continuing into 2003, Dr. Wang saw his royalty revenue stream begin to decline as FastMark gradually transitioned from the use of Dr. Wang's Copyrighted Material.  UF No. 24.  For the Guides FastMark produced and sold using Dr. Wang's code compilations, FastMark continued to pay royalties to Dr. Wang, and those products carried the notice of Dr. Wang's copyright, as required by section 7 of the License Agreement.  UF No. 25.  For the QuickCoder products that FastMark independently created, however, FastMark either used independent coders under independent contractor agreements or entered into license agreements with third parties for the use of their ICD-9 code compilations.  UF No. 26.  The QuickCoder products that FastMark developed without Dr. Wang's codes did not carry Dr. Wang's copyright notice because they did not use Dr. Wang's Copyrighted Material.  UF No. 27.  Likewise, FastMark did not pay Dr. Wang royalties for these products because they did not come within the License Agreement.  UF No. 28.

### E.     Dr. Wang's 2003 Lawsuit Against FastMark

In 2003, Dr. Wang discovered that FastMark was selling its own QuickCoder guides that looked similar to his own but did not contain Dr. Wang's copyright notice.  UF No. 29.  On July 21, 2003, Dr. Wang sued FastMark and its principal, Howard Wolf, in the United States District Court for the Central District of California, Case Number SACV 03-1153 (CJC) (the "2003 Lawsuit").  UF No. 30.  In that lawsuit,  Dr. Wang alleged that FastMark had infringed his compilation copyright in his ICD-9 code selections provided to FastMark under the License Agreement, among other claims.  UF No. 31.  Dr. Wang also alleged that FastMark's QuickCoder products looked like his

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1    Rapid Coder products and that the similar format caused a substantial likelihood of

2    confusion in the marketplace.  UF No. 32.

3          FastMark denied the claims and moved to dismiss the case on various grounds.

4    UF No. 33.  FastMark took the position that it had independently created its QuickCoder

5    products by hiring professional coders to make its ICD-9 codes selections, and those

6    coders did so without use or reliance on Dr. Wang's or anyone else's selection of ICD-9

7    codes, as required under their independent development contracts.   UF No. 34.

8    FastMark advised Dr. Wang that FastMark owned its independently created coder

9    products  and intended to continue selling QuickCoders free and clear of Dr. Wang's

10   copyright claims.  UF No. 35.

11   ### F.      StayWell's Purchase of FastMark

12         Around mid-2003 (the same time of Dr. Wang's lawsuit against FastMark),

13   StayWell began a due diligence investigation of FastMark in connection with its

14   purchase of FastMark and FastMark's line of quick reference coding guides.  UF No.

15   36.  During the due diligence, StayWell learned of Dr. Wang's lawsuit and the claims

16   that FastMark's QuickCoder products infringed Dr. Wang's copyright, breached the

17   License Agreement and violated Dr. Wang's trademark in Rapid Coder.  UF No. 37.

18         StayWell informed FastMark that it could not go forward with its purchase if

19   FastMark's principal asset, QuickCoder, was in doubt.  UF No. 38.  StayWell suggested

20   that FastMark resolve the lawsuit with Dr. Wang.  UF No. 39.  StayWell also requested

21   that FastMark deliver clear title to FastMark's QuickCoder products unencumbered by

22   Dr. Wang's claims, or it could not close the transaction.  UF No. 40 ("[StayWell] would

23   not have done the acquisition if we were not confident that the codes that we were

24   buying as a part of the acquisition were indeed FastMark's codes.  To us it's part of the

25   value of what you're buying is intellectual property in a business.  And if that was a big

26   concern . . . we would not have bought the business.").

27

28

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## G.   The Settlement Agreement and Mutual Release Between FastMark and Dr. Wang

On October 31, 2003, FastMark completed settlement negotiations with Dr. Wang and delivered to StayWell a Settlement Agreement and Mutual Release ("Settlement Agreement") resolving the 2003 lawsuit and the claims against the QuickCoder product line.  UF No. 41.  Dr. Wang accepted a cash payment of $215,000, in exchange for dismissing the lawsuit with prejudice and a broad general release of any and all claims against FastMark and its successors and assigns that relate to QuickCoder, the license agreement, and the lawsuit.  UF No. 42.  FastMark also secured rights under the license agreement in case StayWell wanted to license Dr. Wang's codes and pay him a royalty. StayWell did not participate in drafting or negotiating the settlement.  UF No. 43. Even before execution of the Settlement Agreement, Dr. Wang knew that FastMark was developing and selling its own coder products, and that FastMark intended to continue selling its own coder products after the parties executed the Settlement Agreement.  UF No. 44.

The General Release of Claims, at Section 3 of the Settlement Agreement, grants a two-part release.  Section (i) releases FastMark and its principal from all claims of any nature whatsoever without limitation.  UF No. 45.  Section (ii) releases FastMark's successors and assigns from all claims of any nature whatsoever relating to the circumstances giving rise to or connected with the 2003 lawsuit or arising out of or relating to the License Agreement.  UF No. 46.  The General Release provides:

> Wang…hereby releases and forever discharges (i) FastMark, Inc. and Wolf, from any and all claims demands obligations, losses, causes of action, costs, expenses, attorneys' fees and liabilities of any nature whatsoever, whether based on contract, tort, statutory or other legal or equitable theory of recovery, and whether known or unknown which Wang, had or claims to have against FastMark, Inc. and or Wolf; and (ii) FastMark, Inc.'s…successors and assigns (the "Released Parties") from any and all

1    <u>claims</u>, demands, obligations, losses, causes of action, costs, expenses,

2    attorneys' fees and liabilities <u>of any nature whatsoever</u>, arising out of or

3    <u>relating to the circumstances giving rise to or connected with the Action</u> or

4    arising out of or <u>relating to the non-exclusive license</u> between FastMark, Inc.

5    and Wang, whether based on contract, tort, statutory or other legal or

6    equitable theory of recovery, <u>whether known or unknown</u> which <u>Wang has,</u>

7    <u>had, or claims to have</u> against the Released Parties.  UF No. 47  (emphasis

8    added).

9        In paragraph 4 of the Settlement Agreement, Dr. Wang specifically acknowledged

10    on advice of counsel that he was familiar with the provisions of Section 1542 of the

11    California Civil Code and "knowingly waives and relinquishes any and all rights which

12    he has under the provisions of Section 1542, as well as any other similar statute or

13    common law principle."  UF No. 48.  Section 1542 provides:

14        A general release does not extend to claims which the creditor does not

15        know or suspect to exist in his favor at the time of executing the release,

16        which if known by him must have materially affected his settlement with the

17        debtor.   UF No. 49.

18        In the Recitals of the Settlement Agreement, the parties affirmed that "FastMark

19    and Wolf <u>denied the infringement claims and unfair competition claims</u> alleged in the

20    [2003 lawsuit]" but that "[t]he parties deem such settlement to be in their respective best

21    interests in light of the expense of litigation <u>and in order to put to rest all claims by or</u>

22    <u>between them</u>."   UF No. 50 (emphasis added).   In paragraph 5 of the Settlement

23    Agreement, the parties reiterated that the Settlement Agreement "is a compromise

24    settlement, and that the sums and covenants given in consideration of this Agreement, as

25    well as the execution of this Agreement, <u>shall not be construed to be an admission of</u>

26    <u>liability</u> on the part of any party <u>with respect to the disputed matters set forth above</u>."

27    UF No. 51 (emphasis added).

28

As consideration for the Settlement Agreement, FastMark agreed to pay Dr. Wang two payments of $125,000 and $90,000, on November 15, 2003 and November 15, 2004, respectively, as prepaid royalties *should* FastMark use "Wang's Copyrighted Material (as defined in the FastMark, Inc./Wang nonexclusive license agreement)" in 2004 and 2005 and regardless of whether FastMark actually *did* use Dr. Wang's codes. UF No. 52.

If FastMark did use Dr. Wang's Copyrighted Material, the Settlement Agreement sets forth a mechanism for reporting sales and reconciling the amount of royalties owed in excess of the prepaid royalties.  UF No. 53.  Section 1(d) provides:

> Within thirty(30) days following the end of year 2004 and 2005, respectively, FastMark, Inc. shall provide a certificate signed by its chief financial officer certifying the Gross Invoices Sales for the preceding year (the Report of Sales).  In the event the Report of Sales indicates that amount of royalties due, with rates defined in the non-exclusive license agreement, including any amendment thereto, are in excess of the minimum royalties stated hereinabove, the payment of such excess royalties shall be due and payable on the date of, and be accompanied by, the Report of Sales.  UF No. 54.

Because there had been no use of Dr. Wang's Copyrighted Material since the Settlement Agreement in 2003 (and to this day), Dr. Wang did not request nor have there been any sales reports exchanged or royalty payments made to Dr. Wang, even though Dr. Wang now contends that StayWell uses his Copyrighted Material in sales of FastMark's coder products.  UF No. 55.  StayWell has never made any requests for Dr. Wang's codes under the License Agreement.  UF No. 56.  Likewise, Dr. Wang has made no attempt to enforce the License Agreement against StayWell or to collect royalties, even though Dr. Wang now claims that all of StayWell's coder products infringe his copyrights.  UF No. 57.

11

1    There are no provisions of the Settlement Agreement that limit FastMark's ability

2    to sell its independently created QuickCoder products, which were at issue in the 2003

3    Lawsuit.  UF No. 58.  There is also no temporal limitation in the Settlement Agreement

4    that limits the release of claims to only those claims in existence through the date of the

5    Settlement Agreement.  UF No. 59.  Dr. Wang takes the position today that he only

6    released claims against FastMark through October 31, 2003, the date of the Settlement

7    Agreement, and that after entering into the Settlement Agreement, FastMark lost its

8    right to sell its QuickCoder product line and that the Settlement Agreement gives him

9    the same rights as if he had adjudicated the 2003 lawsuit to a successful conclusion and

10   defeated FastMark's claim to own its independently created QuickCoder product line.

11   UF Nos. 60, 61, 62.

12       **H.    StayWell's Sales of FastMark's QuickCoder Products After the**

13             **Settlement Agreement**

14       In January 2004, shortly after the Settlement Agreement was executed, StayWell

15   paid a total of $2,485,000 to acquire FastMark and FastMark's line of ICD-9 coding

16   guides, known as QuickCoders.  UF No. 63.  StayWell continued selling FastMark's

17   coders, now named SmartCoder and ExpressCoder, to FastMark's clients and StayWell's

18   own.  UF No. 64.  StayWell continued FastMark's independent development of the ICD-

19   9 codes to distance itself from the claims Dr. Wang asserted in the 2003 lawsuit.  UF

20   No. 65 ("After the Settlement Agreement, we [StayWell] were even more concerned

21   with having any use of Dr. Wang's products going forward.  We just wanted to get away

22   from it completely.").  StayWell fulfilled FastMark's pending contracts by providing

23   FastMark's customers with the QuickCoders that used FastMark's own ICD-9 codes.

24   UF No. 66.  Since purchasing FastMark, StayWell—like FastMark before it—hired its

25   own independent coders to select and update the ICD-9 codes for the coder products

26   purchased from FastMark.  UF No. 67.

27       StayWell continued to use the same product format that FastMark had used, since

28   these features and FastMark's product brand was an asset that StayWell purchased from

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1   FastMark.  UF No. 68.  Dr. Wang admits that these formatting features—what Dr. Wang
2   calls his copyrighted "presentation style"—were part of the claims he sued on in the
3   2003 lawsuit.  UF No. 69.  ("The presentation style of Rapid Coder, is [] where you
4   have your disagreement with The StayWell Company in its use of your copyrighted
5   material?  A:  Correct.  Q:  And it was [] that presentation style that you were also
6   alleging was misused by FastMark in the 2003 lawsuit, correct?  A:  Correct.").

7          Since acquiring FastMark in 2003, StayWell has sold thousands of the quick
8   reference coding guides purchased from FastMark.  Over the years since StayWell's
9   purchase of FastMark, StayWell has not made any requests for Dr. Wang's codes under
10  the License Agreement.  UF No. 56.  Similarly, Dr. Wang has made no attempt to
11  enforce the License Agreement against StayWell or to collect royalties, even though Dr.
12  Wang now claims that all of StayWell's coder products infringe his copyrights and that
13  he is entitled to more than $15 million in damages.  UF No. 57.

14  **I.    Dr. Wang Admits That The Current Lawsuit Is Based On The Same**
15          **Causes of Action He Sued On In 2003**

16          Dr. Wang filed this lawsuit against StayWell in August 2006, making the same
17  claims against StayWell that he made against FastMark and its coder products back in
18  2003. UF Nos. 70, 71.  Dr. Wang testified that he never notified StayWell of his belief
19  that it was infringing his copyrights in selling FastMark's products and that he waited as
20  long as he did to sue StayWell to make sure that StayWell had amassed sufficient sales
21  and profits to make his suit worthwhile.  UF No. 72.

22          Dr. Wang admits without equivocation that the claims he is suing StayWell for
23  today are the same claims that he released in 2003.  UF No. 71  ("Q: So you are making
24  a claim that the products that StayWell is marketing are substantially similar to your
25  products? A:   Correct.  Q:  And you made that claim in 2003 that the Quick Coder
26  product was substantially similar to your product? A: Correct.").  Dr. Wang argues,
27  however, that the general release was only effective through October 31, 2003, the date
28

of the release, and that he was free to sue on the released claims beginning on November 1, 2003, the day after the release and at any time thereafter.  UF No. 60.

Dr. Wang has admitted that the Settlement Agreement does not contain any language that supports his understanding.  UF Nos. 72, 75 (Q: "Where in this agreement does it say that [FastMark] can't continue marketing the products that they claim to have independently developed?  A: The settlement doesn't say that."); ("I think in this settlement agreement there is no specific clause addressing the issue whether FastMark can continue to market their own version.  It doesn't say that, as far as I can see.").

Dr. Wang now contends that his "expectation" of the Settlement Agreement was that FastMark "had no products to market other than starting all over again and developing something that [Dr. Wang] approved of."  UF No. 73.  Dr. Wang understands that he "never got a resolution of [his] claim that what [FastMark] had developed infringed."  UF No. 74.  According to Dr. Wang, the Settlement Agreement "is as good as if [Dr. Wang] had tried the lawsuit to conclusion, and got a finding that [FastMark's] independently-developed products infringed."  UF No. 62.

## III.    Analysis And Authorities

### A.    Standard of Review

Summary judgment is appropriate when no genuine dispute of material fact exists.  FED. R. CIV. P. 56(c).  Once the moving party has satisfied its threshold burden of demonstrating the absence of a genuine issue of material fact for trial, the burden shifts to the opposing party, who must then introduce evidence of specific facts proving that there remains a genuine material issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)(2).  The opposing party may not rely on mere allegations or denials of the adverse party's pleadings.  FED. R. CIV. P.. 56(e)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Moreover, the opposing party's burden to demonstrate a genuine issue of material fact increases when the factual context renders the plaintiff's asserted claim or defense implausible.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

1    (1986).    When the nonmoving party fails to make a showing sufficient to establish

2    evidence of an element essential to its case, the complete failure of proof concerning the

3    essential element necessarily renders all other facts immaterial and a summary judgment

4    is warranted.   *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1250 (Fed. Cir.

5    2000).

6          **B.    The Settlement Agreement Extinguishes All Claims Asserted In This**

7          **Case.**

8          "This case again presents the question: When is a comprehensive release

9    enforceable?"  *San Diego Hospice v. County of San Diego*, 31 Cal.App.4th 1048, 1050

10   (1995).  Courts face this question frequently because litigants who come to the

11   settlement table, eat their share in settlement proceeds, often return to the courtroom to

12   try for a second helping.  This case presents a similar situation.  Dr. Wang brought suit

13   against StayWell's predecessor for copyright infringement and was paid to settle claims

14   he brought or could have brought against FastMark and its coder products and was also

15   required to dismiss his lawsuit with prejudice.   His claims are now extinguished and

16   FastMark (and StayWell) have bought their peace from further litigation.

17         The broad general release in the Settlement Agreement resolves this case.

18   Settlement Agreement at ¶ 3.  Dr. Wang waived all claims "whether known or unknown

19   which Wang had, or claims to have against" the released parties  pertaining to the prior

20   lawsuit, the License Agreement, and FastMark's allegedly infringing coder products.  *Id.*

21   This Court should hold Dr. Wang to his bargain and bar his current plea for the same

22   alleged wrong.  *See McCray v. Casual Corner, Inc.*, 812 F. Supp. 1046, 1048 (C.D. Cal.

23   1992) ("A release is an abandonment of a claim that might otherwise be enforced; it

24   constitutes a defense to the assertion of a claim.").

25         **1.    The law favors general releases.**

26         The release contained in the Settlement Agreement that Dr. Wang signed is a

27   broad general release.  The California Supreme Court has defined a release as the

28   "abandonment, relinquishment or giving up of a right or claim to the person against

6233182                                    15

whom it might have been demanded or enforced ... and its effect is to extinguish the cause of action" *Pellett v. Sonotone Corp.*, 26 Cal. 2d 705, 711 (1945).  The law favors general releases as a means by which litigants can buy peace without resort to final adjudication of a dispute in a court of law.  *See, e.g., Dinesol Bldg. Prod., Ltd. v. Tapco Int'l Inc.*, 201 Fed. Appx. 764, 767 (Fed. Cir. 2006) ("Settlement agreements, like consent judgments, reflect an agreement by hostile litigants on more than just contract terms; they reflect a <u>compromise of contested legal positions</u> <u>in matters that are the subject of litigation</u>.") (internal citations and quotations omitted) (emphasis added).  Indeed, one can only imagine the burden on limited court resources if courts could not enforce releases contained in settlement agreements.

The law recognizes that general releases must be enforced in order to allow parties to buy final peace.  As one California appellate court explained:

> Those engaged in contract law are in great need of the availability of iron-clad and enforceable general releases…Our decision to uphold the release and enforce it in accord with its literal terms is in harmony, we believe, with a beneficial principle of contract law: that general releases *can* be constructed as to be completely enforceable.

*Winet v. Price*, 4 Cal. App. 4th 1159, 1173 (1992) (emphasis in original).[4]  Here, Dr. Wang executed just such an ironclad and enforceable general release.

Dr. Wang argues nonetheless that FastMark, and its successor, StayWell, are not entitled to the purchased peace.  Rather, Dr. Wang interprets the Settlement Agreement to give him the equivalent of a final adjudication that FastMark in fact infringed his copyright and a permanent injunction enjoining FastMark from marketing its products without either paying a royalty or facing the prospects of a future infringement case.  UF Nos. 62, 73.  Such an interpretation is contrary to law and the express terms of the Settlement Agreement and renders meaningless the law of general releases.

---

[4] One caveat to the enforcement of general releases is inapplicable in this instance.  Specifically, California Civil Code section 1542 does not allow a person to release claims of which he was unaware.  Here, Dr. Wang expressly waived the protection of section 1542 and similar laws, and his waiver is enforceable.  *Winet*, 4 Cal. App. 4th at 1168.

2. __The current claims fall within the scope of the Settlement Agreement and are released.__

It is undisputed in this summary judgment record that the claims in this lawsuit fall within the scope of the release. Dr. Wang admits that the claims he has asserted against StayWell in the present case are the same claims he asserted in the 2003 lawsuit against FastMark. UF No. 71. The Settlement Agreement language is clear and unambiguous and confirms the parties' mutual intent to compromise—rather than resolve in court—their contested legal positions. FastMark denied the infringement claim but paid Dr. Wang a substantial sum nonetheless. In return, Dr. Wang abandoned his claims against FastMark and its coder products and released FastMark and its successors and affiliates from any and all claims:

(1) arising out of or relating to the circumstances giving rise to or connected with the previous lawsuit; or

(2) arising out of or relating to the License Agreement.

California courts interpret a settlement release pursuant to the principles of contract law. *See Howard v. America Online Inc.*, 208 F.3d 741, 747 (9th Cir. 2000). Accordingly, this Court must look to the contract language to determine and give effect to the parties' intentions. *Winet*, 4 Cal. App. 4th at 1166. The express terms of the agreement contradicts Dr. Wang's interpretation of the release and must be rejected. Parole evidence of intent is only admissible "to prove a meaning to which the language is reasonably susceptible." *Id.* at 1167 (internal quotations omitted).

There is no construction of the Settlement Agreement that supports Dr. Wang's current position that he did not release all claims that he asserted or could have asserted in the previous lawsuit, including his claim that the format of FastMark's coder products and their similarity to his own products infringe his compilation copyright. Dr. Wang admits that he was aware of these claims against FastMark and its products when he filed the 2003 lawsuit and also admits that he is making the same claims against StayWell today. UF Nos. 32, 71.

17

1    Dr. Wang contends, however, that because the claims against StayWell arise after

2    execution of the Settlement Agreement, the claims are not released.  UF No. 60.  Dr.

3    Wang interprets the scope of the release as purely temporal in nature; that is, even

4    claims within the scope of the release are preserved if brought after the date of the

5    Settlement Agreement, although he admits there is no language in the contract that

6    imposes such a temporal limitation.  UF No. 75.  "[W]here one interpretation makes a

7    contract unreasonable or such that a prudent person would not normally contract under

8    such circumstances, but another interpretation equally consistent with the language

9    would make it reasonable, fair and just, the latter interpretation would apply." *Elte, Inc.*

10   *v. S. S. Mullen, Inc.,* 469 F.2d at 1131.  Thus, Dr. Wang's interpretation of the release

11   should be rejected and the release enforced as written.

12   Nevertheless, as to whether this general release covers claims brought after the

13   date of the Settlement Agreement, at least one California court has answered that

14   question.  The use "of the infinitive tense 'to have' fixes the action in the future."  *Fire*

15   *Insurance Exchange v. HAGD, Inc.*, No. F039989, 2003 WL 1521898 at *4 (Cal. App. 5

16   Dist. March 25, 2003).[5]  Here, the Settlement Agreement also uses the infinitive tense in

17   defining the release as all claims that "Wang has, had, or <u>claims to have</u>" against

18   FastMark and StayWell.  The use of the infinitive tense "to have" in the release before

19   this Court refers to claims then existing or arising after the date of the release and bars

20   the claims now asserted against StayWell.  *Id.*

21   But even without use of the infinitive "to have," the broad wording of the

22   Settlement Agreement releases  all claims that arise from or directly relate to the

23

24   [5]  While some federal courts show deference to the California state rule
     prohibiting citation of unpublished opinions, they are not required to do so.  *Cole v. Doe*
25   *1 Thru 2 Officers of the City of Emeryville Police Department*, 387 F. Supp. 2d 1084,
     1103 n.7 (N.D. Cal. 2005) ("California Rule of Court 977(a) prohibits citation or
26   reliance by a court of an unpublished California Court of Appeal decision.  However,
     the rule is not binding in the federal courts. . . .").  This Court may consider the
27   California court's analysis of a similar settlement agreement in *Fire Insurance Exchange*
     *v. HAGD, Inc.* for its persuasive reasoning.  *Id.* (citing *Ortiz-Sandoval v. Gomez*, 81 F.3d
28   891, 895 (9th Cir. 1996) that a court may consider an unpublished opinion even if it
     does not consider it to be decisional law).

1  previous dispute, no matter when they arise.  *Manzanarez v. Low*, No. A100947, 2004
2  WL 363325 (Cal. App. 1 Dist. Feb. 27, 2004).  In *Manzanarez*, the parties executed a
3  general release of known and unknown claims much like the release in the present case.
4  Like Dr. Wang, the plaintiff in *Manzanarez* argued that the release did not apply to
5  "future conduct."  *Id.* at *6.  Quoting *Winet v. Price*, the court looked to the contract
6  language to determine its meaning.  The court concluded that:

> As drafted and executed by the parties, the general release does not
> expressly address the impact of the parties' "future conduct" one way or the
> other.  In the absence of such express language, we must interpret the release
> simply as waiving all "dispute[s], claims and causes of action," "unknown ...
> or unforeseen," arising from "injuries, damages, losses or liability that may
> hereafter incur [ *sic* ] *from the above-described disputes.*"  In other words, <u>to
> the extent any "future conduct" of the parties arises from or is directly
> related to and connected with the underlying disputes of which the
> Settlement Agreement was the intended resolution</u>, the actionable *effect* of
> *such* future conduct on the parties' dispute has been <u>expressly waived</u>.

14  *Id.* at *6 (emphasis in original).  This case, too, argues forcefully for the same result.

15       A close reading of the Settlement Agreement further demonstrates that the parties
16  intended to extend the protection of the Settlement Agreement not only to FastMark, but
17  to protect FastMark's successors from all post-settlement claims.  Subpart (i) of the
18  General Release of Claims section of the Settlement Agreement states that Dr. Wang
19  forever discharges FastMark from "any and all claims." Subpart (ii) of the Release states
20  that Dr. Wang forever discharges FastMark's "successors and assigns" from "any and all
21  claims."  If post-settlement claims were not released by the Settlement Agreement, then
22  the language in subpart (ii), releasing FastMark's "successors and assigns," would be
23  meaningless because FastMark did not have any successors or assigns at the time of the
24  Settlement Agreement and, for that reason, could only apply to claims brought after the
25  date of the agreement.

26       To give effect to its terms, the Settlement Agreement means that all claims within
27  its scope are released, through the date of the settlement and beyond.  Cal. Civ. Code
28  § 1641 ("The whole of a contract is to be taken together, so as to give effect to every

part, if reasonably practicable, each clause helping to interpret the other."); *Elte Inc. v. S.S. Mullen, Inc.*, 469 F.2d 1127, 1131 (9th Cir. 1972) ("In *Purvis v. United States*, 344 F.2d 867, 870 (9th Cir. 1965) this court stated, inter alia, that writings should be interpreted and applied so that they may have effect rather than be destroyed."); *Titan Corp. v. Aetna Casualty & Surety Co.*, 22 Cal. App. 4th 457, 474, (1994) ("Importantly, we should interpret contractual language in a manner which gives force and effect to every clause rather than to one which renders clauses nugatory.")

*Security People v. Medeco*, 59 F. Supp. 2d 1040 (N.D. Cal. 1999) concerns a settlement agreement similar to the one before this Court.  In *Medeco*, plaintiff filed suit, the parties settled and entered into a release, and thereafter, plaintiff sued again on the same claims.  Like Dr. Wang, the *Medeco* plaintiff contended that the release "only covered claims involving the products at issue in the prior suit, and that this action is for acts of defendant subsequent to the release." *Security People v. Medeco*, 59 F. Supp. 2d at 1042.   The court evaluated the release, noting that "[t]he settlement agreement appears to refer to settling claims and causes of action, and not to settling disputes with respect to specific products." *Id.*   The court granted summary judgment because the claims at issue were "the same claims alleged in the prior lawsuit, even though regarding earlier products, and were released by the prior settlement agreement…." *Id.* at 1044. The same reasoning applies here.  Dr. Wang released all of his claims relating to the circumstances leading to the lawsuit, which includes, but is not limited to FastMark's allegedly infringing coder products, as well as claims arising under the License Agreement.  The claims that Dr. Wang asserts today have not changed.  UF Nos. 32, 69.   Therefore, Dr. Wang, like the plaintiff in *Medeco*, waived his claims and is barred from reasserting them here.

Courts routinely enforce agreements by alleged copyright owners releasing their claims for copyright infringement. *See Marder v. Lopez*, 450 F.3d 445, 451 (9th Cir. 2006) (holding that release executed by copyright owner in 1982 barred her claim of copyright infringement for the released party's use of her copyrighted material in a new

6233182

20

1   and different work in 2003); *Lee v. Internet Entertainment Group, Inc.*, 33 Fed. Appx.
2   886, 887 (9th Cir. 2002) (holding that release relating to copyrighted material covered
3   future sales, not just past sales); *Dinesol*, 201 Fed. Appx. at 767 (enforcing release of
4   patent infringement claim despite releaser's later claim that it had no knowledge of the
5   infringing sales).

6       *Marder v. Lopez* is a case strikingly similar to this case, both on the facts and the
7   specific language of the release at issue. There, the plaintiff and Paramount Pictures
8   entered into a general release, in which the plaintiff released "each and every claim"
9   arising from her contribution to the film *Flashdance*, including the claim of copyright
10  infringement. Years later, the entertainer Jennifer Lopez licensed the rights to
11  *Flashdance* from Paramount Pictures and produced a music video based on the film.
12  Plaintiff then sued Paramount Pictures for copyright infringement and argued, like Dr.
13  Wang, that "her claims [were] not precluded because the Release only applies to
14  'matters' occurring 'prior to the date of [the] Release.'"  *Marder*, 450 F.3d at 450-451.

15      The *Marder* court rejected plaintiff's theory and held that the general release
16  precluded her lawsuit. The fact that the lawsuit came after the date of the release did not
17  change the operation of the release to bar all claims within its scope, regardless of when
18  those claims were brought. The court held that the broad general release extinguished
19  plaintiff's copyright infringement claims against a new work incorporating her
20  copyrighted material. Similarly, Dr. Wang, like the plaintiff in *Marder*, cannot revive
21  claims on the basis that the Settlement Agreement does not cover claims brought after
22  the date of the release.

23      The summary judgment record is undisputed that the claims that Dr. Wang asserts
24  against StayWell today are the same claims he brought against FastMark in 2003, which
25  were the subject of the Settlement Agreement and a dismissal with prejudice. The law is
26  clear that the broad general release before the Court extinguishes Dr. Wang's claims and
27  serves to bar this suit. Accordingly, StayWell is entitled to final summary judgment
28  dismissing this case on the basis of the Settlement Agreement.

6233182

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

SACV06-813 JVS (JTLx)

C.      **The Copyright Claims Fail As A Matter of Law**

Irrespective of the Settlement Agreement that extinguishes all the claims asserted against StayWell, Dr. Wang's copyright infringement claims fail as a matter of law for three additional reasons.  First, a plaintiff who grants a licensee a non-exclusive license to use his allegedly copyrighted material waives his right to bring an infringement claim for the licensee's use of the copyrighted material.  Second, the formatting features that Dr. Wang claims to be his copyrighted material are not creative expression and are not copyrightable. Third, even if such formatting options are copyrightable, the copyright is "thin." Thin copyrights require a showing that the allegedly offending work is virtually identical to the copyrighted material, and Dr. Wang has admitted that his products and FastMark's products are not virtually identical.  Therefore, Dr. Wang cannot, as a matter of law, meet this higher legal standard, and his claim of infringement of a thin copyright must necessarily fail.

1.      **A non-exclusive license precludes copyright infringement claims against the licensee for use of the copyrighted material.**

In the Ninth Circuit, a plaintiff who grants a non-exclusive license waives his right to sue for copyright infringement for use of the licensed material.  *See Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1121* (9th Cir. 1999) ("copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement") (citation omitted).  In such cases, plaintiff's only recourse is to sue for breach of contract.  *Id.; see also Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) (If the licensee's allegedly improper conduct constitutes a breach of the license, then the licensor will have a cause of action for breach of contract, not copyright infringement).

The facts giving rise to this license defense are undisputed in the summary judgment record.  Dr. Wang granted a nonexclusive license to FastMark and then

StayWell as FastMark's successor[6] to use his Copyrighted Material.  UF No. 7.  It is undisputed that the License Agreement, which renews automatically, has not been terminated and is still in effect.  UF No. 11.

It is also undisputed that all of plaintiff's claims arise under the License Agreement.  Dr. Wang admits that his claims against StayWell arise from StayWell's use of his Copyrighted Material in violation of the License Agreement.  UF No. 77 ("The StayWell Company, in producing and marketing its products known as 'Smart Coder' and 'Express Coder,' used [his] copyrighted material as defined in the license agreement,"  and that "every product that was sold after the settlement agreement contained [his] copyrighted material.")  Dr. Wang admits that his claims against StayWell are for failing to pay him royalties under the License Agreement for sales of coder products that allegedly contain his Copyrighted Material.  UF No. 78 ("StayWell sold ICD-9 products in breach of the amended agreement in October 2005.  Also, subsequently after 12-31-2005 . . . in breach of the amended agreement while it was extended automatically and remained in force.").

Dr. Wang further admits that "the sales that occurred after StayWell's acquisition of FastMark are in violation of the license agreement," and that "those sales—because they incorporate the copyrighted material, as [Plaintiff] defined it, and as defined in the license agreement—those sales would be in breach of the license agreement, all sales." UF No. 78.  Thus, plaintiff admits that his claims against StayWell arise out of and are for breach of the License Agreement.  *Id.* ("every product that was sold after the settlement agreement contained [his] copyrighted material . . . [a]nd [he has] a claim for royalties for each of those products sold after the settlement agreement.").

Dr. Wang cannot sustain a claim for copyright infringement because the License Agreement authorizes StayWell's alleged use of the Copyrighted Material.  A plaintiff who has granted a non-exclusive license to a licensee waives the right to bring a

---

[6] In April 2004, Dr. Wang consented to the assignment of the License Agreement to StayWell.  UF No.  76.

copyright infringement claim against the licensee for alleged breaches of the license agreement. *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008) (disputes over payment of royalties "sound in contract law"); *see also Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 559 (9th Cir. 1990) (affirming dismissal of infringement claim after finding that the plaintiff had granted the defendant a license to use the copyrighted material and the parties' dispute was over unpaid royalties).

This case is similar to *Peer Intern. Corp.*, where plaintiff gave defendants a license to sell plaintiffs' copyrighted works and then alleged that defendants failed to pay royalties under the license. *Peer Int'l. Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1338-39 (9th Cir. 1990). The Ninth Circuit found that the license authorized the defendants' use of the copyright, and any use of the copyright by the defendant while the license was in effect "was not an act of infringement entitling the plaintiffs to statutory damages." *Id.* at 1339. Likewise, Dr. Wang's claims also derive from alleged use of the Copyrighted Material under the License Agreement. Ninth Circuit law dictates that a copyright plaintiff may not sue for alleged copyright infringement during the term of the license. As a result, the copyright infringement claims are precluded by the License Agreement and fail as a matter of law.

## 2. Formatting options are not copyrightable because they are mechanical, functional, and inevitable.

To prevail on any copyright infringement claim, the plaintiff must show (1) ownership of a valid copyright; and (2) copying of the original elements of the work by the defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (holding that neither format nor selection of white pages phone directory deserved copyright protection). The copyright infringement claims fail as a matter of law because formatting features (such as use of indents, columns, boldface type, tables, symbols, acronyms, alphabetical listing, etc.) are not copyrightable. Therefore, Dr. Wang cannot

1  establish ownership of a valid copyright – an essential element of his infringement

2  claim, and the infringement claims must be dismissed.[7]

3       In this case, Dr. Wang claims that StayWell copied the format and arrangement of

4  his coder products.  Notably, he does not allege that StayWell's selection of ICD-9 codes

5  violates his compilation copyright, but rather that StayWell's products, like FastMark's

6  before it, have a similar look.  Indeed, he bases his claim solely on alleged similarities in

7  (1) typesetting; (2) font style; (3) capitalization; (4) bold reverse ink headings; (5)

8  grouping and subgrouping; (6) style of abbreviation or acronym; (7) use of symbols; (8)

9  columnization (*sic*); (9) alphabetical order; (10) column alignment; (11) tabulation; and

10 (12) overall layout, setup, structure, and organization.  UF No. 80.

11      Formatting features lack the requisite originality to qualify for copyright

12 protection under the law.  To demonstrate sufficient creativity in the arrangement of a

13 factual compilation, the author must show independent thought and some "minimal

14 level of creativity" to gain protection.  *Feist*, 499 U.S. at 358.   But the arrangement may

15 not "be so mechanical or routine as to require no creativity whatsoever."  *Id.* at 362;

16 *Bellsouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 999 F.2d 1436, 1443-

17 1444 (11th Cir. 1993) (declining to extend copyright protection to column heading

18 structure of a classified business directory because it was dictated by functional

19 considerations and common industry practice).

20      In the landmark *Feist* decision, the Supreme Court found the arrangement of

21 names and telephone numbers alphabetically in a white pages directory to be

22 "practically inevitable" so as to lack the minimum standards needed for copyright

23 protection.  499 U.S. at 362-63.  Alphabetical listings, the Court determined, are "an

24

25      [7]The court in *Marder* held that a general release from a copyright owner will bar
26 an infringement claim for the additional reason that once the releasor releases his claim
   of ownership in the allegedly offending material, he cannot establish the essential
27 element of an infringement claim in a subsequent suit – namely, ownership of a valid
   copyright.  The same applies here.  Dr. Wang gave up his claim of ownership in the
28 format and content of FastMark's (and now StayWell's) coder products and his
   copyright infringement claims must likewise be dismissed.

age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course." *Id.* at 363.    Therefore, no infringement of the "arrangement" occurred when a different white pages listed the items in the same manner. *Id.*

Other federal courts have likewise held that functional arrangements and formats are not copyrightable. *Kregos v. Associated Press*, 937 F.2d 700, 709 (2d Cir. 1991) (no copyright protection for choice and arrangement of baseball pitching statistics; work was a "garden-variety" pitching form, with statistics <u>organized into "obvious" arrangement of columns and follows pattern of similar works</u>) (emphasis added); *PIC Design Corp. v. Sterling Precision Corp.*, 231 F. Supp 106, 111 (S.D.N.Y. 1964) (no copyright infringement of arrangement or format of component part catalogs consisting of tables and product drawings displaying information in similar manners; court held since "[t]here are a very <u>few ways of listing such information</u>. . . the general method used by both plaintiff and defendants is <u>logical and to be expected</u>") (emphasis added).

Moreover, federal regulations and the Copyright Office offer guidance on this issue by citing examples of works not subject to copyright protection.  37 C.F.R. § 202.1 (West 2007).  This list includes "[w]ords and short phrases such as…*titles*…[and] mere variations of typographic ornamentation, lettering, or *coloring*."  *Id.* (italics added).  Functional parts of a writing are not sufficiently creative or original to merit copyright protection.  Similarly, "[t]rivial elements of compilation and arrangement, of course, are not copyrightable since they fall below the threshold of originality."  *U.S. v. Hamilton*, 583 F.2d 448, 451 (9th Cir. 1978) (determining that potential copyright of a map does not include coloring, symbols, and key used in delineating boundaries of and locations within the territory depicted).  Trivial components include functional headings, colors, and formatting elements that serve as the configuration of the writing, rather than as creative content.

Dr. Wang admits that all of his formatting elements he seeks to copyright are functional and necessary, which place them beyond the reach of copyright protection. Dr. Wang admits that "all of the formatting elements that [he's] identified . . . to be [his] copyrighted material . . . all of those are intended to accomplish easy lookup of the ICD-9 codes." Wang Dep. 3, 201:23-202:9 (emphasis added). All of the design choices he made "accomplished the objective of organizing a large volume of information in a small space." Wang Dep. 3, 242:3-242:6 (emphasis added). The format of Rapid Coder is all but "inevitable," and allowing Dr. Wang to claim a copyright in the format would close off the medical coder market not only to StayWell, but to any subsequent producer. *See Black's Guide v. Mediaamerica, Inc.*, No. C-90-0819, 1990 WL 169141 at *5 (N.D. Cal. Aug. 15, 1990).

### 3. The formatting features used by Dr. Wang are mandated by the ICD-9 classification and coding system from which his coder products derive.

Here, the arrangement of ICD-9 codes in the coder products at issue are not only "logical" and "expected," but also mandated by the ICD-9 classification and coding *system* itself. For example, the set of categories used in the ICD-9 system are organized by anatomic body sites (e.g., appendix and heart), causes of disease (e.g., infection and tumors), or names of diseases. Within each category are multiple subcategories, organized and arranged using common formatting techniques to direct the coder from the most general identifier to the most specific description of the patient's condition. The highest degree of specificity is mandatory in assigning a code. The ICD-9 system contains detailed formatting conventions (use of bold, capitalization, and indentions, for example) to guide the coder through the hierarchy of information. UF No. 81. For example, the ICD-9 classification system states that "main terms" (a defined term) in the Alphabetic Index to Diseases are in bold print. Indented under the main term for the disease are "subterms," another defined term. UF No. 82. Nonessential modifiers are located directly after the main term in parentheses.

1    All coder products on the market are intended to make the ICD-9 codes more user

2    friendly by "collapsing" the large two volume alphabetic and numeric indexes into a

3    small handy reference guide, but retain the organizational construct and formatting

4    techniques of the ICD-9 coding system.  UF No. 83.  Dr. Wang, StayWell, and FastMark

5    select the codes that in their opinion are most frequently used in a particular medical

6    specialty, excerpt those entries from the official code books, and provide the selected

7    codes in a handy and easy-to-use laminated card.  For example, ICD-9 codes used by a

8    pediatrician are different from those used by a psychiatrist, which are different from

9    those used by a podiatrist.  However, presentation of these selected codes follow, as they

10    must, the formatting conventions of the ICD-9 classification system itself and are not

11    intended to replace the official ICD-9 classification system but to be an adjunct to it.  In

12    fact, Dr. Wang's products prominently display such a disclaimer, as do StayWell's

13    product.[8]

14    The formatting techniques used in the official code books and in the coder

15    products that derive from them, including Dr. Wang's, are logical, functional, and

16    inevitable in organizing a hierarchy of information and ensuring that the categories of

17    information can be accessed quickly and accurately.  UF No. 83.  If ICD-9 codes were

18    presented in any way other than as defined by the classification system, the quick

19    reference guides would have no purpose.  All publishers of coding guides present the

20    codes in virtually identical ways, following the official ICD-9 coding system.  UF No.

21    85.  As the Supreme Court in *Feist* stated, routine, standard format should not be the

22    basis for the requisite "creativity" or "originality" needed for copyright protection.

23    *Feist*, 499 U.S. at 362.  To the extent that the specific formatting features that Dr. Wang

24

25    _____

26    [8]For instance, Dr. Wang's Rapid Coder 2002 Pulmonolgy states:  "Refer to
official code books for complete definition and absolute accuracy."   StayWell's
ExpressCoder Cardiology 2005 states:  "ExpressCoder 2005 CARDIOLOGY is a quick
27    reference guide for finding ICD-9 codes. To ensure complete and accurate coding to the
highest degree of specificity, the most current version of ICD-9-CM should be
28    consulted."  UF No. 84.

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

uses are dictated by the ICD-9 classification system itself, Dr. Wang did not invent them, and he cannot now claim them as his own.

**4.**   **The merger doctrine precludes copyright protection for the formatting features used by Dr. Wang.**

Dr. Wang's material is not copyrightable for the additional reason that only the expression of an idea is copyrightable, and not the idea itself.  When, as here, the idea and the expression of the idea are inseparable and merged, copyright protection is unavailable.  This is known as the idea-expression merger doctrine.  *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir. 1984) (discussing similarities in presentation of Scrabble strategy book ideas). Because only a single method of expressing the idea exists, the merger doctrine precludes Dr. Wang's claim of infringement.

There are only a narrow range of options for presenting an excerpt of ICD-9 codes in a quick reference coding guide.  Were Dr. Wang permitted to deprive subsequent authors from using that narrow range of options, he effectively secures a monopoly over the coder product market.  If subsequent publishers were barred from using the narrow range of expression for the idea due to a prior author's work, the idea itself has been foreclosed by copyright.  It is not the intent of copyright protection to require a subsequent author to design around a previous work such that the resulting work becomes unusable for its intended purchasers.  *See Cooling Sys. and Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 492 (9th Cir. 1985) (reversed on other grounds). Here, the formatting features that Dr. Wang asserts as his copyrighted material are textbook examples of *scenes a faire* for medical coders (that is, forms of expression that are indispensable or standard in expressing the particular idea of medical coders). *See  Black's Guide, Inc.*, 1990 WL 169141 *5 (finding merger of idea and expression of leasing guides using column format, displaying listing alphabetically, and using similar necessary information).

**5.** **Even if some of Dr. Wang's formatting features are copyrightable, it is only a thin copyright, which requires a showing of virtual identity to establish infringement.**

Alternatively, should there be some minimal amount of material worthy of copyright protection for Dr. Wang after removing the non-copyrightable formatting elements, Dr. Wang's infringement claims still fail. "Courts will not protect a copyrighted work from infringement if the idea underlying the work can be expressed only in one way, lest there be a monopoly on the underlying idea. In such an instance, it is said that the work's idea and expression 'merge.'" *Ets-Hokin v. Skyy Spirits, Inc*., 323 F.3d 763, 765 (9th Cir. 2003).

The standard for establishing infringement of a "thin" copyright requires the products to be virtually identical. *Apple Computer, Inc. v. Microsoft Corp*., 35 F.3d 1435, 1444 (9th Cir. 1994) ("When the idea and its expression are indistinguishable or 'merged', the expression will only be protected against nearly identical copying." (citation omitted)); *ETS-HOKIN*, 323 F.3d at 766 (Quoting *Apple* and holding that "[w]hen the range of protectable expression is narrow, the appropriate standard for illicit copying is virtual identity.") Some courts have even gone so far as to require "bodily appropriation of expression" to find copyright infringement of a factual work's format and layout when the work consists of largely uncopyrightable (factual) elements. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989) (citing *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 576 (9th Cir. 1987)). This is sometimes referred to as "limited" or "thin" copyright protection. *Id. See also ETS-HOKIN v. Skyy Spirits Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (noting that the similarity between two works was inevitable given the shared concept and "[w]hen we apply the limiting doctrines, subtracting the unoriginal elements, [Plaintiff] is left with only a 'thin' copyright, which protects against only <u>virtually identical</u> copying." (Emphasis added).

The protection a copyright affords is against copying, not against "any possible infringement caused when an independently created work coincidentally duplicates"

1   other material.  *Roth Greeting Cards v. United Card Co.*,  429 F.2d 1106, 1110 (9th Cir.
2   1970).  The "copied" material must be "something more than what 'must unavoidably
3   be produced by anyone who wishes to use and restate the facts that form the greater part
4   of the work." *Cooling Sys.*, 777 F.2d at 492 (citing *Landsberg*, 736 F.2d at 489).

5   Dr. Wang has admitted that his coder products and StayWell's coder products are
6   not virtually identical.  UF No. 86.  There is also no dispute that the content of
7   StayWell's and Dr. Wang's coder products differ because StayWell selected its own
8   ICD-9 codes through its independent contractors.  Therefore, Dr. Wang cannot as a
9   matter of law meet the required legal standard  for infringement of a thin copyright, and
10  his claims must fail.

11  For all the reasons explained above, there are no genuine issues of material fact
12  relating to Dr. Wang's copyright infringement claims.  Accordingly, StayWell
13  respectfully urges the court to grant summary judgment and dismiss this suit.

14  **D.    The Breach of Contract Claims Fail As A Matter Of Law**

15  Dr. Wang's claims for breach of the License Agreement fail because StayWell did
16  not use Dr. Wang's copyrighted material in its coder products.  "Copyrighted Material"
17  is defined in the License Agreement to mean Dr. Wang's compilation of government
18  ICD-9 codes.  It is undisputed that after acquiring FastMark, StayWell hired its own
19  independent medical coders to select the ICD-9 codes used by StayWell in its coder
20  products.  UF No. 67.  Because it is undisputed that StayWell did not use Dr. Wang's
21  ICD-9 code selections (and because formatting options standing alone, as a matter of
22  law, are not copyrightable as explained above), StayWell's product sales are not subject
23  to the License Agreement.  Therefore, Dr. Wang's breach of contract claims fail as a
24  matter of law and should be summarily dismissed.

25
26
27
28

1.    **The term "Copyrighted Material" in the License Agreement Means Dr. Wang's compilation of ICD-9 Codes, not formatting elements.**

Dr. Wang essentially contends that the term "Copyrighted Material" in the License Agreement includes two separate bodies of copyrightable expression – the codes themselves and the formatting elements used to organize and arrange those codes in the coder guides, which Dr. Wang calls his "presentation style or method." Under Dr. Wang's flawed interpretation of the License Agreement, FastMark and StayWell could choose not to use his ICD-9 code compilations and incur the expense and delay of hiring independent certified coders to compile their own ICD-9 codes, but still infringe Dr. Wang's copyright by using some or all of the formatting features he now claims to own.

This contract interpretation should be summarily rejected because the "Copyrighted Material" is expressly defined by the License Agreement and is susceptible to a certain legal meaning, contrary to the meaning that Dr. Wang ascribes. Copyrighted Material is defined as "compilations of 'ICD-9 codes' used by the U.S. Government for reimbursement of doctors under government programs." The term "compilation" is defined by the Copyright Act as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated or arranged in such a way that the <u>resulting work as a whole</u> constitutes an original work of authorship." 17 U.S.C. § 101 (2005). While Dr. Wang has conceded that StayWell hired independent coders to select the codes for its quick reference coding guides, he argues nonetheless that the formatting elements, standing alone, constitute the Copyrighted Material provided under the License Agreement and StayWell's use of those formatting features constitutes a breach of contract.

Dr. Wang's interpretation of the License Agreement is unreasonable and inconsistent with the language of the contract and the dictates of copyright law. A compilation of public domain elements can only be copyrighted, if at all, as a whole. Dr. Wang did not license formatting features or a presentation method to FastMark, but

his ICD-9 code compilations.  Under the License Agreement Dr. Wang was required to deliver, not a final formatted coder product, but a list of ICD-9 codes in Microsoft Word format.  UF No. 87.  FastMark created and produced the final product in its patented laminated folding design. Thus, it was FastMark that chose the formatting elements and made the design decisions for arranging the ICD-9 code lists in the final guides, not Dr. Wang.  Dr. Wang provided the content for the coding guides by delivering his ICD-9 code selections to FastMark.

Each of Dr. Wang's copyright applications reflect that he obtained a compilation copyright in works derived and/or compiled from the ICD-9 codes in the public domain. UF No. 88.  He has not sought or obtained a copyright on a "presentation method" as he asserts in this lawsuit, but in a compilation of ICD-9 codes.  The License Agreement also defines the Copyrighted Material to be a compilation of ICD-9 codes and not a list of formatting elements or a "presentation method."  UF No. 89.  Furthermore, the License Agreement requires that each coder product using Dr. Wang's ICD-9 code selections carry the copyright designation "© [date], Roger H. Wang, M.D."  UF No. 90. Here again, there is no mention or reference to formatting elements or presentation method owned by Dr. Wang.  In fact, the only mention in the License Agreement to "format" or "design" refers to FastMark's "patented folding laminated <u>format</u>" and FastMark's "patented proprietary <u>design</u>."  UF No. 91.

Dr. Wang has admitted that the License Agreement does not include any language to support his version of the term Copyrighted Material.  UF No. 92 ("Q: And there isn't any mention in the definition of copyrighted material in the License Agreement any of these formatting elements that you began to include in your copyright notice in 2004; is that correct?  . . .  A: Not defined.").  Also, in the 2003 Lawsuit against FastMark, Dr. Wang himself defined "Copyrighted Material" as "original selection and rearrangement of the <u>content</u> contained in the ICD-9-CM publication," evidencing his own <u>correct</u> understanding of the term.  UF No. 93.

Dr. Wang has also admitted under oath that FastMark understood Copyrighted Material to mean only the ICD-9 codes and did not include his formatting elements and presentation method as a separate body of copyrightable expression. When Dr. Wang met with  Howard Wolf, FastMark's owner, in 2000, to discuss the licensing of Dr. Wang's Copyrighted Material, Mr. Wolf compared the Rapid Coder to a generic, "telephone-book" style coder.  UF No. 94 ("And [Howard] said, casually, that this is but a compilation, just like a telephone book style publication; any company or anyone can just do the same.").  Yet, in response to Mr. Wolf's position, Dr. Wang testified that he did not explain that his copyright in the Rapid Coder contained something more than just code compilation.  UF No. 95 (Q:   And even at that time you never spoke up and said, "My copyrighted material includes a number of formatting elements that are the heart and soul of my invention, and it's not only in telephone style directory"?   You never said those things to him, did you? A:   No, I didn't.").

Dr. Wang's own recent conduct belies his litigation-motivated contract interpretation.  In 2004, years after the License Agreement and within months after the Settlement Agreement, Dr. Wang began including a different copyright notice on his coder products.  UF No. 96.  The new copyright notice now includes the formatting features he now claims to own as a separate copyrightable work:

> "The specific design, format, layout, setup, structure, editing, formatting, tabulating, grouping, subgrouping, abbreviating, and/or organization, which are characteristic and inherent to the creation of Rapid Coder, is copyrighted legally protected intellectual property.   Unauthorized adaptation, alteration, reproduction, duplication, and/or dissemination, in part or in toto (Latin), by any means whatsoever, is a violation of copyright law and other pertinent laws, and is subject to liability."  UF No. 97.

The <u>absence</u> of such language in the License Agreement and in the Settlement Agreement demonstrates beyond doubt the clear, reasonable, and unambiguous meaning that should be given to the "Copyrighted Material," and the vastly broader and unfounded meaning that Dr. Wang now seeks to superimpose on it.  Remarkably, during negotiations of the Settlement Agreement when Dr. Wang presumably could have made his understanding known that the term "Copyrighted Material" in the License Agreement separately included his so-called "presentation style," he stayed silent, choosing rather to expand the definition of "Copyrighted Material" in a lawsuit after FastMark, StayWell and Dr. Wang had each gone their separate  ways.[9]

Because the definition of Copyrighted Material is susceptible to a certain legal meaning, this Court can interpret the contract.  When a dispute arises over the meaning of contract language, the court must decide whether the disputed language is "reasonably susceptible" to varying interpretations.  *See Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 980 (2006) (citations omitted).  Whenever possible, the court should determine whether the contract is reasonably susceptible to a party's interpretation "solely from the written provisions of the contract."  *Nat'l Cas. Co. v. Sovereign Gen. Ins. Servs., Inc.*, 137 Cal. App. 4th 812, 818 (2006); see also Cal. Civ. Code § 1638  ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity").

Because Copyrighted Material as defined by the License Agreement is clear and explicit, and there are no genuine issue of material fact to vary the plain meaning, StayWell respectfully urges the Court to construe the contract as a matter of law and enter judgment for StayWell on the contract claims.

---

[9] The Settlement Agreement refers to the definition of "Copyrighted Material" given in License Agreement.  UF No. 98.

2.    **The claim for breach of the covenant of good faith and fair dealing fails as a matter of law.**

StayWell is entitled to summary judgment on its alleged breach of the covenant of good faith and fair dealing. Dr. Wang alleges that by selling its coder products to AstraZeneca, StayWell breached a duty of good faith. Dr. Wang is essentially arguing that it is "bad faith" or unfair for StayWell to compete for AstraZeneca's business, especially because the License Agreement does not prohibit StayWell from selling its own products to AstraZeneca. In essence, Dr. Wang is asking the Court to re-write the License Agreement to include a covenant not to compete that would prevent StayWell from competing against him.

But good faith and fair dealing covenants do not require parties to a <u>non-exclusive</u> license to refrain from developing and selling competing products. *See, e.g., Conan Props., Inc. v. Mattel, Inc.*, 712 F. Supp. 353, 365 (S.D.N.Y. 1989) (rejecting an argument that a licensee is prohibited from developing competing projects because a licensee is not limited to promoting only the licensor's product "absent specific agreement to this effect.") *New Paradigm Software Corp. v. New Era of Networks, Inc.*, No. 99Civ.12409, 2002 WL 31749396 at *4 and **14-15 (S.D.N.Y. 2002) (rejecting argument that defendant's marketing of products that were "identical, virtually identical, or substantially similar to" the licensed product, but under a different name and without paying a royalty, constituted a breach because "there is no breach of the contract per se from marketing" a competing product).

If Dr. Wang wanted a covenant not to compete that covered independently-developed products, he should have negotiated for one with FastMark first and then with StayWell later. He chose not to. He cannot now use litigation to rewrite the contract and secure himself greater rights than those for which he bargained.

E.    **The "Unfair Competition" Claims Fail**

California unfair competition law prohibits any "unlawful, unfair or fraudulent business act or practice." California Business and Professional Code, § 17200 et seq.

1  Plaintiff bases his unfair competition claim on StayWell's alleged breach of the License

2  Agreement and StayWell's alleged copyright infringement.   UF Nos. 102, 103.   The

3  unfair competition claims must be dismissed because, as a matter of law, neither of these

4  alleged claims can form the predicate for an unfair competition claim.

5          **1.    California does not recognize breach of contract as an "Unlawful**

6               **Business Practice."**

7          Plaintiff's unfair competition claim fails as a matter of law to the extent that claim

8  relies on breach of contact as the underlying unlawful act.    Unfair acts among

9  competitors means "conduct that threatens an incipient violation of an antitrust law, or

10  violates the policy or spirit of one of those laws . . . "  *Cel-Tech Commc'ns, Inc. v. L.A.*

11  *Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  Fraudulent acts are ones where members

12  of the public are likely to be deceived.   See *Nat'l Rural Telecomm. Co-op. v.*

13  *DIRECTTV, Inc.*, 319 F. Supp. 2d 1059, 1077-78 (C. D. Cal. 2003).  Plaintiff has failed

14  to provide any evidence that StayWell acted "unfairly" by threatening competition or

15  "fraudulently" by deceiving the public.  Plaintiff's unfair competition claim, therefore,

16  can only be based on "unlawful" business conduct.

17          In California, however, mere breach of contract cannot constitute an "unlawful"

18  business practice pursuant to section 17200.   See *Sybersound Records, Inc. v. UAV*

19  *Corp.*, 517 F.3d 1137, 1152-53 (9th Cir. 2008) (dismissing the plaintiff's unfair

20  competition claim because the plaintiff's based its claim on acts that constituted mere

21  breach of contract); *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638,

22  645 (2008) (defendant's alleged breach of contract "may not be a predicate for a UCL

23  action as a matter of law").  As one court interpreting section 17200 clarified, "[r]eading

24  the term 'unlawful' in the UCL to include any breach of contract under the common law

25  would give every plaintiff alleging breach of contract in a California court a

26  corresponding cause of action for injunctive relief under the UCL."  *In re Microsoft*

27  *Corp. Antitrust Litigation*, 274 F. Supp. 2d 747, 750 (D. Md. 2003).

28

1    Here, Dr. Wang admits in his interrogatory responses that the basis for his unfair

2    competition claim are StayWell's alleged breaches of the License Agreement.  UF No.

3    102.  In *Sybersound*, plaintiffs based their unfair competition claim on the defendants'

4    failure to pay royalties pursuant to a licensing contract.   517 F.3d at 1152.  The Ninth

5    Circuit dismissed the plaintiff's unfair competition claim because the claim was based

6    on acts that constituted mere breach of contract.  *Id.*  Likewise here, Dr. Wang admits

7    that the only allegedly wrongful acts are breaches of contract, which legally cannot form

8    the basis for an unfair competition claim.

9         **2.    Copyright infringement cannot support a claim for unfair**

10        **competition because the infringement claim itself fails or,**

11        **alternatively, the Copyright Act preempts the unfair competition**

12        **cause of action.**

13    The unfair competition claim fails because it repeats or relies upon the

14    infringement claim.  If the copyright infringement claim fails as set forth above, the

15    unfair competition claim must also fail.

16    Even if the copyright infringement claim survives, the Copyright Act will

17    preempt the unfair competition cause of action.  If an unfair competition claim gives rise

18    to rights equivalent to copyright protection, it is preempted.  17 U.S.C. § 301(a) (1998)

19    (preempting state laws that protect "legal or equitable rights that are equivalent to any of

20    the exclusive rights within the general scope of copyright"); *see also Kodadek v. MTV*

21    *Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (applying section 301 preemption to

22    an unfair competition claim).   Thus, a plaintiff's unfair competition claim that the

23    defendant sold copyrightable material is preempted.  *See id.* at 1212-13 (plaintiff

24    claimed that the defendant competed unfairly by selling copyrightable material).

25    When a plaintiff incorporates by reference the paragraphs setting forth its

26    copyright claim in a cause of action for unfair competition, this further evidences a

27    finding of preemption.  *See id.*  Here, Dr. Wang's unfair competition claim is preempted

28    because it relies on his infringement claim.  Like the complaint at issue in *Kodadeck*,

6233182                                         38

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Dr. Wang's Complaint incorporates the copyright count into the unfair competition claim and fails to distinguish between the rights granted by the Copyright Act from the rights granted by section 17200.  UF No. 104; *see Kodadeck,* 152 F.3d at 1212.

Also, in his interrogatory responses, plaintiff identified acts of copyright infringement as the basis for his unfair competition claim.  Plaintiff's Supp. Response, No. 4.  Like the plaintiffs in *Kodadeck*, plaintiff here "expressly bases his unfair competition claim on rights granted by the Copyright Act."  152 F.3d at 1213.  The Copyright Act, therefore, preempts the unfair competition claim.

Because Dr. Wang bases his unfair competition claim on two underlying acts which cannot form the predicate for this claim as a matter of law, the unfair competition should also be summarily dismissed.

### F.    The Claim For Intentional Interference with Contractual Relations Fails Because Plaintiff Admits That No Contract Existed With Which StayWell Allegedly Interfered

The elements of a claim for intentional interference with contractual relations are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship, and (5) resulting damages. *See Quelimane Co. v. Stewart Title Guaranty Co*., 19 Cal. 4th 26, 55 (1998).   This claim fails because Dr. Wang admitted that he had no contract with AstraZeneca, although he has sued StayWell for interfering with such an alleged contract.

The crucial element of intentional interference with contractual relations is the existence of a contract between the plaintiff and a third party.  The Court must dismiss plaintiff's claim because Dr. Wang admitted that he had no contract with AstraZeneca when StayWell first sold coder products to AstraZeneca.  When asked "What contract did you have with AstraZeneca that was interfered with," Dr. Wang testified that he "didn't have a contract; [he] had a request for an estimate."  UF No. 105.  He confirmed

STAYWELL'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

SACV06-813 JVS (JTLx)

that he "never got a purchase order with a purchase order number because [AstraZeneca] never entered into a contract with [him] for those estimates." *Id*.  As a consequence, this claim too must be dismissed.

### G.   The Claim for Intentional Interference with Prospective Business Advantage Fails Because There is No "Wrongful Conduct."

Plaintiff's claim for intentional interference with prospective business advantage fails because there is no "independent wrongful conduct" necessary to support the claim.  The elements of the claim are:  (1) An economic relationship between the plaintiff and a third party, with a probability of future economic benefit to the plaintiff; (2) The defendant's knowledge of the relationship; (3) Intentional and wrongful conduct on the part of the defendant, separate from the interference itself, designed to interfere with  or disrupt the relationship; (4) Actual disruption or interference; and (5) Economic harm to the plaintiff as a proximate result of the defendant's wrongful conduct.  *Overstock.com, Inc. v. Gradient Analytics, Inc.,* 151 Cal. App. 4th 688, 713 (2007) (citations omitted).

A plaintiff alleging intentional interference with prospective business advantage must prove that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself."  *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1153 (2003) (citation omitted).  An act is "independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Id.* at 1159.

A party to a contract, however, cannot base a tort claim for intentional interference with prospective business advantage on acts that constitute breach of the contract.  *See JRS Prod., Inc. v. Matsushita Elec. Corp. of America*, 115 Cal. App. 4th 168, 180 (2004) (damages cannot be recovered "for interference with prospective business advantage by one contracting party against another based on conduct that would otherwise constitute a breach of the parties' contract").  In *JRS*, the plaintiff, proved at trial that its franchisor, Panasonic, terminated the franchise contract without

1  good cause, and offered evidence to prove that Panasonic violated franchise law and

2  engaged in unfair competition.  *Id.* at 183.  The court of appeals reversed the judgment

3  for JRS on the intentional interference with prospective business advantage claim,

4  because "the basis for JRS's claim at trial that Panasonic violated the [California

5  Franchise Relations] Act and engaged in anticompetitive activity is the very same

6  activity that gave rise to the claim of intentional interference—Panasonic's termination

7  of the JRS dealer agreement."  *Id.* (emphasis in original).

8       Dr. Wang's claim for intentional interference with prospective business advantage

9  must likewise be dismissed because, like the plaintiff in *JRS*, Dr. Wang's tort claim is

10  based on the same acts that constitute the alleged breaches of contract.  In sworn

11  testimony, Dr. Wang explained that the independent wrongful conduct "is StayWell's

12  alleged breach of the license agreement," specifically, StayWell's sales to AstraZeneca.

13  UF No. 106.  Because StayWell's alleged breach of the License Agreement is not an

14  independent wrong separate from the alleged interference, this claim fails as a matter of

15  law and should be summarily dismissed.

16       **H.    StayWell Is Entitled To Judgment For Its Reasonable Attorneys' Fees**

17           **Incurred In Defending This Action.**

18       Paragraph 8 of the Settlement Agreement provides that "[i]n any dispute that

19  arises over the performance of this agreement, the prevailing party shall be entitled to

20  reasonable attorneys' fees and costs."  UF No. 100.  The License Agreement also

21  provides that "[i]n any action to enforce or interpret this Agreement, the prevailing party

22  shall be entitled to recover its reasonable attorneys' fees from the other party."  UF No.

23  107.  Dr. Wang has brought this lawsuit in contravention of the express terms of the

24  License Agreement and the Settlement Agreement.  Accordingly, StayWell has a

25  contractual right to recover its attorneys' fees and costs incurred in defending this ill-

26  conceived lawsuit.  StayWell respectfully requests that the Court grant summary

27  judgment on its affirmative claim for attorneys' fees.  Upon entry of summary judgment,

28  StayWell will provide proof of its attorneys fees and costs.

## IV.   Conclusion

Dr. Wang's claims are all based on the faulty premise that StayWell's products (acquired from FastMark) infringed his alleged copyright in his formatting elements or presentation method.  But, even assuming Dr. Wang had such rights, he released all claims against FastMark and FastMark's coder products (acquired by StayWell) in the Settlement Agreement and Mutual Release.  Thus, his claims are extinguished and barred and this case should be summarily dismissed.  Had Dr. Wang not abandoned his claims by virtue of the Settlement Agreement, each of his claims asserted in this lawsuit fail legally for a multitude of reasons as set forth above.  Accordingly, StayWell respectfully urges the Court to enter judgment in its favor dismissing all of Dr. Wang's claims with prejudice and awarding its reasonable attorneys' fees and costs to defend this ill-conceived action.


Respectfully submitted,

Dated:                                               AKIN GUMP STRAUSS HAUER & FELD LLP


By_____
               Karen C. Corallo (*pro hac vice*)
                    Chad A. Stegeman
          Attorneys for Defendant and Counter-Plaintiff
        THE STAYWELL COMPANY, A DIVISION OF
                    MEDIMEDIA USA, INC.