KAREN C. CORALLO (*pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone:    214-969-2800
Facsimile:    214-969-4343
E-Mail:         kcorallo@akingump.com

CHAD A. STEGEMAN (SBN 225745)
Akin Gump Strauss Hauer & Feld LLP
580 California St., Ste. 1500
San Francisco, California 94104
Telephone:    415-765-9500
Facsimile:    415-765-9501
E-Mail:         cstegeman@akingump.com

Attorneys for Defendant and Counter-Plaintiff
THE STAYWELL COMPANY, A DIVISION OF
MEDIMEDIA USA, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROGER H. WANG, M.D., an individual,<br><br>      Plaintiff, Counter-Defendant<br><br>      v.<br><br>THE STAYWELL COMPANY, a Delaware corporation; and DOES 1-20, inclusive,<br><br>      Defendants, Counter-Plaintiffs. | Case No. SACV 06-813 ODW (JTLx)<br><br>Judge:   Otis D. Wright II<br><br>**DEFENDANT AND COUNTER-PLAINTIFF THE STAYWELL COMPANY'S PROPOSED STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Filed:    August 29, 2006<br>Pretrial Conference  June 9, 2008<br>Trial Date:          July 8, 2008<br><br>Hearing Date:  May 19, 2008<br>Time:              1:30 p.m.<br>Before the Hon. Otis Wright |

# THE STAYWELL COMPANY'S PROPOSED STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

Defendant and Counter-Plaintiff The StayWell Company, a division of MediMedia USA, Inc., ("StayWell" or "defendant"), by and through its undersigned counsel, files its Proposed Statement of Uncontroverted Facts in conjunction with its Motion for Summary Judgment and would respectfully show the Court as follows:

| | Undisputed Fact | Evidence |
|---|---|---|
| 1. | To demonstrate the relationship between main terms, sub-terms, groups and sub- groups, ICD-9 uses an indented format for each in reference, with main terms appearing in bold. | Ex. R (ICD-9-CM Publication). |
| 2. | ICD-9 codes are in the public domain. | Declaration of Chad A. Stegeman in Support of StayWell's Motion for Summary Judgment, ("Stegeman Decl."), [1] Ex. A (Deposition of Roger H. Wang, Feb. 15, 2008 ("Wang Dep. 1"), at 108:8-11)<br><br>Q:  And isn't it true that your copyright application and registration is for compilations of public domain information?<br><br>A:  Design and compilation, yes.<br><br>Ex. A (Wang Dep. 1, at 147:11-18).<br><br>Q:  So your method of presentation is taking the |

---

[1] For the Court's convenience, all exhibits cited hereon are attached to the Stegeman Declaration.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

codes that you find in the public domain code books and putting them in tables, is one of the ways that you have defined a method of presentation?

   MR. WITTEN:  Misstates testimony.

   THE WITNESS:  Well, I will call them the -- I organize them the way that they will become much easier to use.  If I may, this is what was the original Rapid Coder.

Ex. C ((Deposition of Roger H. Wang, Apr. 18, 2008 ("Wang Dep. 3"), at 226:4-12).

Q:   And that's the way that the government puts out the codes, they're organized by body systems?

A:   Not government, but this is actually ICD-9 codes in public domain but it's managed by the American Hospital Association and World Health Organization that -- I don't know that we should consider AHA or -- or -- or WHO as a -- as a government.

Q:   Okay.

| 3. | There are multiple publishers and sellers of compilations of ICD-9-CM codes ("coder products"). | *See* http://www.medicalcodingbooks.com/ (offering for sale coder products from myriad publishers) |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| 4. | A Certified Professional Coder® (CPC®) is "an individual of high professional integrity who has passed a medical coding certification examination sponsored by the American Academy of Professional Coders (AAPC)." | *See* http://www.aapc.com/certification/cpc.aspx (website of the American Academy of Professional Coders). |
| 5. | On or about March 1, 2000, FastMark and Dr. Wang executed the Non-Exclusive License Agreement. | Ex. E (Non-Exclusive License Agreement). |
| 6. | On or about March 1, 2001, FastMark and Dr. Wang executed an Amendment to the Non-Exclusive License Agreement. | Ex. F (Amendment to Non-Exclusive License Agreement). |
| 7. | Dr. Wang agreed to license to FastMark the non-exclusive right to use his copyrighted material and his trademark Rapid Coder to produce, market, distribute, and sell quick reference coding guides in a patented folding laminated design owned  by FastMark. | Ex. E (Non-Exclusive License Agreement, ¶ 1). |
| 8. | The License Agreement defined Copyrighted Material to mean | Ex. E (Non-Exclusive License Agreement, Preamble). |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

|  |  |  |
|---|---|---|
|  | Dr. Wang's copyrighted "compilations of 'ICD-9 codes' used by the U.S. Government for reimbursement of doctors under government programs (the 'Copyrighted Material')." |  |
| 9. | The "Guides" that FastMark was permitted to produce and sell is also a defined term and means the Copyrighted Material used in FastMark's patented folding laminated format. | Ex. E (Non-Exclusive License Agreement, ¶ 1). |
| 10. | The License Agreement was for a 5-year term and automatically renewed for successive one-year periods unless terminated by either party. | Ex. F (Amendment to Non-Exclusive License Agreement, ¶ 3). |
| 11. | To date, neither party has terminated the License Agreement and Dr. Wang contends that it is still in effect and covers the claims he makes today. | Ex. H (Plaintiff's Seventh Notice of Production, RW02873) ("The settlement agreement dated 10-31-2003 did not annul, cancel, rescind, nor void the original agreement or the amended agreement.  It was in full force as of 12-31-2005."). Ex. D (Deposition of Curtis Risley, Mar. 19, 2008 ("Risley Dep."), at 40:7-41:10). Q:   This is the amendment to the Nonexclusive |

License Agreement.  Have you ever seen this document before?

A:  I have, yes.

Q:  If you could look down at paragraph three on the first page.  Take your time and read that.

A:  I'm sorry, come down to where?

Q:  Paragraph three on the first page.

A:  Yeah.

Q:  It says term.  It says that the term of the agreement is extended through December 31st, 2005.  And that's your understanding of when it was terminated, right, when it expired?

A:  Yes.

Q:  And then after that it says "And shall be automatically renewed for additional one-year period unless terminated by either party as of the expiration date of the term by giving the other party written notice at least 60 days prior thereto."

A:  Right.

Q:  Was written notice ever given?

A:  I don't believe it was.  I'm not aware of it.

Q:  With this in mind, do you think that the License Agreement is still ongoing?

MS. CORALLO:  Objection to the form of the question, calls for a legal conclusion.

A:  It would seem to me that if no notice was

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

given by either party, that it is continuing in effect today.

Ex. B (Deposition of Roger H. Wang, Mar. 28, 2008 ("Wang Dep. 2"), at 172:18-173:4).

Q:   And in the first sentence, you state -- and I take it it's your view, sir – and correct me if I'm wrong -- that you do not believe that the settlement agreement annulled, canceled, rescinded, or voided the license agreement in the case?

A:   Correct.

Q:   And that's your position; right?

A:   Correct.

Q:   Okay.  And that it was in full force and effect as of December 31, 2005; and it still is in effect; correct?

A:   Yes.

Ex. B (Wang. Dep. 2, at 208:17-23).

A:   There, I think we must correct this word, "ending."  The relation [sic] didn't end.  After the lawsuit, it doesn't mean there was an end to the relation between the two parties.

Q:   Because you believed the license agreement is still ongoing?

A:   It is; it's still in effect.

| 12. | Because the License Agreement was non-exclusive, both Dr. Wang and FastMark remained competitors during the term of the license. | Ex. E (Non-Exclusive License Agreement, ¶ 4).<br><br>Ex. B (Wang Dep. 2, at 272:24-273:15).<br>Q: And so did you -- were you okay with the fact that they were developing their own [coder] products?<br>A: Of course not.<br>Q: Well, you don't have any objection to their developing their own products if they're not using your copyrighted material; right?<br>A: Correct.<br>Q: Okay.<br>A: I have no right to object if they have product that is entirely not infringing on my own publication.<br>Q: And you would have an interest in objecting if they were using your copyrighted material.<br>A: Of course, yes.<br>Q: But you wouldn't have objected if they weren't using your copyrighted material.<br>A: Correct. |
| --- | --- | --- |
| 13. | In the 2001 Amendment to the license, the parties agreed that FastMark did not have to use Dr. Wang's Rapid Coder trademark, but that Fastmark could produce | Ex. F (Amendment to Non-Exclusive License Agreement, ¶ 5). |

| | | |
|---|---|---|
| | and sell quick reference coding guides using its own trademark, QuickCoder. | |
| 14. | The License Agreement did not prevent FastMark from developing its own compilations of ICD-9 codes and producing its own quick reference coding guides but it could not use the Rapid Coder trademark. | Ex. F (Amendment to Non-Exclusive License Agreement, ¶ 5).<br><br>Ex. B (Wang Dep. 2, at 272:24-273:15).<br>Q:  And so did you -- were you okay with the fact that they were developing their own products?<br>A:  Of course not.<br>Q:  Well, you don't have any objection to their developing their own products if they're not using your copyrighted material; right?<br>A:  Correct.<br>Q:  Okay.<br>A:  I have no right to object if they have product that is entirely not infringing on my own publication.<br>Q:  And you would have an interest in objecting if they were using your copyrighted material.<br>A:  Of course, yes.<br>Q:  But you wouldn't have objected if they weren't using your copyrighted material.<br>A:  Correct. |
| 15. | The License Agreement | Ex. E (Non-Exclusive License Agreement, ¶ 14). |

| | | |
|---|---|---|
| | restricted Dr. Wang from using FastMark's confidential sales and customer information for his own benefit | |
| 16. | The License Agreement restricted FastMark from selling "Guides" (as defined by the License Agreement) to Dr. Wang's two pharmaceutical clients, namely AstraZeneca and Procter & Gamble. | Ex. E (Non-Exclusive L icense Agreement, ¶ 2). |
| 17. | In December 2001, FastMark filed suit against Dr. Wang for misusing its confidential information in violation of the License Agreement. | Ex. P (Jan. 22, 2003 Judgment and Permanent Injunction against Roger Wang). |
| 18. | In January 2002, Dr. Wang stipulated to a judgment and a permanent injunction against him in Case No. CV 802915, styled *FastMark, Inc. v. Roger H. Wang, M.D.*, in the Superior Court of California, County of Santa Clara (Judgment entered January 23, 2002). | Ex. P (Jan. 22, 2003 Judgment and Permanent Injunction against Roger Wang). |
| 19. | In the Agreed Judgment, Dr. Wang admitted that he "solicited | Ex. P (Jan. 22, 2003 Judgment and Permanent Injunction against Roger Wang). |

| | | |
|---|---|---|
| | FastMark's customers, and apparently used FastMark's Confidential Information to do so" and affirmed "his obligation not to misuse FastMark's Confidential Information." | |
| 20. | As a consequence of his breach, Dr. Wang agreed never to sell coder products of any nature whatsoever to nine of FastMark's pharmaceutical clients, namely Bristol-Myers Squibb Co., Dey Pharmaceuticals, GlaxoSmithKline plc/ SmithKline Beecham, Merck & Co., Inc, Novartis Pharmaceuticals Corp., Pfizer, Inc., Pharmacia Corp./ Searle/ Monsanto Co., Schering-Plough Corp./ Key, and Wyeth-Ayerst Pharmaceuticals. | Ex. P (Jan. 22, 2003 Judgment and Permanent Injunction against Roger Wang, Ex. A). |
| 21. | The Injunction also states that Dr. Wang is "permanently restrained and enjoined from . . . selling any product, in any | Ex. P (Jan. 22, 2003 Judgment and Permanent Injunction against Roger Wang). |

| | | |
|---|---|---|
| | format, which competes with FastMark's coding guides for ICD-9 codes and follow on coding systems . . . to the FastMark coding guide customers identified in the list attached as Exhibit A." | |
| 22. | After entry of the Agreed Judgment and Permanent Injunction against Dr. Wang, FastMark hired independent certified coders to develop Fastmark's own code compilations. | Ex. B (Wang Dep. 2, at 194:5-24). Q:   Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you amended the license agreement in 2001.  Do you remember that? A:   I see. Q:   And we can look at the date in just a minute.  But within a year of that you found out that FastMark was creating its own coder products; correct? A:   In some specialty. Q:   In some specialties. So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material? A:   Exactly. Q:   So as early as 2002, you knew that? A:   By this document now.  I have to correct my |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

previous statement; yes.

Ex.C (Wang Dep. 3, at 282:4-16).

Q:   Okay.  And, in fact, throughout the course of the couple of years before the settlement agreement and certainly around the settlement agreement, you actually looked at the independent contracts because FastMark's lawyer provided them to your lawyer showing that they had hired independent coders to pull their own codes, correct?

A:   Fine, yes.

Q:   And it was your position then that while they may have independently developed the -- their own code lists, they didn't independently develop the format, correct?

A:   Correct.

Ex. C (Wang Dep. 3, at 282:17-283:5).

Q:   Okay.  And it was your position that they should have, if they wanted to develop their own product, they should have recreated the format as well --

A:   Correct.

Q:   -- right?

And that's why you sued them.

A:   Correct.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

Q:   Okay.  So you don't have any complaint about the way -- sorry -- you don't have any complaint about the way that FastMark independent- -- independently created its codes but, rather, the fact that they didn't independently create the format, right?

A:   Correct.


Ex. D (Risley Dep., at 21:3-10).

Q:   What was your belief of the difference between Dr. Wang's materials and FastMark or StayWell's materials

A:   Difference was that FastMark's code of products had been independently developed by them and were not based at all on compilations of ICD9 codes that Dr. Wang had put together and had been licensing in past years to FastMark.


Ex. D (Risley Dep., at 21:11-22:3).

Q:   Okay.  And how confident are you in FastMark's efforts to develop products separate from Dr. Wang's that didn't rely on his material?

A:   We were confident enough that they had provided us with enough support to determine that they had in fact used independent developers to compile the codes that they were

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | | using, and that the independent developers had not referred to any of Dr. Wang's materials in coming up with those compilations. |
| 23. | In around 2002, FastMark began producing quick reference coding guides using its own ICD-9 codes under its QuickCoder trademark. | Ex. B (Wang Dep. 2, at 194:5-24).<br><br>Q:   Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you amended the license agreement in 2001.  Do you remember that?<br><br>A:  I see.<br><br>Q:   And we can look at the date in just a minute.  But within a year of that you found out that FastMark was creating its own coder products; correct?<br><br>A:   In some specialty.<br><br>Q:   In some specialties.<br><br>So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material?<br><br>A:   Exactly.<br><br>Q:   So as early as 2002, you knew that?<br><br>A:   By this document now.  I have to correct my previous statement; yes.<br><br><br>Ex.C (Wang Dep. 3, at 282:4-16).<br><br>Q:   Okay.  And, in fact, throughout the course of |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

the couple of years before the settlement agreement and certainly around the settlement agreement, you actually looked at the independent contracts because FastMark's lawyer provided them to your lawyer showing that they had hired independent coders to pull their own codes, correct?

A:   Fine, yes.

Q:   And it was your position then that while they may have independently developed the -- their own code lists, they didn't independently develop the format, correct?

A:   Correct.


Ex. C (Wang Dep. 3, at 282:17-283:5).

Q:   Okay.  And it was your position that they should have, if they wanted to develop their own product, they should have recreated the format as well --

A:   Correct.

Q:   -- right?

And that's why you sued them.

A:   Correct.

Q:   Okay.  So you don't have any complaint about the way -- sorry -- you don't have any complaint about the way that FastMark independent- -- independently created its codes

but, rather, the fact that they didn't

independently create the format, right?

A:   Correct.

Ex.D (Risley Dep., at 21:3-10).

Q:   What was your belief of the difference

between Dr. Wang's materials and FastMark or

StayWell's materials

A:   Difference was that FastMark's code of

products had been independently developed by

them and were not based at all on compilations

of ICD9 codes that Dr. Wang had put together

and had been licensing in past years to

FastMark.

Ex.D (Risley Dep., at 21:11-22:3).

Q:   Okay.  And how confident are you in

FastMark's efforts to develop products separate

from Dr. Wang's that didn't rely on his material?

A:   We were confident enough that they had

provided us with enough support to determine

that they had in fact used independent

developers to compile the codes that they were

using, and that the independent developers had

not referred to any of Dr. Wang's materials in

coming up with those compilations.

| 24. | As a result, in 2002 and | Ex. B (Wang Dep. 2, at 271:19-272:4). |
|---|---|---|

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

continuing into 2003, Dr. Wang saw his royalty revenue stream begin to decline as FastMark gradually transitioned from the use of Dr. Wang's Copyrighted Material.

Q:   Okay.  And you also knew that they were -- "they" being FastMark -- were requesting -- were not requesting as many codes from you; right?

A:   Correct.

Q:   And what was your conclusion?

A:   My conclusion was that perhaps pharmaceutical companies are not buying this product as often as they wanted before.

Q:   And you suspected early on that they might be developing their own products; right?

A:   Yes, they might be.

Ex. B (Wang Dep. 2, at 283:13-24).

Q:   So you're in a license agreement with FastMark; they're paying you royalties; and rather than just pick up the phone and say, "Let's solve this problem," you just filed suit against them?

A:   Probably I did.

Q:   How come you just didn't call them?

A:   I don't know.

Q:   Is it because you knew that they had their own products and you weren't going to get royalties going forward anyway because that royalty stream was drying up?

A:   Probably.

| | | |
|---|---|---|
| | | Ex. B (Wang Dep. 2, at 286:19-287:17).<br><br>Q:   Okay.  And here, FastMark's lawyers are stating that -- the issue in the case, which was that it was FastMark's view that they independently develop their coder products and they intended to continue their use; correct?<br><br>A:   Yes.<br><br>Q:   And "continue" suggests that they were already doing that prior to this letter and prior to the lawsuit, based on your testimony; correct?<br><br>A:   Correct.<br><br>Q:   So this didn't come as a surprise to you, this statement about FastMark owning their independently-developed coders and continuing to use them?<br><br>A:   No, not a surprise.  It's in their viewpoint.<br><br>Q:   Right.  And, also, you had seen the evidence of it, that they would have a minimal need to use your coders in 2004 and 2005, because -- because they were developing their own coders; and you knew that because the royalty stream had decreased through -- certainly through that year and the year before; right?<br><br>A:   Yes. |
| 25. | For the Guides FastMark produced and sold using Dr. | Ex. E (Non-Exclusive License Agreement, ¶ 7). |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | |
|---|---|
| Wang's code compilations, FastMark continued to pay royalties to Dr. Wang, and those products carried the notice of Dr. Wang's copyright, as required by section 7 of the License Agreement. | Ex. A (Wang Dep. 1, at 101:10-20). |
| | Q:  So No. 58 there is a coder product that FastMark created that does contain a copyright notice for Roger Wang, correct? |
| | A:  Indeed, yes. |
| | Q:  And that's because that was a product which did not contain FastMark's independently developed codes, correct, and they were giving you attribution because they were using your codes? |
| | A:  My product, yes, they were using -- the year 2002 and 2003 are the transitional time that FastMark was developing, quote, unquote, so called their own version. |
| | Ex. B (Wang Dep. 2, at 194:5-23). |
| | Q:  Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you amended the license agreement in 2001.  Do you remember that? |
| | A:  I see. |
| | Q:  And we can look at the date in just a minute. But within a year of that you found out that FastMark was creating its own coder products; correct? |
| | A:  In some specialty. |
| | Q:  In some specialties. |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material?<br><br>A:  Exactly.<br><br>Q:  So as early as 2002, you knew that?<br><br>A:  By this document now.  I have to correct my previous statement; yes. |
| 26. | For the QuickCoder products that FastMark independently created, FastMark either used certified coders under independent contractor agreements. | Ex. B (Wang Dep. 2, at 271:19-272:4).<br><br>Q:  Okay.  And you also knew that they were -- "they" being FastMark -- were requesting -- were not requesting as many codes from you; right?<br><br>A:  Correct.<br><br>Q:  And what was your conclusion?<br><br>A:  My conclusion was that perhaps pharmaceutical companies are not buying this product as often as they wanted before.<br><br>Q:  And you suspected early on that they might be developing their own products; right?<br><br>A:  Yes, they might be.<br><br>Ex. B (Wang Dep. 2, at 194:5-24).<br><br>Q:  Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

amended the license agreement in 2001.  Do you remember that?

A:  I see.

Q:  And we can look at the date in just a minute. But within a year of that you found out that FastMark was creating its own coder products; correct?

A:  In some specialty.

Q:  In some specialties.

So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material?

A:  Exactly.

Q:  So as early as 2002, you knew that?

A:  By this document now.  I have to correct my previous statement; yes.


Ex. C (Wang Dep. 3, at 282:4-16).

Q:  Okay.  And, in fact, throughout the course of the couple of years before the settlement agreement and certainly around the settlement agreement, you actually looked at the independent contracts because FastMark's lawyer provided them to your lawyer showing that they had hired independent coders to pull

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

their own codes, correct?

A:   Fine, yes.

Q:   And it was your position then that while they may have independently developed the -- their own code lists, they didn't independently develop the format, correct?

A:   Correct.

Ex. C (Wang Dep. 3, at 282:17-283:5).

Q:   Okay.  And it was your position that they should have, if they wanted to develop their own product, they should have recreated the format as well --

A:   Correct.

Q:   -- right?

And that's why you sued them.

A:   Correct.

Q:   Okay.  So you don't have any complaint about the way -- sorry -- you don't have any complaint about the way that FastMark independent- -- independently created its codes but, rather, the fact that they didn't independently create the format, right?

A:   Correct.

Ex. D (Risley Dep., at 21:3-10).

Q:   What was your belief of the difference

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | | between Dr. Wang's materials and FastMark or StayWell's materials<br><br>A:  Difference was that FastMark's code of products had been independently developed by them and were not based at all on compilations of ICD9 codes that Dr. Wang had put together and had been licensing in past years to FastMark.<br><br>Ex. D (Risley Dep., at 21:11-22:3).<br>Q:  Okay.  And how confident are you in FastMark's efforts to develop products separate from Dr. Wang's that didn't rely on his material?<br>A:  We were confident enough that they had provided us with enough support to determine that they had in fact used independent developers to compile the codes that they were using, and that the independent developers had not referred to any of Dr. Wang's materials in coming up with those compilations. |
| 27. | The QuickCoder products that FastMark developed without Dr. Wang's codes did not carry Dr. Wang's copyright notice because they did not use Dr. Wang's Copyrighted Material. | Ex. B (Wang Dep. 2, at 194:5-230).<br>Q:  Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you amended the license agreement in 2001.  Do you remember that?<br>A:  I see. |

23

Q:   And we can look at the date in just a minute. But within a year of that you found out that FastMark was creating its own coder products; correct?

A:   In some specialty.

Q:   In some specialties.

So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material?

A:   Exactly.

Q:   So as early as 2002, you knew that?

A:   By this document now.  I have to correct my previous statement; yes.

Ex. C (Wang Dep. 3, at 282:4-16).

Q:   Okay.  And, in fact, throughout the course of the couple of years before the settlement agreement and certainly around the settlement agreement, you actually looked at the independent contracts because FastMark's lawyer provided them to your lawyer showing that they had hired independent coders to pull their own codes, correct?

A:   Fine, yes.

Q:   And it was your position then that while

they may have independently developed the -- their own code lists, they didn't independently develop the format, correct?

A:  Correct.

Ex. C (Wang Dep. 3, at 282:17-283:5).

Q:  Okay.  And it was your position that they should have, if they wanted to develop their own product, they should have recreated the format as well --

A:  Correct.

Q:  -- right?

And that's why you sued them.

A:  Correct.

Q:  Okay.  So you don't have any complaint about the way -- sorry -- you don't have any complaint about the way that FastMark independent- -- independently created its codes but, rather, the fact that they didn't independently create the format, right?

A:  Correct.

| 28. | FastMark did not pay Dr. Wang royalties for the products it independently developed because they did not come within the License Agreement. | Ex. B (Wang Dep. 2, at 194:5-23). Q:  Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you amended the license agreement in 2001.  Do you remember that? A  I see. |

Q:   And we can look at the date in just a minute. But within a year of that you found out that FastMark was creating its own coder products; correct?

A:   In some specialty.

Q:   In some specialties.

So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material?

A:   Exactly.

Q:   So as early as 2002, you knew that?

A:   By this document now.  I have to correct my previous statement; yes.

Ex. B (Wang Dep. 2, at 283:13-24).

Q:   So you're in a license agreement with FastMark; they're paying you royalties; and rather than just pick up the phone and say, "Let's solve this problem," you just filed suit against them?

A:   Probably I did.

Q:   How come you just didn't call them?

A:   I don't know.

Q:   Is it because you knew that they had their own products and you weren't going to get

royalties going forward anyway because that royalty stream was drying up?

A:  Probably.

Ex. B (Wang Dep. 2, at 286:19-287:17).

Q:  Okay.  And here, FastMark's lawyers are stating that -- the issue in the case, which was that it was FastMark's view that they independently develop their coder products and they intended to continue their use; correct?

A:  Yes.

Q:  And "continue" suggests that they were already doing that prior to this letter and prior to the lawsuit, based on your testimony; correct?

A:  Correct.

Q:  So this didn't come as a surprise to you, this statement about FastMark owning their independently-developed coders and continuing to use them?

A:  No, not a surprise.  It's in their viewpoint.

Q:  Right.  And, also, you had seen the evidence of it, that they would have a minimal need to use your coders in 2004 and 2005, because -- because they were developing their own coders; and you knew that because the royalty stream had decreased through -- certainly through that year and the year before; right?

| | | A:  Yes. |
|---|---|---|
| 29. | In 2003, Dr. Wang discovered that FastMark was selling its own QuickCoder guides that looked similar to his own but did not contain Dr. Wang's copyright notice. | Ex. A (Wang Dep. 1, at 11:10-13). Q:  Do you remember having discovered a Quick Coder product in the days before or the time before bringing the lawsuit in 2003 that caused you to bring the lawsuit? A:  Yes. <br><br> Ex. A (Wang Dep. 1, at 107:13-18). Q:  Okay, okay, okay.  And the reason you brought suit against them was because they weren't paying you royalties on the coder products that they were independently developing, and you sued because you said they were using your formatted design, correct? A:  Correct. <br><br> Ex. B (Wang Dep. 2, at 196:14-18). Q:  And one of the problems that you had with the Quick Coder products that FastMark was selling, was that Quick Coder looked so much like your product; correct? A:  Exactly. <br><br> Ex. B (Wang Dep. 2, at 198:10-17). Q:  Okay.  Okay.  And taking a look at the |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

amended complaint that's in front of you, you
see on page 4 you've sued in 2003 on this very
claim, in paragraph 19, that FastMark was
producing and distributing guides that you
believed to be substantially similar to your
copyrighted material; correct?

A:  Exactly.


Ex. B (Wang Dep. 2, at 200:9-16).

Q:  Okay.  So you are making a claim that the
products that Staywell is marketing are
substantially similar to your products?

A:  Correct.

Q:  And you made that claim in 2003 that the
Quick Coder product was substantially similar to
your product?

A:  Correct.


Ex. B (Wang Dep. 2, at 201:1-11).

Q:  And the kinds of things that you've talked
about the last time and that you've stated in your
interrogatory responses, the presentation style of
Rapid Coder, is the -- is where you have your
disagreement with The Staywell Company in its
use of your copyrighted material?

A:  Correct.

Q:  And it was -- it was that presentation style

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

that you were also alleging was misused by FastMark in the 2003 lawsuit; correct?

A:   Correct.


Ex. B (Wang Dep. 2, at 317:8-318:3).

Q:   Well, I'm not talking about a future action. I'm talking about the claims that you brought against FastMark at the time.  You knew that they were developing their own products.  You knew that -- it was your view that their products used your copyrighted material.  You -- you testified that their products were confusing the public because they look like your products. And -- and you wanted to put an end to that, and you did it by filing a lawsuit.

All of that was true; right?  Those were the claims you had against FastMark at the time?

MR. WITTEN:   Objection.  The complaint and the first amended complaint speak for themselves in the 2003 action.

BY MS. CORALLO:

Q:   I'm not talking about the complaint.  I'm talking about what your understanding of events were that led you to the complaint.  Did I state that correctly?

A:   Correct.

| 30. | On July 21, 2003, Dr. Wang sued | Exs. K, L (2003 Complaint, Wang v. FastMark, |

| | | |
|---|---|---|
| | FastMark and its principal, Howard Wolf, in the United States District Court for the Central District of California, Case Number SACV 03-1153 (CJC) (the "2003 Lawsuit"). | and 2003 Amended Complaint, *Wang v. FastMark*). |
| 31. | In that lawsuit, Dr. Wang alleged that FastMark had infringed his compilation copyright in his ICD-9 code selections provided to FastMark under the License Agreement, among other claims. | Ex. L (2003 Amended Complaint, *Wang v. FastMark*). |
| 32. | Dr. Wang also alleged that FastMark's QuickCoder products looked like his Rapid Coder products and that the similar format caused a substantial likelihood of confusion in the marketplace. | Ex. G (Settlement Agreement and Mutual Release ("Settlement Agreement")). <br><br> Ex. A (Wang Dep. 1, at 16:4-23). <br> Q: So if I go get a copy of that settlement agreement -- I'm sorry, of the lawsuit or you bring it to me the next time and that lawsuit contains claims concerning the substantial similarity between Quick Coder and Rapid Coder, you would agree with me then that those claims would be resolved and settled as a result of the settlement agreement? … <br> THE WITNESS: No. This does not release FastMark from repeating the same act in the |

31

subsequent years.  That's my conclusion, and I think it stands to reason that this agreement doesn't bar them from repeating the same act. In other words, in my opinion, the agreement does not permit FastMark to repeat the same action in subsequent years.

Q:   What action is that?

A:   Such as using the structural units or elements or building blocks of my Rapid Coder creation.

Q:   What structural units are you talking about?

A:   I have a whole list of them that I have analyzed based on the material supplied to me and that I can illustrate them one by one later on if you are interested.

Ex. A (Wang Dep. 1, at 94:20-95:6).

Q:   And you said to [Wolf], and I have a property interest in the format and the layout and the setup and the structure and the editing and the formatting and the tabulating, typesetting, grouping, subgrouping, abbreviating, and that you were entitled to protect that as your copyrighted material; is that right?

A:   Yes.

Q:   And those are the same claims you make in this lawsuit, right, that StayWell has infringed

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

your copyright because they have used those same formatting elements; is that true?

A:  True.

Ex. A (Wang Dep. 1, at 101:18-102:11)

A:   My product, yes, they Fastmark were using -- the year 2002 and 2003 are the transitional time that FastMark was developing, quote, unquote, so-called their own version.

Q:   And did you tell them that it wasn't really their own version because they were still using the same design that you claimed to own?

A:  I did not verbally say so, except that there was a lawsuit that was filed in the year 2003, as I recall.

Q:   And you sued because although they may have independently developed the codes, it was your position that they were still using your format?

A:   Correct. …

Q:   Is that why you sued FastMark, is because you believed that you owned more than just the compilations, you owned the format?

A:  Yes.

Ex. A (Wang Dep. 1, at 107:13-18)

Q:   Okay, okay, okay.  And the reason you

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

brought suit against them was because they weren't paying you royalties on the coder products that they were independently developing, and you sued because you said they were using your formatted design, correct?

A:   Correct.

Ex. A (Wang Dep. 1, at 113: 14-19).

Q:   At the point when you settled the lawsuit against FastMark, the point of disagreement between the two of you had been where you told them that you believed that every Quick Coder product that they produced and sold that looked like yours was an infringement of your copyright, correct?

A:   Yes.

Ex. A (Wang Dep. 1, at 116:3-7).

Q:   And you've explained under oath today in your deposition that the infringement claim that you were making is that to which they disagreed, was that the format of Quick Coder belonged to you; is that correct?

A:   Yes.

Ex. A (Wang Dep, 1, 129:1-6).

Q:   Do you agree, Dr. Wang, that the format that

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

FastMark was using over which you sued in 2003 is the same format that Krames is using today?  That's the basis of your lawsuit today, correct?

A:   Exactly.  The lawsuit today is, again, copyright infringement.

Ex. B (Wang Dep. 2, at 196:1-5).

Q:   And that's why, in the middle of 2003, because they were selling their own coder products that you believed were adapted from your copyrighted material, that you sued in 2003?

A:   Yes.

Ex. B (Wang Dep. 2, at 196:14-18).

Q:   And one of the problems that you had with the Quick Coder products that FastMark was selling, was that Quick Coder looked so much like your product; correct?

A:   Exactly.

Ex. B (Wang Dep. 2, at 198:10-17).

Q:   Okay.  Okay.  And taking a look at the amended complaint that's in front of you, you see on page 4 you've sued in 2003 on this very claim, in paragraph 19, that FastMark was

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

producing and distributing guides that you believed to be substantially similar to your copyrighted material; correct?

A:   Exactly.

Ex. B (Wang Dep. 2, at 200:9-16).

Q:   Okay.  So you are making a claim that the products that Staywell is marketing are substantially similar to your products?

A:   Correct.

Q:   And you made that claim in 2003 that the Quick Coder product was substantially similar to your product?

A:   Correct.

Ex. B (Wang Dep. 2, at 201:1-11).

Q:   And the kinds of things that you've talked about the last time and that you've stated in your interrogatory responses, the presentation style of Rapid Coder, is the -- is where you have your disagreement with The Staywell Company in its use of your copyrighted material?

A:   Correct.

Q:   And it was -- it was that presentation style that you were also alleging was misused by FastMark in the 2003 lawsuit; correct?

A:   Correct.

Ex. B (Wang Dep. 2, at 203:3-14).

Q:   Well, I mean, separate and apart from the amended complaint, it's your testimony today that even then, back in 2002, you believed that your copyrighted material, that you had licensed to FastMark, included the formatting style, the presentation style, of the Rapid Coder; correct?

A:   Correct.

Q:   And when your -- and you instructed your lawyers to file suit on your behalf because -- because FastMark was using your copyrighted format; correct?

A:   Correct.

Ex. B (Wang Dep. 2, at 317:8-318:3).

Q:   Well, I'm not talking about a future action. I'm talking about the claims that you brought against FastMark at the time.  You knew that they were developing their own products.  You knew that -- it was your view that their products used your copyrighted material.  You -- you testified that their products were confusing the public because they look like your products. And -- and you wanted to put an end to that, and you did it by filing a lawsuit.

All of that was true; right?  Those were the

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

claims you had against FastMark at the time?

MR. WITTEN:   Objection.  The complaint and the first amended complaint speak for themselves in the 2003 action.

BY MS. CORALLO:

Q:   I'm not talking about the complaint.  I'm talking about what your understanding of events were that led you to the complaint.  Did I state that correctly?

A:   Correct.


Ex. B (Wang Dep. 2, at 320:8-22).

Q:   And what -- what conduct of FastMark was the basis for your infringement and trademark claims?

MR. WITTEN:  Objection.  Asked and answered.

THE WITNESS:  They made use of part of my copyrighted material to compile their own edition.

BY MR. CORALLO:

Q:   And that's the claim that you gave up in the settlement agreement; correct?

A:  Yes.

Q:   Okay.  And the claim that you gave up under the settlement agreement was that the Quick Coder product used your material and looked

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | like your Rapid Coder; correct?<br><br>A:  Yes. |
| 33. | FastMark denied Dr. Wang's claims. | Ex. G (Settlement Agreement).<br><br>Ex. B (Wang Dep. 2, at 286:19-24).<br>Q:  Okay.  And here, FastMark's lawyers are stating that -- the issue in the case, which was that it was FastMark's view that they independently develop their coder products and they intended to continue their use; correct?<br>A:  Yes. |
| 34. | FastMark took the position that it had independently created its QuickCoder products by hiring professional certified coders to make its ICD-9 codes selections, and those coders did so without use or reliance on Dr. Wang's or anyone else's selection of ICD-9 codes, as required under their independent development contracts. | Ex. B (Wang Dep. 2, at 286:19-24).<br>Q:  Okay.  And here, FastMark's lawyers are stating that -- the issue in the case, which was that it was FastMark's view that they independently develop their coder products and they intended to continue their use; correct?<br>A:  Yes.<br><br>Ex. C (Wang Dep. 3, at 282:4-16).<br>Q:  Okay.  And, in fact, throughout the course of the couple of years before the settlement agreement and certainly around the settlement agreement, you actually looked at the independent contracts because FastMark's lawyer provided them to your lawyer showing that they had hired independent coders to pull |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

their own codes, correct?

A:   Fine, yes.

Q:   And it was your position then that while they may have independently developed the -- their own code lists, they didn't independently develop the format, correct?

A:   Correct.


Ex. C (Wang Dep. 3, at 282:17-283:5).

Q:   Okay.  And it was your position that they should have, if they wanted to develop their own product, they should have recreated the format as well --

A:   Correct.

Q:   -- right?

And that's why you sued them.

A:   Correct.

Q:   Okay.  So you don't have any complaint about the way -- sorry -- you don't have any complaint about the way that FastMark independent- -- independently created its codes but, rather, the fact that they didn't independently create the format, right?

A:   Correct.


Ex. D (Risley Dep., at 21:3-10).

Q:   What was your belief of the difference

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

between Dr. Wang's materials and FastMark or StayWell's materials?

A:   Difference was that FastMark's code of products had been independently developed by them and were not based at all on compilations of ICD9 codes that Dr. Wang had put together and had been licensing in past years to FastMark.

Ex. D (Risley Dep., at 21:11-22:3).

Q:   Okay.  And how confident are you in FastMark's efforts to develop products separate from Dr. Wang's that didn't rely on his material?

A:   We were confident enough that they had provided us with enough support to determine that they had in fact used independent developers to compile the codes that they were using, and that the independent developers had not referred to any of Dr. Wang's materials in coming up with those compilations.

| 35. | FastMark advised Dr. Wang that FastMark owned its independently created coder products  and intended to continue selling QuickCoders free and clear of Dr. Wang's | Ex. I (letter dated Oct. 15, 2003, from FastMark's attorney Tait Graves to Plaintiff's attorney, Jen-Feng Lee ("FastMark owns these independently developed coders and intends to continue their use.  Thus, FastMark has only a minimal need for Dr. Wang's coders in 2004 and |
|---|---|---|

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | |
|---|---|
| copyright claims. | 2005, and has no obligation to use them at all.")). |
| | Ex. B (Wang Dep. 2, at 194:5-23). |
| | Q:   Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you amended the license agreement in 2001.  Do you remember that? |
| | A:  I see. |
| | Q:   And we can look at the date in just a minute. But within a year of that you found out that FastMark was creating its own coder products; correct? |
| | A:   In some specialty. |
| | Q:   In some specialties.  So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material? |
| | A:   Exactly. |
| | Q:   So as early as 2002, you knew that? |
| | A:   By this document now.  I have to correct my previous statement; yes. |
| | Ex. B (Wang Dep. 2, at 271:19-272:4). |
| | Q:   Okay.  And you also knew that they were -- |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

"they" being FastMark -- were requesting -- were not requesting as many codes from you; right?

A:   Correct.

Q:   And what was your conclusion?

A:   My conclusion was that perhaps pharmaceutical companies are not buying this product as often as they wanted before.

Q:   And you suspected early on that they might be developing their own products; right?

A:   Yes, they might be.

Ex. B (Wang Dep. 2, at 285:24-286:12).

Q:   And do you see in the third paragraph of the letter where it says, "FastMark owns these independently developed coders and intends to continue their use"?

A:   Yes.

Q:   That was your view at the time, too, wasn't it?

A:   Yes.

Q:   And when he goes on to say, "Thus, FastMark has only a minimal need for Dr. Wang's coders in 2004 and 2005, and has no obligation to use them at all."  You also were aware of that as well; right?

A:   Correct.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

Ex. B (Wang Dep. 2, at 286:19-287:17).

Q:   Okay.  And here, FastMark's lawyers are stating that -- the issue in the case, which was that it was FastMark's view that they independently develop their coder products and they intended to continue their use; correct?

A:   Yes.

Q:   And "continue" suggests that they were already doing that prior to this letter and prior to the lawsuit, based on your testimony; correct?

A:   Correct.

Q:   So this didn't come as a surprise to you, this statement about FastMark owning their independently-developed coders and continuing to use them?

A:   No, not a surprise.  It's in their viewpoint.

Q:   Right.  And, also, you had seen the evidence of it, that they would have a minimal need to use your coders in 2004 and 2005, because -- because they were developing their own coders; and you knew that because the royalty stream had decreased through -- certainly through that year and the year before; right?

A:   Yes.

Ex. B (Wang Dep. 2, at 292:8-293:7).

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

Q:  And you knew, when you entered into the settlement agreement, that FastMark intended to continue marketing its own products; correct?

A:  I thought they would.

Q:  Because that's what the lawyer tells you right here -- tells your lawyer -- that FastMark owns these coders and intends to continue their use.  Do you see that?

A:  Correct.

Q:  And so that gave you -- gave you your awareness that they were going to proceed beyond the settlement, in using their own coder products; right?

A:  Correct.

Q:  And you never told them otherwise.

MR. WITTEN:  I'm sorry.  Vague and ambiguous.

BY MS. CORALLO:

Q:  Did you ever tell FastMark otherwise, that they did not have the right to market their products after the settlement agreement?

A:  No, I didn't.

Q:  And you had no reason to believe, at the time of the settlement, that they would not market Quick Coder after the settlement agreement?

A:  No.

6203777
THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

Ex. B (Wang Dep. 2, at 317:8-318:3).

Q:   Well, I'm not talking about a future action. I'm talking about the claims that you brought against FastMark at the time.  You knew that they were developing their own products.  You knew that -- it was your view that their products used your copyrighted material.  You -- you testified that their products were confusing the public because they look like your products. And -- and you wanted to put an end to that, and you did it by filing a lawsuit.  All of that was true; right?  Those were the claims you had against FastMark at the time?

MR. WITTEN:  Objection.  The complaint and the first amended complaint speak for themselves in the 2003 action.

BY MS. CORALLO:

Q:   I'm not talking about the complaint.  I'm talking about what your understanding of events were that led you to the complaint.  Did I state that correctly?

A:   Correct.

| 36. | Around mid-2003 (the same time of Dr. Wang's lawsuit against FastMark), StayWell began a due | Ex. D (Risley Dep., at 8:23-9:9). Q:   Were you involved in the acquisition of FastMark? |

| diligence investigation of FastMark in connection with its purchase of FastMark and FastMark's line of quick reference coding guides. | A:  Yes.<br>Q:  What was your role in that?<br>A:  To provide assistance and guidance to the business unit managers who wish to do the acquisition.<br>Q:  What kind of guidance did you provide?<br>A:  Evaluating the company, the feasibility of making an acquisition, trying to ascertain what a proper value to pay for the business would be, helping with and guiding the due diligence process, and helping to negotiate the purchase agreement.<br><br>Ex. D (Risley Dep., at 11:10-16).<br>Q:  What was the opinion of the company [StayWell]?<br>A:  The opinion of the company was FastMark had developed its own products based upon due diligence work that we had done and given that the company was – had protection under the Settlement Agreement so long as it was using the products that had been developed by FastMark.<br><br>Ex. D (Risley Dep., at 36:1-7).<br>A:  While we [StayWell] were reviewing the acquisition, we were aware that FastMark had developed its own products in some specialties. |

| | | In our due diligence we became aware that in 2003 they had utilized some of Dr. Wang's products in certain specialties where they had not developed their own yet and paid royalties to him based upon that. |
|---|---|---|
| 37. | During the due diligence, StayWell learned of Dr. Wang's lawsuit and the claims that FastMark's QuickCoder products infringed Dr. Wang's copyright, breached the License Agreement and violated Dr. Wang's trademark in Rapid Coder. | Ex. D (Risley Dep., at 36:1-15). A:   While we [StayWell] were reviewing the acquisition, we were aware that FastMark had developed its own products in some specialties. In our due diligence we became aware that in 2003 they had utilized some of Dr. Wang's products in certain specialties where they had not developed their own yet and paid royalties to him based upon that. Our position as businessmen was we want to reduce unnecessary costs to the extent we could do so.  And we wanted to continue the program that FastMark had started themselves in developing and maintaining their own internally produced independently developed products. After the Settlement Agreement, we were even more concerned with having any use of Dr. Wang's products going forward.  We just wanted to get away from it completely. |
| 38. | StayWell informed FastMark that | Ex. D (Risley Dep., at 38:14-39:2). |

it could not go forward with its purchase if FastMark's principal asset, QuickCoder, was in doubt.

Q:  Was there any concern that FastMark's products that FastMark had allegedly independently created, they could still infringe on Dr. Wang's copyrights?

A:  I don't think it was a big concern.  We [StayWell] would not have done the acquisition if we were not confident that the codes that we were buying as a part of the acquisition were in deed FastMark's codes.  To us it's part of the value of what you're buying is intellectual property in a business.  And if that was a big concern, and particularly given the claim in the lawsuit and the Settlement Agreement eventually that was reached with FastMark and Dr. Wang, if that was still a concern of ours, we would not have bought the business.

Ex. D (Risley Dep., at 39:3-20).

Q:  Did StayWell do any analysis in the 2003, 2004 time frame of actually taking Dr. Wang's products and comparing them to FastMark's products?

A:  I'm not aware that a detailed analysis was made of the two.  I'm not aware that.  Other than codes that Dr. Wang provided to FastMark for their use in publishing under the License Agreement, I'm not aware that FastMark had

6203777

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | access to any of Dr. Wang's codes.  I know personally for myself, I've never even seen a Dr. Wang product.  So our -- an analysis that we would have done prior to the acquisition that detailed, no, I don't believe that was done.  We did ask for documentation from FastMark that they had independently developed their own compilations of ICD9 codes and they provided us with documents from the consultants that they had utilized for doing that.  And that satisfied us.  I was comfortable that in fact they developed them independently. |
| 39. | StayWell suggested that FastMark resolve the lawsuit with Dr. Wang. | Ex.D (Risley Dep., at 38:14-39:2). Q:  Was there any concern that FastMark's products that FastMark had allegedly independently created, they could still infringe on Dr. Wang's copyrights? A:  I don't think it was a big concern.  We would not have done the acquisition if we were not confident that the codes that we were buying as a part of the acquisition were in deed FastMark's codes.  To us it's part of the value of what you're buying is intellectual property in a business.  And if that was a big concern, and particularly given the claim in the lawsuit and the Settlement Agreement eventually that was |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | reached with FastMark and Dr. Wang, if that was still a concern of ours, we would not have bought the business. |
| 40. | StayWell also requested that FastMark deliver clear title to FastMark's QuickCoder products unencumbered by Dr. Wang's claims, or it could not close the transaction. | Ex. D (Risley Dep., at 11:10-16). Q:   What was the opinion of the company? A:   The opinion of the company was FastMark had developed its own products based upon due diligence work that we had done and given that the company was – had protection under the Settlement Agreement so long as it was using the products that had been developed by FastMark. Ex. D (Risley Dep., at 38:14-39:2). Q:   Was there any concern that FastMark's products that FastMark had allegedly independently created, they could still infringe on Dr. Wang's copyrights? A:   I don't think it was a big concern.  We would not have done the acquisition if we were not confident that the codes that we were buying as a part of the acquisition were in deed FastMark's codes.  To us it's part of the value of what you're buying is intellectual property in a business.  And if that was a big concern, and particularly given the claim in the lawsuit and the Settlement Agreement eventually that was |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

reached with FastMark and Dr. Wang, if that was still a concern of ours, we would not have bought the business.

Ex. D (Risley Dep., at 39:3-20).

Q:   Did StayWell do any analysis in the 2003, 2004 time frame of actually taking Dr. Wang's products and comparing them to FastMark's products?

A:   I'm not aware that a detailed analysis was made of the two.  I'm not aware that.  Other than codes that Dr. Wang provided to FastMark for their use in publishing under the License Agreement, I'm not aware that FastMark had access to any of Dr. Wang's codes.  I know personally for myself, I've never even seen a Dr. Wang product.  So our -- an analysis that we would have done prior to the acquisition that detailed, no, I don't believe that was done.  We did ask for documentation from FastMark that they had independently developed their own compilations of ICD9 codes and they provided us with documents from the consultants that they had utilized for doing that.  And that satisfied us. I was comfortable that in fact they developed them independently.

| 41. | On October 31, 2003, FastMark completed settlement negotiations with Dr. Wang and delivered to StayWell a Settlement Agreement and Mutual Release ("Settlement Agreement") resolving the 2003 lawsuit and the claims against the QuickCoder product line. | Ex. G (Settlement Agreement). |
|---|---|---|
| 42. | Dr. Wang accepted a cash payment of $215,000, in exchange for dismissing the lawsuit with prejudice and a broad general release of any and all claims against FastMark and its successors and assigns that relate to QuickCoder, the license agreement, and the lawsuit. | Ex. G (Settlement Agreement).<br><br>Ex. A (Wang Dep. 1, at 115:13-117:4).<br>A:  This is a Settlement Agreement and Mutual Release.<br>Q:  Between yourself and FastMark?<br>A:  Correct.<br>Q:  And the Wolfs?<br>A:  Yes.<br>Q:  And it's dated October 31, 2003?<br>A:  Correct.<br>Q:  Do you see in paragraph B on page 1, Whereas, Wang alleged copyright infringement upon his works represented by the copyright registrations that are listed there?<br>A:  Yes.<br>Q:  That refers to the lawsuit that you filed?<br>A:  Yes. |

Q:  And you've explained under oath today in your deposition that the infringement claim that you were making is that to which they disagreed, was that the format of Quick Coder belonged to you; is that correct?

A:  Yes.

Q:  That's why paragraph C says, "Whereas, FastMark and Wolf denied the infringement claims and unfair competition claims alleged in the Action," correct?

A:  Correct.

Q:  And paragraph D says that the parties, all parties, desire to settle, and it goes on to say that "The parties deem such settlement to be in their respective best interests in light of the expense of litigation and in order to put to rest all claims by or between them."

Do you see that?

A:  Yes.

Q:  And that means that nobody is admitting that they are right or wrong, they're just agreeing not to pursue it any further, correct?

A:  Correct.

Q:  Then the next page explains that you're going to get a prepaid royalty payment, correct?

A:  Correct.

Q:  And that's going to be in settlement of your

54

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | claims that they're violating the copyright that you claim to own in the format of the coder products, correct?<br>A:   Correct.<br><br>Ex. A (Wang Dep. 1, at 116:23-117:4).<br>Q:   Then the next page explains that you're going to get a prepaid royalty payment, correct?<br>A:   Correct.<br>Q:   And that's going to be in settlement of your claims that they're violating the copyright that you claim to own in the format of the coder products, correct?<br>A:   Correct. |
| 43. | FastMark and its successor StayWell secured rights under the license agreement to license Dr. Wang's codes and pay him a royalty. | Ex. D (Risley Dep., at 20:13-16).<br>Q:   Okay.  Are you aware that the License Agreement between Dr. Wang and FastMark was still in effect when StayWell acquired FastMark?<br>A:  Yes.<br><br>Ex. D (Risley Dep., at 22:21-23:2).<br>A:   It's my understanding of the Settlement Agreement that we had the right to use Dr. Wang's products, compiled ICD9 codes through his copyrighted material only under the License Agreement and under the terms of the License |

| | | |
|---|---|---|
| | | Agreement.  So if you were going to use his materials outside of the License Agreement, you were breaching the License Agreement.<br><br>Ex. D (Risley Dep., at 30:4-16).<br>A:   StayWell agrees with everything that begins with StayWell can claim a license.  I don't know what you mean regardless of what happens in the future.  But the License Agreement that was in effect stayed in effect.  We understood that. We understood that the monies that were paid in the Settlement Agreement were to be applied towards prepaid royalties, and to the extent that we utilized Wang's copyrighted material under the License Agreement, the sales would count against those prepaid royalties, if you would call them that.  And to the extent that our sales under the terms of the License Agreement exceeded those royalties, we would owe more royalties. |
| 44. | Even before execution of the Settlement Agreement, Dr. Wang knew that FastMark was developing and selling its own coder products, and that FastMark intended to continue selling its own coder products | Ex. I (letter dated Oct. 15, 2003, from FastMark's attorney Tait Graves to Plaintiff's attorney, Jen-Feng Lee ("FastMark owns these independently developed coders and intends to continue their use.  Thus, FastMark has only a minimal need for Dr. Wang's coders in 2004 and 2005, and has no obligation to use them at |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| after the parties executed the Settlement Agreement. | all.")). <br><br> Ex. B (Wang Dep. 2, at 194:5-24). <br> Q:   Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you amended the license agreement in 2001.  Do you remember that? <br> A:   I see. <br> Q:   And we can look at the date in just a minute. But within a year of that you found out that FastMark was creating its own coder products; correct? <br> A:   In some specialty. <br> Q:   In some specialties.  So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material? <br> A:   Exactly. <br> Q:   So as early as 2002, you knew that? <br> A:   By this document now.  I have to correct my previous statement; yes. <br><br> Ex. B (Wang Dep. 2, at 271:19-272:4). <br> Q:   Okay.  And you also knew that they were -- "they" being FastMark -- were requesting -- |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

were not requesting as many codes from you; right?

A:   Correct.

Q:   And what was your conclusion?

A:   My conclusion was that perhaps pharmaceutical companies are not buying this product as often as they wanted before.

Q:   And you suspected early on that they might be developing their own products; right?

A:   Yes, they might be.

Ex. B (Wang Dep. 2, at 285:24-286:12).

Q:   And do you see in the third paragraph of the letter where it says, "FastMark owns these independently developed coders and intends to continue their use"?

A:   Yes.

Q:   That was your view at the time, too, wasn't it?

A:   Yes.

Q:   And when he goes on to say, "Thus, FastMark has only a minimal need for Dr. Wang's coders in 2004 and 2005, and has no obligation to use them at all."  You also were aware of that as well; right?

A:   Correct.

Ex. B (Wang Dep. 2, at 286:19-287:17).

Q:   Okay.  And here, FastMark's lawyers are stating that -- the issue in the case, which was that it was FastMark's view that they independently develop their coder products and they intended to continue their use; correct?

A:  Yes.

Q:   And "continue" suggests that they were already doing that prior to this letter and prior to the lawsuit, based on your testimony; correct?

A:   Correct.

Q:   So this didn't come as a surprise to you, this statement about FastMark owning their independently-developed coders and continuing to use them?

A:  No, not a surprise.  It's in their viewpoint.

Q:   Right.  And, also, you had seen the evidence of it, that they would have a minimal need to use your coders in 2004 and 2005, because -- because they were developing their own coders; and you knew that because the royalty stream had decreased through -- certainly through that year and the year before; right?

A:  Yes.


Ex. B (Wang Dep. 2, at 292:8-293:7).

Q:   And you knew, when you entered into the

6203777

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

settlement agreement, that FastMark intended to continue marketing its own products; correct?

A:   I thought they would.

Q:   Because that's what the lawyer tells you right here -- tells your lawyer -- that FastMark owns these coders and intends to continue their use.  Do you see that?

A:   Correct.

Q:   And so that gave you -- gave you your awareness that they were going to proceed beyond the settlement, in using their own coder products; right?

A:   Correct.

Q:   And you never told them otherwise.

MR. WITTEN:  I'm sorry.  Vague and ambiguous.

BY MS. CORALLO:

Q:   Did you ever tell FastMark otherwise, that they did not have the right to market their products after the settlement agreement?

A:   No, I didn't.

Q:   And you had no reason to believe, at the time of the settlement, that they would not market Quick Coder after the settlement agreement?

A:   No.

| | | Ex. B (Wang Dep. 2, at 317:8-318:3). |
|---|---|---|
| | | Q:  Well, I'm not talking about a future action.  I'm talking about the claims that you brought against FastMark at the time.  You knew that they were developing their own products.  You knew that -- it was your view that their products used your copyrighted material.  You -- you testified that their products were confusing the public because they look like your products.  And -- and you wanted to put an end to that, and you did it by filing a lawsuit.  All of that was true; right?  Those were the claims you had against FastMark at the time?  MR. WITTEN:  Objection.  The complaint and the first amended complaint speak for themselves in the 2003 action.  BY MS. CORALLO:  Q:  I'm not talking about the complaint.  I'm talking about what your understanding of events were that led you to the complaint.  Did I state that correctly?  A:  Correct. |
| 45. | Section (i) of the General Release of Claims releases FastMark and its principal from all claims of any nature whatsoever without limitation. | Ex. G (Settlement Agreement, ¶ 3(i)). |

| 46. | Section (ii) releases FastMark's successors and assigns from all claims of any nature whatsoever relating to the circumstances giving rise to or connected with the 2003 lawsuit or arising out of or relating to the License Agreement. | Ex. G (Settlement Agreement, ¶ 3(ii)). |
| 47. | The General Release provides: Wang…hereby releases and forever discharges (i) FastMark, Inc. and Wolf, from any and all claims demands obligations, losses, causes of action, costs, expenses, attorneys' fees and liabilities of any nature whatsoever, whether based on contract, tort, statutory or other legal or equitable theory of recovery, and whether known or unknown which Wang, had or claims to have against FastMark, Inc. and or Wolf; and (ii) FastMark, Inc.'s…successors and assigns (the "Released Parties") from any and all claims, demands, obligations, | Ex. G (Settlement Agreement, ¶ 3). |

| | | |
|---|---|---|
| | losses, causes of action, costs, expenses, attorneys' fees and liabilities of any nature whatsoever, arising out of or relating to the circumstances giving rise to or connected with the Action or arising out of or relating to the non-exclusive license between Fastmark, Inc. and Wang, whether based on contract, tort, statutory or other legal or equitable theory of recovery, whether known or unknown which Wang has, had, or claims to have against the Released Parties. | |
| 48. | In paragraph 4 of the Settlement Agreement, Dr. Wang specifically acknowledged on advice of counsel that he was familiar with the provisions of Section 1542 of the California Civil Code and "knowingly waives and relinquishes any and all rights which he has under the provisions of Section 1542, as well as any other similar statute | Ex. G (Settlement Agreement, ¶ 4, 7). <br><br> Ex. B (Wang Dep. 2, at 307:22-308:16). <br> Q:  And did you have legal counsel when you signed the settlement agreement? <br> A:  Mr. Lee. <br> Q:  And you relied on your legal counsel -- <br> A:  Yes. <br> Q:  -- to advise you whether this agreement best protected your interest? <br> A:  I relied on his advice, yes. |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | or common law principle. | Q:  Okay.  And nobody coerced you into signing this agreement?<br><br>A:  No.<br><br>Q:  You didn't sign it under duress?<br><br>A:  No.<br><br>Q:  You don't -- you don't believe that there was any fraud, relative to the drafting or the signing of this agreement?<br><br>A:  No.<br><br>Q:  And you haven't sued your lawyer because he made a bad deal for you?<br><br>A:  No. |
| 49. | The Settlement Agreement contains the language of section 1542, which states:<br>A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor. | Ex. G (Settlement Agreement, ¶ 4). |
| 50. | In the Recitals of the Settlement Agreement, the parties affirmed that "FastMark and Wolf denied the infringement claims and | Ex. G (Settlement Agreement, Recitals (I.C-D)). |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | unfair competition claims alleged in the [2003 lawsuit]" but that "[t]he parties deem such settlement to be in their respective best interests in light of the expense of litigation and in order to put to rest all claims by or between them." | |
| 51. | In paragraph 5 of the Settlement Agreement, the parties reiterated that the Settlement Agreement "is a compromise settlement, and that the sums and covenants given in consideration of this Agreement, as well as the execution of this Agreement, shall not be construed to be an admission of liability on the part of any party with respect to the disputed matters set forth above." | Ex. G (Settlement Agreement, ¶ 5). |
| 52. | As consideration for the Settlement Agreement, FastMark agreed to pay Dr. Wang two payments of $125,000 and $90,000, on November 15, 2003 and November 15, 2004, | Ex. G (Settlement Agreement, ¶ 1(a)-(b)). |

6203777

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | respectively, as prepaid royalties should FastMark use "Wang's Copyrighted Material (as defined in the FastMark, Inc./Wang nonexclusive license agreement)" in 2004 and 2005 and regardless of whether FastMark actually did use Dr. Wang's codes. | |
| 53. | If FastMark did use Dr. Wang's Copyrighted Material, the Settlement Agreement sets forth a mechanism for reporting sales and reconciling the amount of royalties owed in excess of the prepaid royalties. | Ex. G (Settlement Agreement, ¶ 1(d)). |
| 54. | Section 1(d) provides: Within thirty (30) days following the end of year 2004 and 2005, respectively, Fastmark, Inc. shall provide a certificate signed by its chief financial officer certifying the Gross Invoices Sales for the preceding year (the Report of Sales).  In the event the Report of Sales indicates that amount of royalties due, with rates defined | Ex. G (Settlement Agreement, ¶ 1(d)). |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | in the non-exclusive license agreement, including any amendment thereto, are in excess of the minimum royalties stated hereinabove, the payment of such excess royalties shall be due and payable on the date of, and be accompanied by, the Report of Sales. | |
| 55. | Because there had been no use of Dr. Wang's Copyrighted Material since the Settlement Agreement in 2003 (and to this day), Dr. Wang did not request nor have there been any sales reports exchanged or royalty payments made to Dr. Wang, even though Dr. Wang now contends that StayWell uses his Copyrighted Material in sales of FastMark's coder products. | Ex.B (Wang Dep. 2, at 176:25-177:10). Q:  Did The Staywell Company pay you any royalties during the period after the settlement agreement and after the assignment of the license agreement, on any of its sales of coder products A:  No.<br><br>Ex. B (Wang Dep. 2, at 177:11-178:1). Q:  And after you consented to the assignment of the license agreement, did you ever inquire of The Staywell Company as to what sales it was making and what royalties were owed during that time period? A:  No. Q:  In that time period, did The Staywell Company ever ask you to compile codes for them? |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

A:   No, they never did.

Q:   Was there any interaction with The Staywell Company regarding the creation of the Smart Coder and Express Coder products, similar to the interaction that you had with the FastMark Company when you were delivering codes to FastMark for the production of Quick Coder?

A:   No, they never did.

Ex. B (Wang Dep. 2, at 184:24-185:7).
After the settlement agreement with FastMark, did you ever inquire of FastMark -- or after you learned there was a successor to FastMark -- about the sales reports for the coder products that were made that utilized your copyrighted material?

A:   No, I did not approach them for such report. I just assumed that they would send to me directly whatever is involved.

Ex. B (Wang Dep. 2, at 186:17-187:7).
Q:   Okay.  And so in 2004, at the conclusion of that licensing year, did you make inquiry if they had overlooked?  Did you make inquiry about whether there were any sales to report?

A:   No, I didn't.

Q:   And then if both of you had overlooked it at

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

the end of 2004, did you or they raise the issue in 2005 about sales reports?

A:  No.

Q:  Okay.  And so at the end of 2005, another year under the settlement agreement when a report was due, if there was a use of your copyrighted material, did you make any inquiry concerning any revenues earned based on the use of your copyrighted material?

A  No, I didn't.

Ex. D (Risley Dep., at 21:11-19).

Q:  How confident are you or were you in StayWell's efforts to independently develop those separate from Dr. Wang?

MS. CORALLO:  You said StayWell.

MR. WITTEN:  StayWell, yeah.

A:  So this is after the acquisition?

BY MR. WITTEN:

Q:  Yes.

A:  Very confident.

Ex. D (Risley Dep., at 33:25-34:13).

A:  The business plan and the business rationale, as we were contemplating the acquisition, was to minimize costs of the business as much as possible.  So to the extent

that we would be utilizing our own intellectual property, our own being FastMark's intellectual property going forward after the acquisition, that would reduce cost.

BY MR. WITTEN:

Q:   Okay.  So part of the plan for StayWell then to continue selling its products was to create its own products that would not fall under Dr. Wang's copyrights?

A:   Or continue to use and update the products that FastMark had already created.

Ex. D (Risley Dep., at 36:1-37:15).

A:   While we were reviewing the acquisition, we were aware that FastMark had developed its own products in some specialties.  In our due diligence we became aware that in 2003 they had utilized some of Dr. Wang's products in certain specialties where they had not developed their own yet and paid royalties to him based upon that.

Our position as businessmen was we want to reduce unnecessary costs to the extent we could do so.  And we wanted to continue the program that FastMark had started themselves in developing and maintaining their own internally produced independently developed products.

After the Settlement Agreement, we were even more concerned with having any use of Dr. Wang's products going forward.  We just wanted to get away from it completely.

And it's my recollection that I was concerned whether or not we would have to utilize any of Dr. Wang's codes in 2004 to fulfill any contracts that FastMark had already signed with customers or was in the process of negotiating with customers at the time of the acquisition.  These would be contracts that would become now our obligation to fulfill to customers.

And I know that -- my recollection is that the answer came back -- there was nothing that was in the works or had been signed with a customer that would require the use of codes from Dr. Wang.  Everything that had been signed up to that point or was in negotiation with customers could be fulfilled with codes that had been developed internally and independently by FastMark.

After the closing, after we bought the business, we made it a point to utilize just codes that had been developed internally and not have to rely on Dr. Wang's codes.  And to the extent that any of our sales representatives, you know, began a discussion or had a good sales prospect for a

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

particular medical specialty for which a code set had not yet been developed internally, I believe that StayWell had the program that they would begin work on putting those code sets together so that if the sales contract was landed we would be in a position to fulfill the contract with our own codes.

Ex. D (Risley Dep., at 46:8-22).

A:   StayWell has a belief that it developed independently its own compilations of ICD9 codes and developed its own products, and did so as FastMark prior to the acquisition, and did so after the acquisition, with no reference to Dr. Wang's copyrighted material.

BY MR. WITTEN:

Q:   And why did it do that?

MS. CORALLO:  Objection to the form.

A:   I believe we discussed this before.  We did this for two reasons.  One, because the basis of the business would be better if you're utilizing your own intellectual property from a cost standpoint.  And secondly, based upon the legal claim that Dr. Wang had brought against FastMark in 2003, we wanted to get away from utilizing any of Dr. Wang's material in the future.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| 56. | StayWell has never made any requests for Dr. Wang's codes under the License Agreement. | Ex. B (Wang Dep. 2, at 176:25-177:10). Q:  Did The Staywell Company pay you any royalties during the period after the settlement agreement and after the assignment of the license agreement, on any of its sales of coder products A:  No.<br><br>Ex. B (Wang Dep. 2, at 177:11-178:1). Q:  And after you consented to the assignment of the license agreement, did you ever inquire of The Staywell Company as to what sales it was making and what royalties were owed during that time period? A:  No. Q:  In that time period, did The Staywell Company ever ask you to compile codes for them? A:  No, they never did. Q:  Was there any interaction with The Staywell Company regarding the creation of the Smart Coder and Express Coder products, similar to the interaction that you had with the FastMark Company when you were delivering codes to FastMark for the production of Quick Coder? A:  No, they never did. |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

Ex. D (Risley Dep., at 9:21-10:3).

Q:   Did you read the License Agreement prior to the acquisition of FastMark?

A:   I may have glanced at it or looked at it.  It wasn't, in my mind, particularly important.

Q:   Why was that?

A:   FastMark had developed its own products and our anticipation of having to use Dr. Wang's products going forward was very small.

Ex. D (Risley Dep., at 21:11-19).

Q:   How confident are you or were you in StayWell's efforts to independently develop those separate from Dr. Wang?

MS. CORALLO:  You said StayWell.

MR. WITTEN:  StayWell, yeah.

A:   So this is after the acquisition?

BY MR. WITTEN:

Q:   Yes.

A:   Very confident.

Ex. D (Risley Dep., at 33:25-34:13).

A:   The business plan and the business rationale, as we were contemplating the acquisition, was to minimize costs of the business as much as possible.  So to the extent

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

that we would be utilizing our own intellectual property, our own being FastMark's intellectual property going forward after the acquisition, that would reduce cost.

BY MR. WITTEN:

Q:   Okay.  So part of the plan for StayWell then to continue selling its products was to create its own products that would not fall under Dr. Wang's copyrights?

A:   Or continue to use and update the products that FastMark had already created.

Ex. D (Risley Dep., at 36:1-37:15).

A:   While we were reviewing the acquisition, we were aware that FastMark had developed its own products in some specialties.  In our due diligence we became aware that in 2003 they had utilized some of Dr. Wang's products in certain specialties where they had not developed their own yet and paid royalties to him based upon that.

Our position as businessmen was we want to reduce unnecessary costs to the extent we could do so.  And we wanted to continue the program that FastMark had started themselves in developing and maintaining their own internally produced independently developed products.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

After the Settlement Agreement, we were even more concerned with having any use of Dr. Wang's products going forward.  We just wanted to get away from it completely.

And it's my recollection that I was concerned whether or not we would have to utilize any of Dr. Wang's codes in 2004 to fulfill any contracts that FastMark had already signed with customers or was in the process of negotiating with customers at the time of the acquisition.  These would be contracts that would become now our obligation to fulfill to customers.

And I know that -- my recollection is that the answer came back -- there was nothing that was in the works or had been signed with a customer that would require the use of codes from Dr. Wang.  Everything that had been signed up to that point or was in negotiation with customers could be fulfilled with codes that had been developed internally and independently by FastMark.

After the closing, after we bought the business, we made it a point to utilize just codes that had been developed internally and not have to rely on Dr. Wang's codes.  And to the extent that any of our sales representatives, you know, began a discussion or had a good sales prospect for a

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

particular medical specialty for which a code set had not yet been developed internally, I believe that StayWell had the program that they would begin work on putting those code sets together so that if the sales contract was landed we would be in a position to fulfill the contract with our own codes.

Ex. D (Risley Dep., at 46:8-22).

A:   StayWell has a belief that it developed independently its own compilations of ICD9 codes and developed its own products, and did so as FastMark prior to the acquisition, and did so after the acquisition, with no reference to Dr. Wang's copyrighted material.

BY MR. WITTEN:

Q:   And why did it do that?

MS. CORALLO:  Objection to the form.

A:   I believe we discussed this before.  We did this for two reasons.  One, because the basis of the business would be better if you're utilizing your own intellectual property from a cost standpoint.  And secondly, based upon the legal claim that Dr. Wang had brought against FastMark in 2003, we wanted to get away from utilizing any of Dr. Wang's material in the future.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| 57. | Dr. Wang has made no attempt to enforce the license agreement against StayWell or to collect royalties, even though Dr. Wang now claims that all of StayWell's coder products infringe his copyrights. | Ex. B (Wang Dep. 2, at 177:11-178:1).<br><br>Q:  And after you consented to the assignment of the license agreement, did you ever inquire of The Staywell Company as to what sales it was making and what royalties were owed during that time period?<br><br>A:  No.<br><br>Q:  In that time period, did The Staywell Company ever ask you to compile codes for them?<br><br>A:  No, they never did.<br><br>Q:  Was there any interaction with The Staywell Company regarding the creation of the Smart Coder and Express Coder products, similar to the interaction that you had with the FastMark Company when you were delivering codes to FastMark for the production of Quick Coder?<br><br>A:  No, they never did.<br><br>Ex. B (Wang Dep. 2, at 184:24-185:7).<br><br>Q:  After the settlement agreement with FastMark, did you ever inquire of FastMark -- or after you learned there was a successor to FastMark -- about the sales reports for the coder products that were made that utilized your copyrighted material? |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | A:   No, I did not approach them for such report. I just assumed that they would send to me directly whatever is involved.<br><br>Ex. B (Wang Dep. 2, at 186:17-187:7).<br>Q:   Okay.  And so in 2004, at the conclusion of that licensing year, did you make inquiry if they had overlooked?  Did you make inquiry about whether there were any sales to report?<br>A:   No, I didn't.<br>Q:   And then if both of you had overlooked it at the end of 2004, did you or they raise the issue in 2005 about sales reports?<br>A:   No.<br>Q:   Okay.  And so at the end of 2005, another year under the settlement agreement when a report was due, if there was a use of your copyrighted material, did you make any inquiry concerning any revenues earned based on the use of your copyrighted material?<br>A:   No, I didn't. |
| 58. | There are no provisions of the Settlement Agreement that limit FastMark's ability to sell its independently created QuickCoder products. | Ex. G (Settlement Agreement). |

| 59. | There is no temporal limitation in the Settlement Agreement that limits the release of claims to only those claims in existence through the date of the Settlement Agreement. | Ex. G (Settlement Agreement). |
|---|---|---|
| 60. | Dr. Wang takes the position today that he only released claims against FastMark through October 31, 2003, the date of the Settlement Agreement. | Ex. A (Wang Dep. 1, at 13:8-21).<br>Q:  Did you understand as a result of that you were not able to continue with your claims against FastMark as a result of the settlement?<br>A:  That settlement covers what were included up to that point.<br>Q:  What was that?<br>A:  My understanding is that the settlement does not bar any future actions.<br>Q:  How did you derive that understanding, and don't tell me what your lawyers told you?<br>A:  Well, no nothing my lawyer told me.  It's quite clear there was no such clause in the settlement that it will permanently bar me from taking any new action against any new offense.<br><br>Ex. A (Wang Dep. 1, at 15:20-16:3).<br>Q:  So if you brought claims in the lawsuit against FastMark for its use of what you claim to be your format in 2003, would you agree with me, then, that those claims are released as a |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | result of the settlement? …<br><br>A:   Up to 2003, but it doesn't bar anything following that date.<br><br>Ex. A (Wang Dep. 2, at 303:10-14).<br>Q:   So if they went out on November 1st, 2003 -- which is the day after the settlement agreement -- and sold Quick Coder -- that circle "c" FastMark -- could you sue them on November 1st?<br>A:   I certainly can. |
| 61. | Dr. Wang takes the position today that after entering into the Settlement Agreement, FastMark lost its right to sell its QuickCoder product line. | Ex. B (Wang Dep. 2, at 292:25-293-7).<br>Q:   Did you ever tell FastMark otherwise, that they did not have the right to market their products after the settlement agreement?<br>A:   No, I didn't.<br>Q:   And you had no reason to believe, at the time of the settlement, that they would not market Quick Coder after the settlement agreement?<br>A:   No.<br><br>Ex. B (Wang Dep. 2, at 294:23-295:3).<br>Q:   So at the time that you entered into the settlement agreement, you knew -- but didn't tell them [FastMark]-- that if they tried to market |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

their independently-developed coders, that they were infringing?

A:  I'll be watching their product.

Ex. B (Wang Dep. 2, at 298:15-24).

Q:  Okay.  So it's your view that -- that according to your interpretation of the settlement agreement, that they [FastMark] pay you money for -- that they didn't owe because their coder products, in their view, didn't infringe; and they could not market their coder products after -- after the settlement agreement, without also facing another infringement claim.  That's your view of the settlement?

A:  Yes.

Ex. B (Wang Dep. 2, at 321:4-12).

Q:  Okay.  What coder products did FastMark have that they would be allowed to use?

A:  They would be allowed to use in developing their own product that contained not -- no part of my copyrighted material.

Q:  So your testimony here today is that they had to start all over again after the settlement agreement.  That's your testimony?

A:  If they are intelligent.

Ex. B (Wang Dep. 2, at 322:9-15).

Q:   So your sworn testimony today is that it was your expectation that they had no products to market other than starting all over again and developing something that you approved of.  Is that your testimony today?

A:   That's my expectation, but I don't know what their expectation was.


Ex. B (Wang Dep. 2, at 323:5-14).

Q:   Okay.  So when FastMark's lawyer put you on notice that they had independently developed coders -- and I'm reading right from the language of the letter that you said you saw -- and that they intend to continue their use -- continue their use -- you ignored that and decided simply that your view was going to be that they were going to just develop new coder products, not continue the use of the ones they had already developed.

A:   Exactly.

| 62. | Dr. Wang takes the position today that the Settlement Agreement gives him the same rights as if he had adjudicated the 2003 lawsuit to a successful | Ex. B (Wang Dep. 2, at 298:15-24). Q:   Okay.  So it's your view that -- that according to your interpretation of the settlement agreement, that they pay you money for -- that they didn't owe because their coder products, in |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | conclusion and defeated FastMark's claim to own its independently created QuickCoder product line. | their view, didn't infringe; and they could not market their coder products after -- after the settlement agreement, without also facing another infringement claim.  That's your view of the settlement?<br><br>A:  Yes.<br><br>Ex. B (Wang Dep. 2, at 299:14-18)<br>Q:   Okay.  So your view of the settlement agreement is that it is as good as if you had tried the lawsuit to conclusion, and got a finding that their independently-developed products infringed?<br>A:   Correct. |
| 63. | In January 2004, shortly after the Settlement Agreement was executed, StayWell acquired FastMark and FastMark's line of ICD-9 coding guides, known as QuickCoders. | Ex. J (Complaint, ¶ 8).<br><br>Ex. D (Risley Dep., at 9:21-10:3).<br>Q:   Did you read the License Agreement prior to the acquisition of FastMark?<br>A:  I may have glanced at it or looked at it.  It wasn't, in my mind, particularly important.<br>Q:   Why was that?<br>A:   FastMark had developed its own products and our anticipation of having to use Dr. Wang's products going forward was very small. |

Ex. D (Risley Dep., at 18:18-25).

A:   Well, Dr. Wang is claiming that FastMark's products, as they exist today, which are descendents from the products we acquired in 2004, are infringing on his copyrighted material. And it's the same products that we bought with the exception of being updated with new codes added by the federal government, and so therefore relates to the action that was filed in 2003 and settled in 2003.

Ex. D (Risley Dep., at 21:11-22:3).

Q:   How confident are you or were you in StayWell's efforts to independently develop those separate from Dr. Wang?

MS. CORALLO:  You said StayWell.

MR. WITTEN:  StayWell, yeah.

A:   So this is after the acquisition?

BY MR. WITTEN:

Q:   Yes.

A:   Very confident.

Q:   Okay.  And how confident are you in FastMark's efforts to develop products separate from Dr. Wang's that didn't rely on his material?

A:   We were confident enough that they had provided us with enough support to determine that they had in fact used independent

developers to compile the codes that they were using, and that the independent developers had not referred to any of Dr. Wang's materials in coming up with those compilations.

Ex. D (Risley Dep., at 33:11-20).

Q:   All right.  In 2003, 2004 time frame, StayWell came up with some kind of a plan or a procedure on how to handle Dr. Wang's claims and Dr. Wang's copyrights, right?

MS. CORALLO:  Objection to the form.  I think you misstated the time frame.

A:   We came up with a plan on how we were going to continue the development and the updating of the compilations of ICD9 codes and the code of products that FastMark had developed prior to the acquisition.

Ex. D (Risley Dep., at 33:25-34:13).

A:   The business plan and the business rationale, as we were contemplating the acquisition, was to minimize costs of the business as much as possible.  So to the extent that we would be utilizing our own intellectual property, our own being FastMark's intellectual property going forward after the acquisition, that would reduce cost.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

BY MR. WITTEN:

Q:   Okay.  So part of the plan for StayWell then to continue selling its products was to create its own products that would not fall under Dr. Wang's copyrights?

A:   Or continue to use and update the products that FastMark had already created.

Ex. D (Risley Dep., at 36:1-15).

A:   While we were reviewing the acquisition, we were aware that FastMark had developed its own products in some specialties.  In our due diligence we became aware that in 2003 they had utilized some of Dr. Wang's products in certain specialties where they had not developed their own yet and paid royalties to him based upon that.  Our position as businessmen was we want to reduce unnecessary costs to the extent we could do so.  And we wanted to continue the program that FastMark had started themselves in developing and maintaining their own internally produced independently developed products.  After the Settlement Agreement, we were even more concerned with having any use of Dr. Wang's products going forward.  We just wanted to get away from it completely.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | Ex. D (Risley Dep., at 38:14-39:2).<br><br>Q:  Was there any concern that FastMark's products that FastMark had allegedly independently created, they could still infringe on Dr. Wang's copyrights?<br><br>A:  I don't think it was a big concern.  We would not have done the acquisition if we were not confident that the codes that we were buying as a part of the acquisition were in deed FastMark's codes.  To us it's part of the value of what you're buying is intellectual property in a business.  And if that was a big concern, and particularly given the claim in the lawsuit and the Settlement Agreement eventually that was reached with FastMark and Dr. Wang, if that was still a concern of ours, we would not have bought the business. |
| 64. | StayWell continued selling FastMark's coders, now named SmartCoder and ExpressCoder, to FastMark's clients and StayWell's own. | Ex. D (Risley Dep., at 9:21-10:3).<br><br>Q:  Did you read the License Agreement prior to the acquisition of FastMark?<br><br>A:  I may have glanced at it or looked at it.  It wasn't, in my mind, particularly important.<br><br>Q:  Why was that?<br><br>A:  FastMark had developed its own products and our anticipation of having to use Dr. Wang's products going forward was very small. |

Ex. D (Risley Dep., at 18:18-25).

A:   Well, Dr. Wang is claiming that FastMark's products, as they exist today, which are descendents from the products we acquired in 2004, are infringing on his copyrighted material. And it's the same products that we bought with the exception of being updated with new codes added by the federal government, and so therefore relates to the action that was filed in 2003 and settled in 2003.

Ex. D (Risley Dep., at 21:11-22:3).

Q:   How confident are you or were you in StayWell's efforts to independently develop those separate from Dr. Wang?

MS. CORALLO:  You said StayWell.

MR. WITTEN:  StayWell, yeah.

A:   So this is after the acquisition?

BY MR. WITTEN:

Q:   Yes.

A:   Very confident.

Q:   Okay.  And how confident are you in FastMark's efforts to develop products separate from Dr. Wang's that didn't rely on his material?

A:   We were confident enough that they had provided us with enough support to determine

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

that they had in fact used independent developers to compile the codes that they were using, and that the independent developers had not referred to any of Dr. Wang's materials in coming up with those compilations.

Ex. D (Risley Dep., at 33:11-20).

Q:   All right.  In 2003, 2004 time frame, StayWell came up with some kind of a plan or a procedure on how to handle Dr. Wang's claims and Dr. Wang's copyrights, right?

MS. CORALLO:  Objection to the form.  I think you misstated the time frame.

A:   We came up with a plan on how we were going to continue the development and the updating of the compilations of ICD9 codes and the code of products that FastMark had developed prior to the acquisition.

Ex. D (Risley Dep., at 33:25-34:13).

A:   The business plan and the business rationale, as we were contemplating the acquisition, was to minimize costs of the business as much as possible.  So to the extent that we would be utilizing our own intellectual property, our own being FastMark's intellectual property going forward after the acquisition, that

would reduce cost.

BY MR. WITTEN:

Q:   Okay.  So part of the plan for StayWell then to continue selling its products was to create its own products that would not fall under Dr. Wang's copyrights?

A:   Or continue to use and update the products that FastMark had already created.

Ex. D (Risley Dep., at 36:1-15).

A:   While we were reviewing the acquisition, we were aware that FastMark had developed its own products in some specialties.  In our due diligence we became aware that in 2003 they had utilized some of Dr. Wang's products in certain specialties where they had not developed their own yet and paid royalties to him based upon that.  Our position as businessmen was we want to reduce unnecessary costs to the extent we could do so.  And we wanted to continue the program that FastMark had started themselves in developing and maintaining their own internally produced independently developed products. After the Settlement Agreement, we were even more concerned with having any use of Dr. Wang's products going forward.  We just wanted to get away from it completely.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | Ex. D (Risley Dep., at 38:14-39:2). |
| --- | --- | --- |
| | | Q:  Was there any concern that FastMark's products that FastMark had allegedly independently created, they could still infringe on Dr. Wang's copyrights? |
| | | A:  I don't think it was a big concern.  We would not have done the acquisition if we were not confident that the codes that we were buying as a part of the acquisition were in deed FastMark's codes.  To us it's part of the value of what you're buying is intellectual property in a business.  And if that was a big concern, and particularly given the claim in the lawsuit and the Settlement Agreement eventually that was reached with FastMark and Dr. Wang, if that was still a concern of ours, we would not have bought the business. |
| 65. | StayWell continued FastMark's independent development of the ICD-9 codes to distance itself from the claims Dr. Wang asserted in the 2003 lawsuit. | Ex. D (Risley Dep., at 9:21-10:3).  Q:  Did you read the License Agreement prior to the acquisition of FastMark?  A:  I may have glanced at it or looked at it.  It wasn't, in my mind, particularly important.  Q:  Why was that?  A:  FastMark had developed its own products and our anticipation of having to use Dr. Wang's |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

products going forward was very small.

Ex. D (Risley Dep., at 18:18-25).

A:  Well, Dr. Wang is claiming that FastMark's products, as they exist today, which are descendents from the products we acquired in 2004, are infringing on his copyrighted material. And it's the same products that we bought with the exception of being updated with new codes added by the federal government, and so therefore relates to the action that was filed in 2003 and settled in 2003.

Ex. D (Risley Dep., at 21:11-22:3).

Q:  How confident are you or were you in StayWell's efforts to independently develop those separate from Dr. Wang?

MS. CORALLO:  You said StayWell.

MR. WITTEN:  StayWell, yeah.

A:  So this is after the acquisition?

BY MR. WITTEN:

Q:  Yes.

A:  Very confident.

Q:  Okay.  And how confident are you in FastMark's efforts to develop products separate from Dr. Wang's that didn't rely on his material?

A:  We were confident enough that they had

provided us with enough support to determine that they had in fact used independent developers to compile the codes that they were using, and that the independent developers had not referred to any of Dr. Wang's materials in coming up with those compilations.

Ex. D (Risley Dep., at 33:11-20).

Q:  All right.  In 2003, 2004 time frame, StayWell came up with some kind of a plan or a procedure on how to handle Dr. Wang's claims and Dr. Wang's copyrights, right?

MS. CORALLO:  Objection to the form.  I think you misstated the time frame.

A:  We came up with a plan on how we were going to continue the development and the updating of the compilations of ICD9 codes and the code of products that FastMark had developed prior to the acquisition.

Ex. D (Risley Dep., at 33:25-34:13).

A:  The business plan and the business rationale, as we were contemplating the acquisition, was to minimize costs of the business as much as possible.  So to the extent that we would be utilizing our own intellectual property, our own being FastMark's intellectual

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

property going forward after the acquisition, that would reduce cost.

BY MR. WITTEN:

Q:   Okay.  So part of the plan for StayWell then to continue selling its products was to create its own products that would not fall under Dr. Wang's copyrights?

A:   Or continue to use and update the products that FastMark had already created.

Ex. D (Risley Dep., at 36:1-15).

A:   While we were reviewing the acquisition, we were aware that FastMark had developed its own products in some specialties.  In our due diligence we became aware that in 2003 they had utilized some of Dr. Wang's products in certain specialties where they had not developed their own yet and paid royalties to him based upon that.  Our position as businessmen was we want to reduce unnecessary costs to the extent we could do so.  And we wanted to continue the program that FastMark had started themselves in developing and maintaining their own internally produced independently developed products.  After the Settlement Agreement, we were even more concerned with having any use of Dr. Wang's products going forward.  We just wanted

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | to get away from it completely.

Ex. D (Risley Dep., at 38:14-39:2).

Q:  Was there any concern that FastMark's products that FastMark had allegedly independently created, they could still infringe on Dr. Wang's copyrights?

A:  I don't think it was a big concern.  We would not have done the acquisition if we were not confident that the codes that we were buying as a part of the acquisition were in deed FastMark's codes.  To us it's part of the value of what you're buying is intellectual property in a business.  And if that was a big concern, and particularly given the claim in the lawsuit and the Settlement Agreement eventually that was reached with FastMark and Dr. Wang, if that was still a concern of ours, we would not have bought the business. |

| 66. | StayWell fulfilled FastMark's pending contracts by providing FastMark's customers with the QuickCoders that used FastMark's own ICD-9 codes. | Ex. D (Risley Dep., at 36:8-37:15).

Our position as businessmen was we want to reduce unnecessary costs to the extent we could do so.  And we wanted to continue the program that FastMark had started themselves in developing and maintaining their own internally produced independently developed products. |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

After the Settlement Agreement, we were even more concerned with having any use of Dr. Wang's products going forward.  We just wanted to get away from it completely.

And it's my recollection that I was concerned whether or not we would have to utilize any of Dr. Wang's codes in 2004 to fulfill any contracts that FastMark had already signed with customers or was in the process of negotiating with customers at the time of the acquisition.  These would be contracts that would become now our obligation to fulfill to customers.

And I know that -- my recollection is that the answer came back -- there was nothing that was in the works or had been signed with a customer that would require the use of codes from Dr. Wang.  Everything that had been signed up to that point or was in negotiation with customers could be fulfilled with codes that had been developed internally and independently by FastMark.

After the closing, after we bought the business, we made it a point to utilize just codes that had been developed internally and not have to rely on Dr. Wang's codes.  And to the extent that any of our sales representatives, you know, began a discussion or had a good sales prospect for a

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | particular medical specialty for which a code set had not yet been developed internally, I believe that StayWell had the program that they would begin work on putting those code sets together so that if the sales contract was landed we would be in a position to fulfill the contract with our own codes. |
|---|---|---|
| 67. | Since purchasing FastMark, StayWell – like Fastmark before it – hired its own independent certified coders to select and update the ICD-9 codes for the coder products purchased from FastMark. | Ex. O (StayWell's contract with Independent contractor Janice Bayol).<br><br>Ex. C (Wang Dep. 3, at 283:23-284:6).<br>Q:  So while you don't have any argument about Staywell's creation of its code lists, your argument is with the fact that just like FastMark, Staywell didn't independently develop the presentation method, correct?<br>A:  Correct.<br><br>Ex. D (Risley Dep., at 21:11-19).<br>Q:  How confident are you or were you in StayWell's efforts to independently develop those separate from Dr. Wang?<br>MS. CORALLO:  You said StayWell.<br>MR. WITTEN:  StayWell, yeah.<br>A:  So this is after the acquisition?<br>BY MR. WITTEN:<br>Q:  Yes. |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

A:   Very confident.

Ex. D (Risley Dep., at 33:25-34:13).

A:   The business plan and the business rationale, as we were contemplating the acquisition, was to minimize costs of the business as much as possible.  So to the extent that we would be utilizing our own intellectual property, our own being FastMark's intellectual property going forward after the acquisition, that would reduce cost.

BY MR. WITTEN:

Q:   Okay.  So part of the plan for StayWell then to continue selling its products was to create its own products that would not fall under Dr. Wang's copyrights?

A:   Or continue to use and update the products that FastMark had already created.

Ex. D (Risley Dep., at 38:14-39:2).

Q:   Was there any concern that FastMark's products that FastMark had allegedly independently created, they could still infringe on Dr. Wang's copyrights?

A:   I don't think it was a big concern.  We would not have done the acquisition if we were not confident that the codes that we were buying

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | as a part of the acquisition were in deed FastMark's codes.  To us it's part of the value of what you're buying is intellectual property in a business.  And if that was a big concern, and particularly given the claim in the lawsuit and the Settlement Agreement eventually that was reached with FastMark and Dr. Wang, if that was still a concern of ours, we would not have bought the business. |
| 68. | StayWell continued to use the same product format that FastMark had used, since these features and FastMark's product brand was an asset that StayWell purchased from FastMark. | Ex. D (Risley Dep., at 9:21-10:3).<br>Q:   Did you read the License Agreement prior to the acquisition of FastMark?<br>A:   I may have glanced at it or looked at it.  It wasn't, in my mind, particularly important.<br>Q:   Why was that?<br>A:   FastMark had developed its own products and our anticipation of having to use Dr. Wang's products going forward was very small.<br><br>Ex. D (Risley Dep., at 18:18-25).<br>A:   Well, Dr. Wang is claiming that FastMark's products, as they exist today, which are descendents from the products we acquired in |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

2004, are infringing on his copyrighted material. And it's the same products that we bought with the exception of being updated with new codes added by the federal government, and so therefore relates to the action that was filed in 2003 and settled in 2003.

Ex. D (Risley Dep., at 21:11-22:3).

Q:  How confident are you or were you in StayWell's efforts to independently develop those separate from Dr. Wang?

MS. CORALLO:  You said StayWell.

MR. WITTEN:  StayWell, yeah.

A:  So this is after the acquisition?

BY MR. WITTEN:

Q:  Yes.

A:  Very confident.

Q:  Okay.  And how confident are you in FastMark's efforts to develop products separate from Dr. Wang's that didn't rely on his material?

A:  We were confident enough that they had provided us with enough support to determine that they had in fact used independent developers to compile the codes that they were using, and that the independent developers had not referred to any of Dr. Wang's materials in coming up with those compilations.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

Ex. D (Risley Dep., at 33:11-20).

Q:   All right.  In 2003, 2004 time frame, StayWell came up with some kind of a plan or a procedure on how to handle Dr. Wang's claims and Dr. Wang's copyrights, right?

MS. CORALLO:  Objection to the form.  I think you misstated the time frame.

A:   We came up with a plan on how we were going to continue the development and the updating of the compilations of ICD9 codes and the code of products that FastMark had developed prior to the acquisition.


Ex. D (Risley Dep., at 33:25-34:13).

A:   The business plan and the business rationale, as we were contemplating the acquisition, was to minimize costs of the business as much as possible.  So to the extent that we would be utilizing our own intellectual property, our own being FastMark's intellectual property going forward after the acquisition, that would reduce cost.

BY MR. WITTEN:

Q:   Okay.  So part of the plan for StayWell then to continue selling its products was to create its own products that would not fall under Dr.

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

Wang's copyrights?

A:   Or continue to use and update the products that FastMark had already created.

Ex. D (Risley Dep., at 36:1-15).

A:   While we were reviewing the acquisition, we were aware that FastMark had developed its own products in some specialties.  In our due diligence we became aware that in 2003 they had utilized some of Dr. Wang's products in certain specialties where they had not developed their own yet and paid royalties to him based upon that.  Our position as businessmen was we want to reduce unnecessary costs to the extent we could do so.  And we wanted to continue the program that FastMark had started themselves in developing and maintaining their own internally produced independently developed products. After the Settlement Agreement, we were even more concerned with having any use of Dr. Wang's products going forward.  We just wanted to get away from it completely.

Ex. D (Risley Dep., at 38:14-39:2).

Q:   Was there any concern that FastMark's products that FastMark had allegedly independently created, they could still infringe

| | | |
|---|---|---|
| | | on Dr. Wang's copyrights?<br><br>A:  I don't think it was a big concern.  We would not have done the acquisition if we were not confident that the codes that we were buying as a part of the acquisition were in deed FastMark's codes.  To us it's part of the value of what you're buying is intellectual property in a business.  And if that was a big concern, and particularly given the claim in the lawsuit and the Settlement Agreement eventually that was reached with FastMark and Dr. Wang, if that was still a concern of ours, we would not have bought the business. |
| 69. | Dr. Wang admits that the formatting features at issue in this case – what Dr. Wang calls his copyrighted "presentation style" – were part of the claims he sued on in the 2003 lawsuit. | Ex. A (Wang Dep. 1, 94:20-95:6).<br><br>Q:  And you said to [Wolf], and I have a property interest in the format and the layout and the setup and the structure and the editing and the formatting and the tabulating, typesetting, grouping, subgrouping, abbreviating, and that you were entitled to protect that as your copyrighted material; is that right?<br><br>A:  Yes.<br><br>Q:  And those are the same claims you make in this lawsuit, right, that StayWell has infringed your copyright because they have used those same formatting elements; is that true? |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

A:  True.

Ex. A (Wang Dep, 1, 129:1-6).

Q:  Do you agree, Dr. Wang, that the format that FastMark was using over which you sued in 2003 is the same format that Krames is using today?  That's the basis of your lawsuit today, correct?

A:  Exactly.  The lawsuit today is, again, copyright infringement.

Ex. B ( Wang Dep. 2, at 201:1-11).

Q:  And the kinds of things that you've talked about the last time and that you've stated in your interrogatory responses, the presentation style of Rapid Coder, is the -- is where you have your disagreement with The Staywell Company in its use of your copyrighted material?

A:  Correct.

Q:  And it was -- it was that presentation style that you were also alleging was misused by FastMark in the 2003 lawsuit; correct?

A:  Correct.

Ex. B (Wang Dep. 2, at 200:9-16).

Q:  Okay.  So you are making a claim that the products that Staywell is marketing are

substantially similar to your products?

A:   Correct.

Q:   And you made that claim in 2003 that the Quick Coder product was substantially similar to your product?

A:   Correct.


Ex. B (Wang Dep. 2, at 280:12-20).

Q:   And what do you recall being the similarities between Rapid Coder and Quick Coder?

A:   Similarity.  Well, same thing; just -- just this -- you know, same way of typesetting, grouping, subgrouping, table formation and so on.

Q:   So all the same things in this lawsuit, you saw had been done by FastMark in its Quick Coder product?

A:   Yes.


Ex. B (Wang Dep. 2, at 320:8-22).

Q:   And what -- what conduct of FastMark was the basis for your infringement and trademark claims?

MR. WITTEN:  Objection.  Asked and answered.

THE WITNESS:  They made use of part of my copyrighted material to compile their own

edition.

BY MR. CORALLO:

Q:   And that's the claim that you gave up in the settlement agreement; correct?

A:   Yes.

Q:   Okay.  And the claim that you gave up under the settlement agreement was that the Quick Coder product used your material and looked like your Rapid Coder; correct?

A:   Yes.


Ex. C (Wang Dep. 3, at 256:8-24).

Q:   There is a bucket of design elements that you claim to be your copyrighted material, correct?

A:   Yes.

Q:   And those design elements you've identified in your Rapid Coder products, correct?

A:   Yes.

Q:   Are those the same design elements that -- that appear in QuickCoder?

A:   Yes.

Q:   Are those the same design elements that appear in SmartCoder?

A:   Yes.

Q:   Are those the same design elements that appear in --

| | | A:  ExpressCoder. |
| | | Q:  -- ExpressCoder? |
| | | A:  Yes. |
| | | |
| | | Ex. C (Wang Dep. 3, at 257:19-25). |
| | | Q:  So your position then, just to make sure that I understand, is that the same elements that – that you believe infringed when FastMark put them in QuickCoder, are the same elements that you contend Staywell is using to infringe in its products SmartCoder and ExpressCoder? |
| | | A:  Yes. |
| 70. | Dr. Wang filed this lawsuit against StayWell in August 2006. | Ex. J (Plaintiff's 2006 Complaint against StayWell). |
| 71. | In his lawsuit against StayWell, Dr. Wang is making the same claims against StayWell that he made against FastMark and its coder products back in 2003. | Ex. A (Wang Dep. 1, at 94:20-95:6) Q:  And you said to [Wolf], and I have a property interest in the format and the layout and the setup and the structure and the editing and the formatting and the tabulating, typesetting, grouping, subgrouping, abbreviating, and that you were entitled to protect that as your copyrighted material; is that right? A:  Yes. Q:  And those are the same claims you make in this lawsuit, right, that StayWell has infringed your copyright because they have used those |

same formatting elements; is that true?

A:   True.

Ex. B (Wang Dep. 2, at 200:9-16).

Q:   Okay.  So you are making a claim that the products that Staywell is marketing are substantially similar to your products?

A:   Correct.

Q:   And you made that claim in 2003 that the Quick Coder product was substantially similar to your product?

A:   Correct.

Ex. B (Wang Dep. 2, at 200:1-11).

Q:   And the kinds of things that you've talked about the last time and that you've stated in your interrogatory responses, the presentation style of Rapid Coder, is the -- is where you have your disagreement with The Staywell Company in its use of your copyrighted material?

A:   Correct.

Q:   And it was -- it was that presentation style that you were also alleging was misused by FastMark in the 2003 lawsuit; correct?

A:   Correct.

Ex. B (Wang Dep. 2, at 280:12-20).

Q:  And what do you recall being the similarities between Rapid Coder and Quick Coder?

A:  Similarity.  Well, same thing; just -- just this -- you know, same way of typesetting, grouping, subgrouping, table formation and so on.

Q:  So all the same things in this lawsuit, you saw had been done by FastMark in its Quick Coder product?

A:  Yes.

Ex. B (Wang Dep. 2, at 320:8-22).

Q:  And what -- what conduct of FastMark was the basis for your infringement and trademark claims?

MR. WITTEN:  Objection.  Asked and answered.

THE WITNESS:  They made use of part of my copyrighted material to compile their own edition.

BY MR. CORALLO:

Q:  And that's the claim that you gave up in the settlement agreement; correct?

A:  Yes.

Q:  Okay.  And the claim that you gave up under the settlement agreement was that the Quick Coder product used your material and looked

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

like your Rapid Coder; correct?

A:  Yes.


Ex. C (Wang Dep. 3, at 256:8-24).

There is a bucket of design elements that you claim to be your copyrighted material, correct?

A:  Yes.

Q:  And those design elements you've identified in your Rapid Coder products, correct?

A:  Yes.

Q:  Are those the same design elements that -- that appear in QuickCoder?

A:  Yes.

Q:  Are those the same design elements that appear in SmartCoder?

A:  Yes.

Q:  Are those the same design elements that appear in --

A:  ExpressCoder.

Q:  -- ExpressCoder?

A:  Yes.


Ex. C (Wang Dep. 3, at 257:19-25).

Q:  So your position then, just to make sure that I understand, is that the same elements that – that you believe infringed when FastMark put them in QuickCoder, are the same elements that

| | | you contend Staywell is using to infringe in its products SmartCoder and ExpressCoder?<br>A:  Yes. |
|---|---|---|
| 72. | Dr. Wang has admitted that the Settlement Agreement does not contain any language that supports his interpretation of it regarding FastMark's right to market its products. | Ex. B (Wang Dep. 2, at 300:15-18).<br>Q:  "Where in this agreement does it say that they can't continue marketing the products that they claim to have independently developed?<br>A:  The settlement doesn't say that."<br><br>Ex. B (Wang Dep. 2, at 304:18-22).<br>"I think in this settlement agreement there is no specific clause addressing the issue whether FastMark can continue to market their own version.  It doesn't say that, as far as I can see." |
| 73. | Dr. Wang now contends that his "expectation" of the Settlement Agreement was that FastMark had "no products to market other than starting all over again and developing something that [Dr. Wang] approved of." | Ex. B (Wang Dep. 2, at 294:23-295:3).<br>Q:  So at the time that you entered into the settlement agreement, you knew -- but didn't tell them -- that if they tried to market their independently-developed coders, that they were infringing?<br>A:  I'll be watching their product.<br><br>Ex. B (Wang Dep. 2, at 298:15-24).<br>Q:  Okay.  So it's your view that -- that according to your interpretation of the settlement agreement, that they pay you money for -- that |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

they didn't owe because their coder products, in their view, didn't infringe; and they could not market their coder products after -- after the settlement agreement, without also facing another infringement claim.  That's your view of the settlement?

A:  Yes.


Ex. B (Wang Dep. 2, at 292:25-293-7).

Q:  Did you ever tell FastMark otherwise, that they did not have the right to market their products after the settlement agreement?

A:  No, I didn't.

Q:  And you had no reason to believe, at the time of the settlement, that they would not market Quick Coder after the settlement agreement?

A:  No.


Ex. B (Wang Dep. 2, at 321:4-12).

Q:  Okay.  What coder products did FastMark have that they would be allowed to use?

A:  They would be allowed to use in developing their own product that contained not -- no part of my copyrighted material.

Q:  So your testimony here today is that they had to start all over again after the settlement

agreement.  That's your testimony?

A:   If they are intelligent.


Ex. B (Wang Dep. 2, at 322:9-15).

Q:   So your sworn testimony today is that it was your expectation that they had no products to market other than starting all over again and developing something that you approved of.  Is that your testimony today?

A:   That's my expectation, but I don't know what their expectation was.


Ex. B (Wang Dep. 2, at 323:5-14).

Q:   Okay.  So when FastMark's lawyer put you on notice that they had independently developed coders -- and I'm reading right from the language of the letter that you said you saw -- and that they intend to continue their use -- continue their use -- you ignored that and decided simply that your view was going to be that they were going to just develop new coder products, not continue the use of the ones they had already developed.

A:   Exactly.

| 74. | Dr. Wang understands that he "never got a resolution of [his] | Ex. A (Wang Dep. 1, at 114:11-21). You settled your disagreement that their format |
|-----|-----|-----|

| | |
|---|---|
| claim that what [FastMark] had developed infringed." | belonged to you, you settled that instead of pursuing that, correct?<br><br>A:   Correct.<br><br>Q:   And you believed what you believed, which is that you were right, but you didn't pursue it, and they believed what they believed, that they were right, and they didn't pursue it either, correct?<br><br>A:   I don't want to interpret their position.  We settled with understanding that we will just close the case at that point.<br><br><br>Ex. B (Wang Dep. 2, at 297:16-21).<br><br>Q:   Was there any resolution, at the time of the settlement, to determine that their products infringed?<br><br>A:   No, it wasn't determined on that.<br><br>Q:   You agreed not to pursue that claim.<br><br>A:   Up to that point, yes, so to speak.<br><br><br>Ex. B (Wang Dep. 2, at 314:15-20)<br><br>Q:   But you never got a resolution of your claim that what they had developed infringed; right?<br><br>A:   No.<br><br>Q:   Okay.  Because you decided to give up that claim; right?<br><br>A:   Up to that point, yes. |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | Ex. B (Wang Dep. 2, at 318:9-20). Q:  So I'm not talking about future claims.  I'm talking about the claims that you brought against FastMark at the time.  You were agreeing that you would take money in exchange for a settlement where neither side had to conclude their claims.  There was no need to try the claims; there was no need to go to a jury and get an adjudication from a Court.  You were simply going to agree to disagree, and you were going to be paid for that; is that right? A:  Correct. |
| 75. | Dr. Wang admits that the Settlement Agreement does not support his understanding that he can sue on the same claim the say after execution of the Settlement Agreement. | Ex. A (Wang Dep. 1, at 121:6-14). A:  This agreement does not stipulate any -- there is not any clause that bars future claims if the infringement activity continues.  If the infringement activity continues, it will -- any new infringement activity will actually – Q:  I understand that's your position, but where does it say that in the agreement?  Does it say that in the  agreement? A:  No, it doesn't say that. |
| 76. | In April 2004, Dr. Wang consented to the assignment of the License Agreement to | Ex. W (letter dated  April 27, 2004, to Roger H. Wang, M.D., from by George Parker of StayWell). |

6203777                                                              116

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | StayWell. | Ex. B (Wang Dep. 2, at 169:20-171:9)<br><br>A:   It's in the form of a letter dated April 27, 2004, to Roger H. Wang, M.D., and signed by George Parker.  And it essentially says that "Reference is made to that certain Non-Exclusive License Agreement..." and so on. [referring to Ex. W] . . .<br><br>Q:   Did you go to your counsel and ask what the -- if he should sign it, or did you seek legal advice about that?<br><br>A:  No, not at all.<br><br>Q:   Did you have any problems with assigning the license agreement to The Staywell Company?<br><br>A:  No, not at all.<br><br>Q:   And so you signed the agreement and sent it back to him?<br><br>A:  Yes. |
| 77. | Dr. Wang admits that his claims against StayWell are due to StayWell's use of his Copyrighted Material. | Ex. B (Wang Dep. 2, at 175:17-22).<br><br>Q:   Is it your view that The Staywell Company, in producing and marketing its products known as "Smart Coder" and "Express Coder," used your copyrighted material as defined in the license agreement?<br><br>A:  Yes. |

| | | |
|---|---|---|
| | | Ex. B (Wang Dep. 2, at 176:4-12).<br><br>Q:  And just take a look at the definition of "copyrighted materials," which is in the -- I think it's in the second paragraph.  And so your position is that the sales that The Staywell Company is making of its products -- Express Coder and Smart Coder -- used the copyrighted material -- your copyrighted material -- as defined in the license agreement?<br><br>A:  Yes.<br><br>Ex. B (Wang Dep. 2, at 306:10-13)<br><br>Q:  It's your view, Dr. Wang, that every product that was sold after the settlement agreement contained your copyrighted material; right?<br><br>A:  Yes. |
| 78. | Plaintiff alleges that StayWell breached the License Agreement by failing to pay Plaintiff royalties for StayWell's sales of coder products that allegedly contain his Copyrighted Material. | Ex. H (Plaintiff's Mar. 19, 2008 Notice of Production, RW20873 ("StayWell sold ICD-9 products in breach of the amended agreement in October 2005.  Also, subsequently after 12-31-2005 . . . in breach of the amended agreement while it was extended automatically and remained in force.")).<br><br>Ex. B (Wang Dep. 2, at 173:11-14).<br><br>Q:  And so the sales that occurred after |

Staywell's acquisition of FastMark are in violation of the license agreement; correct?

A:   Correct.

Ex. B (Wang Dep. 2, at 176:16-177:5).

Q:   Okay.  So what -- to paraphrase what you just said, The Staywell products -- and the Express Coders and the Smart Coders -- are not identical to your products but they, in your view, incorporate certain features of your products which are the copyrighted material as defined in the license agreement; correct?

A:   Certain features, or we might say as the presentation method.

Q:   And those sales -- because they incorporate the copyrighted materials, as you defined it, and as defined in the license agreement -- those sales would be in breach of the license agreement; all sales?

A:   Correct.

Ex. B (Wang Dep. 2, at 306:10-17).

Q:   It's your view, Dr. Wang, that every product that was sold after the settlement agreement contained your copyrighted material; right?

A:   Yes.

Q:   And you have a claim for royalties for each

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | of those products sold after the settlement agreement; correct?<br><br>A:  Yes. |
| 79. | Dr. Wang testified that, after the parties executed the Settlement Agreement, he never notified StayWell of his belief that it was infringing his copyrights in selling FastMark's products and that he waited as long as he did to sue StayWell to make sure that StayWell had amassed sufficient sales and profits to make his suit worthwhile. | Ex. B (Wang Dep. 2, at 305:9-25).<br><br>Q:  Well, if they were using your copyrighted material, and your testimony is that you believe that their products did use your copyrighted material --<br><br>A:  Yes.<br><br>Q:  -- why, on November 1, didn't you file another lawsuit and demand royalties from them?<br><br>A:  It requires time to see the entire observation -- I mean, it's not just a matter of one issue or two issues; it required at least a year of observation.  That's my understanding.<br><br>Q:  And you don't see any --<br><br>A:  We have to gather enough material to initiate another action.<br><br>Q:  So you were just going to let your damages accumulate over time and then sue?<br><br>A:  That would get me a better reward.<br><br><br>Ex. B (Wang Dep. 2, at 306:10-307:8).<br><br>Q:  It's your view, Dr. Wang, that every product that was sold after the settlement agreement |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | contained your copyrighted material; right? |
| | | A:  Yes. |
| | | Q:  And you have a claim for royalties for each of those products sold after the settlement agreement; correct? |
| | | A:  Yes. |
| | | Q:  Okay.  And your testimony is you didn't pursue it because you just wanted that number to get bigger and bigger before you finally sued. |
| | | A:  We have to gather enough evidence. |
| | | Q:  Is that -- are you agreeing with my characterization? |
| | | A:  Maybe you can interpret it that way.  But for me, I would gather enough evidence to initiate another legal action.  Again, legal action is very costly and time-consuming, and I -- I'm patient. |
| | | Q:  And it sure is expensive.  And wouldn't it have been less expensive simply to tell them they are not entitled to market their product, going forward, or at least include it in the settlement agreement? |
| | | A:  No, I didn't do that. |
| 80. | Dr. Wang bases his claim solely on alleged similarities in (1) typesetting; (2) font style; (3) capitalization; (4) bold reverse ink headings; (5) grouping and | Ex. N (Plaintiff's Responses to StayWell's Third Set of Interrogatories, No. 12). <br><br> Ex. C (Wang Dep. 3, at 275 :1-14). <br> Q:  So in your -- in your interrogatory |

| | | |
|---|---|---|
| | subgrouping; (6) style of abbreviation or acronym; (7) use of symbols; (8) columnization (sic); (9) alphabetical order; (10) column alignment; (11) tabulation; and (12) overall layout, setup, structure, and organization. | responses, there are 12 that you list -- or 12 elements or formatting design options that you've chosen.<br><br>     Are those the dozen or so telltales that -- that you're relying on in this case to show copying?<br><br>A:  Yes.  Those are the place or the features that you look for. |
| 81. | The ICD-9 system contains detailed formatting conventions (use of bold, capitalization, and indentions, for example) to guide the coder through the hierarchy of information. | Ex. R (ICD-9-CM Publication). |
| 82. | For example, the ICD-9 classification system states that "main terms" (a defined term) in the Alphabetic Index to Diseases are in bold print.  Indented under the main term for the disease are "subterms," another defined term.  Nonessential modifiers are located directly after the main term in parentheses. | Ex. R  (ICD-9-CM Publication). |
| 83. | All coder products on the market are intended to make the ICD-9 codes more user friendly by | Ex. C (Wang Dep. 3, at 242:2-242:17)<br>Q:   Okay.  So would you agree with me, Dr. Wang, that all of the design choices that you |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | |
|---|---|
| "collapsing" the large two volume alphabetic and numeric indexes into a small handy reference guide. | made for using Microsoft Word accomplished the objective of organizing a large volume of information in a small space, would you agree with that?<br><br>A:   Correct.<br><br>Q:   Okay.  And all of the design choices that you made accomplished the objective of allowing the user to quickly access that information, correct?<br><br>A:   Correct.<br><br>Q:   And all of the design choices that you made using Microsoft Word allowed the users not only quick access but accurate access, because the information that they are looking for has to be correctly noted, right?<br><br>A:   Exactly.<br><br>Ex. C (Wang Dep. 3, at 279:8-280:9).<br><br>Q:   So you may know it in Volume 2 but the actual procedure that is recommended is -- you find it in the alphabetic listing and then you take the number that you have found and you go to Volume 1, the numeric listing, to find the most specific entry that relates to your diagnosis, correct?<br><br>A:   Correct.  Only part of the time.  Some other time that, you know, Volume 2 already provide |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | you directly the code --<br><br>Q:    Okay.  All right.<br><br>A:    -- you don't need to go to Volume 1.<br><br>Q:    But the procedure is -- is as I explained it, correct?<br><br>A:    I –<br><br>Q:    If you have to -- if you have to find a code beyond the alphabetic listing, you go to the numeric listing, correct?<br><br>A:    Yes.<br><br>Q:    Okay.  And what -- what your product does, what your coder product does and what other coder products out there do is basically combine those two steps, correct?<br><br>A:    Yes.<br><br>Q:    Using the same classification and coding system of ICD-9 code books, but you do it in a shorthand, convenient way, correct?<br><br>A:    That's the purpose, yes. |
| 84. | Dr. Wang's Rapid Coder 2002 Pulmonolgy states:  "Refer to official code books for complete definition and absolute accuracy."   StayWell's ExpressCoder Cardiology 2005 states:  "ExpressCoder 2005 CARDIOLOGY is a quick | Ex. V (ExpressCoder Cardiology).<br><br>Ex. S (RapidCoder Pulmonology). |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | reference guide for finding ICD-9 codes. To ensure complete and accurate coding to the highest degree of specificity, the most current version of ICD-9-CM should be consulted." | |
| 85. | All publishers of coding guides present the codes in virtually identical ways, following the official ICD-9 coding system. | Ex. X (chart comparing RapidCoder to other products). |
| 86. | Dr. Wang has admitted that his coder products and StayWell's coder products are not virtually identical. | Ex. B (Wang Dep. 2, at 176:16-24). Q:   Okay.  So what -- to paraphrase what you just said, The Staywell products -- and the Express Coders and the Smart Coders -- are not identical to your products but they, in your view, incorporate certain features of your products which are the copyrighted material as defined in the license agreement; correct? A:   Certain features, or we might say as the presentation method.<br><br>Ex. C (Wang Dep. 3, at 253:20-254:6). Q:   You have already testified that you have found no evidence of any product of FastMark or Staywell that is identical to any product that you have created; is that correct? A:   Not hundred percent. |

| | | Q:   Okay.  And that's what identical means, a hundred percent. <br> A:   Correct. <br> Q:   You have found no 100 percent identity between my client's products and your products, correct? <br> A:   Correct. <br><br> Ex. C (Wang Dep. 3, at 264:1-7). <br> You're not -- it's not your position in this lawsuit that -- that Staywell made a wholesale copy of your code compilations and put the ExpressCoder name on there, on their product? <br> A:   That is correct. <br> Q:   You're not making that claim, correct? <br> A:   No. |
| 87. | Under the License Agreement Dr. Wang was required to deliver, not a final formatted coder product, but a list of ICD-9 codes in Microsoft Word format. | Ex. E (License Agreement, ¶ 9). |
| 88. | Each of Dr. Wang's copyright applications reflect that he obtained a compilation copyright in works derived and/or | Ex. Q (Plaintiff's copyright registration). <br><br> Ex. A (Wang Dep. 1, at 108:8-11) <br> Q:  And isn't it true that your copyright |

| | | |
|---|---|---|
| | compiled from the ICD-9 codes in the public domain. | application and registration is for compilations of public domain information?<br><br>A:   Design and compilation, yes. |
| 89. | The License Agreement also defines the Copyrighted Material to be a compilation of ICD-9 codes and not a list of formatting elements or a "presentation method." | Ex. E (License Agreement). |
| 90. | The License Agreement requires that each coder product using Dr. Wang's ICD-9 code selections carry the copyright designation "© [date], Roger H. Wang, M.D." | Ex. E (License Agreement, ¶ 7). |
| 91. | the only mention in the License TAgreement to "format" or "design" refers to FastMark's "patented folding laminated format" and FastMark's "patented proprietary design." | Ex. E (License Agreement, Preamble, ¶ 4). |
| 92. | Dr. Wang has admitted that the License Agreement does not include any language to support his version of the term | Ex. A (Wang Dep. 1, 104:1-23)<br><br>Q:   So copyrighted material in the License Agreement is defined as compilations of ICD-9 codes.  Do you see that?  .. |

| | | |
|---|---|---|
| | Copyrighted Material. | THE WITNESS:  Yes.<br><br>BY MS. CORALLO:<br><br>Q:    And there isn't any mention in the definition of copyrighted material in the License Agreement any of these formatting elements that you began to include in your copyright notice in 2004; is that correct?<br><br>MR. WITTEN:  Same objection.<br><br>BY MS. CORALLO:<br><br>Q:    It's just a "yes" or "no."  It's not there, is it?<br><br>A:    It's not there, but the compilation -- the word "compilation" implies that is the way it was done.<br><br>Q:    But the words that you used in 2004 about tabs and tables and format and abbreviations and alphabet and columns, none of that was listed as defining the copyrighted material in the original License Agreement, correct?<br><br>A:    Not defined. |
| 93. | In the 2003 Lawsuit against FastMark, Dr. Wang defined "Copyrighted Material" as "original selection and | Ex. L (2003 First Amended Complaint, *Wang v. FastMark*). |

| | | |
|---|---|---|
| | rearrangement of the content contained in the ICD-9-CM publication," | |
| 94. | When Dr. Wang met with Howard Wolf, FastMark's owner, in 2000 to discuss the licensing of Dr. Wang's Copyrighted Material, Mr. Wolf compared the Rapid Coder to a generic, "telephone-book" style compilation. | Ex. A (Wang Dep. 1, at 93:5-16).<br>A:  Correct.  Except that Howard Wolf mention to me that the royalty percentage appears too high to him, that he threatened to create his own version, he threatened by saying that this kind of product is nothing more than just a calculation, just like a telephone book.<br>Q:  When did he say that?<br>A:  When did he say that?  Somewhere between -- somewhere at the time an amendment was made.<br>Q:  So that would have been in 2001?<br>A:  I think that he -- probably -- it was just a conversation by telephone.  It wasn't like an email or in writing.<br><br>Ex. B (Wang Dep. 2, at 228:4-24).<br>A:  No, I don't think so.  They intended to do such -- their version, right from the beginning. They called it "this is a telephone style" -- "telephone directory style publication" that anyone can just do it.<br>Q:  How do you know what their intentions were from the very beginning? |

| | | |
|---|---|---|
| | | A:   Very beginning, there was a very first approach before signing even the license agreement, that at the meeting in a restaurant in Newport Beach Mr. Wolf said that -- I think it was kind of like a "carrot-and-stick" style conversation, that he tried to persuade me to sign the agreement.  And he said, casually, that this is but a compilation, just like a telephone book style publication; any company or anyone can just do the same.<br><br>Q:   When was this conversation?<br><br>A:   Just before signing the original licensing agreement.<br><br>Q:   In 2000?<br><br>A:   Must be. |
| 95. | In response to Mr. Wolf's position, Dr. Wang testified that he did not explain that his copyright in the Rapid Coder contained something more than just code compilation. | Ex. B (Wang Dep. 2, 229:18-230:9).<br>So then Howard and I met, just the two of us, in the restaurant.  And that's when he casually mentioned that, you know -- and so I -- it wasn't this injunction that prompted him to create their own version.  Right from the very beginning, he has intention to do that.<br><br>Q:   And you knew that?<br><br>A:   I knew that.<br><br>Q:   Okay.<br><br>A:   Yes. |

6203777

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | Q:  And even at that time you never spoke up and said, "My copyrighted material includes a number of formatting elements that are the heart and soul of my invention, and it's not only in telephone style directory"?  You never said those things to him, did you? <br><br> A:  No, I didn't. <br><br> Ex. B (Wang Dep. 2, at 231:8-12). <br><br> Q:  But you're sitting over dinner with Howard Wolf and he said, "You haven't done anything more than the equivalent of a telephone directory," and you sat silent and said nothing? <br><br> A:  No, I didn't say anything. |
| 96. | In 2004, years after the License Agreement and within months after the Settlement Agreement, Dr. Wang began including a different copyright notice on his coder products. | Ex. B (Wang Dep. 2, 206:18-207:4) <br><br> A:  Well, it's approximately the year 2003 that I went into detail to specify all the -- all the aspects of the production or the publication to be protected by copyright. <br><br> Q:  So that -- and that was, I think you testified in your last deposition, after you settled this lawsuit? <br><br> A:  Yes. <br><br> Q:  You amended your copyright notice to include all the elements of formatting that you claim is part of your copyrighted material? |

6203777

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | A:  Yes. |
| 97. | The new copyright notice now includes the formatting features he now claims to own as a separate copyrightable work: "The specific design, format, layout, setup, structure, editing, formatting, tabulating, grouping, subgrouping, abbreviating, and/or organization, which are characteristic and inherent to the creation of Rapid Coder, is copyrighted legally protected intellectual property. Unauthorized adaptation, alteration, reproduction, duplication, and/or dissemination, in part or in toto (Latin), by any means whatsoever, is a violation of copyright law and other pertinent laws, and is subject to liability." | Ex. A (Wang Dep. 1, at 88:11-20) Q:   Let me hand you -- it doesn't need to be made an exhibit, but I can't read it.  Can you read the copyright notice on that?  I handed you a 2004 Rapid Coder product. A:   In addition to what was in 2002, then I added the copyright statement as follows:  "The specific design, format, layout, setup, structure, editing, formatting, tabulating, typesetting, grouping, subgrouping, abbreviating, and/or organization, which are characteristic and inherent to the creation of Rapid Coder, is copyrighted legally protected intellectual property." |
| 98. | The Settlement Agreement refers to the definition of "Copyrighted Material" given in License Agreement. | Ex. E (Non-Exclusive License Agreement)  Ex. G (Settlement Agreement). |
| 99. | Even before execution of the | Ex. I (letter dated Oct. 15, 2003, from |

| | |
|---|---|
| Settlement Agreement, Dr. Wang knew that FastMark was developing and selling its own coder products, and that FastMark intended to continue selling its own coder products after the parties executed the Settlement Agreement. | FastMark's attorney Tait Graves to Plaintiff's attorney, Jen-Feng Lee ("FastMark owns these independently developed coders and intends to continue their use.  Thus, FastMark has only a minimal need for Dr. Wang's coders in 2004 and 2005, and has no obligation to use them at all.")). |

Ex. B (Wang Dep. 2, at 194:5-23).

Q:   Okay.  So as early as 2002 -- which is within a year of the amended license agreement -- you amended the license agreement in 2001.  Do you remember that?

A:   I see.

Q:   And we can look at the date in just a minute. But within a year of that you found out that FastMark was creating its own coder products; correct?

A:   In some specialty.

Q:   In some specialties.  So in some specialties, they were marketing Quick Coder products as their own; and in other specialties where they hadn't developed their own codes, they were marketing Quick Coder with your copyrighted material?

A:   Exactly.

Q:   So as early as 2002, you knew that?

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

A:  By this document now.  I have to correct my previous statement; yes.

Ex. B (Wang Dep. 2, at 271:19-272:4).

Q:  Okay.  And you also knew that they were -- "they" being FastMark -- were requesting -- were not requesting as many codes from you; right?

A:  Correct.

Q:  And what was your conclusion?

A:  My conclusion was that perhaps pharmaceutical companies are not buying this product as often as they wanted before.

Q:  And you suspected early on that they might be developing their own products; right?

A:  Yes, they might be.

Ex. B (Wang Dep. 2, at 285:24-286:12).

Q:  And do you see in the third paragraph of the letter where it says, "FastMark owns these independently developed coders and intends to continue their use"?

A:  Yes.

Q:  That was your view at the time, too, wasn't it?

A:  Yes.

Q:  And when he goes on to say, "Thus,

134

FastMark has only a minimal need for Dr. Wang's coders in 2004 and 2005, and has no obligation to use them at all."  You also were aware of that as well; right?

A:   Correct.

Ex. B (Wang Dep. 2, at 286:19-287:17; referring to Ex. I above).

Q:   Okay.  And here, FastMark's lawyers are stating that -- the issue in the case, which was that it was FastMark's view that they independently develop their coder products and they intended to continue their use; correct?

A:   Yes.

Q:   And "continue" suggests that they were already doing that prior to this letter and prior to the lawsuit, based on your testimony; correct?

A:   Correct.

Q:   So this didn't come as a surprise to you, this statement about FastMark owning their independently-developed coders and continuing to use them?

A:   No, not a surprise.  It's in their viewpoint.

Q:   Right.  And, also, you had seen the evidence of it, that they would have a minimal need to use your coders in 2004 and 2005, because -- because they were developing their own coders;

6203777

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

and you knew that because the royalty stream had decreased through -- certainly through that year and the year before; right?

A:  Yes.


Ex. B (Wang Dep. 2, at 292:8-293:7).

Q:   And you knew, when you entered into the settlement agreement, that FastMark intended to continue marketing its own products; correct?

A:  I thought they would.

Q:   Because that's what the lawyer tells you right here -- tells your lawyer -- that FastMark owns these coders and intends to continue their use.  Do you see that?

A:   Correct.

Q:   And so that gave you -- gave you your awareness that they were going to proceed beyond the settlement, in using their own coder products; right?

A:   Correct.

Q:   And you never told them otherwise.

MR. WITTEN:  I'm sorry.  Vague and ambiguous.

BY MS. CORALLO:

Q:   Did you ever tell FastMark otherwise, that they did not have the right to market their products after the settlement agreement?

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

A:   No, I didn't.

Q:   And you had no reason to believe, at the time of the settlement, that they would not market Quick Coder after the settlement agreement?

A:   No.

Ex. B (Wang Dep. 2, at 317:8-318:3).

Q:   Well, I'm not talking about a future action. I'm talking about the claims that you brought against FastMark at the time.  You knew that they were developing their own products.  You knew that -- it was your view that their products used your copyrighted material.  You -- you testified that their products were confusing the public because they look like your products. And -- and you wanted to put an end to that, and you did it by filing a lawsuit.  All of that was true; right?  Those were the claims you had against FastMark at the time?

MR. WITTEN:  Objection.  The complaint and the first amended complaint speak for themselves in the 2003 action.

BY MS. CORALLO:

Q:   I'm not talking about the complaint.  I'm talking about what your understanding of events were that led you to the complaint.  Did I state

137

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | that correctly?<br>A:  Correct. |
| 100. | Paragraph 8 of the Settlement Agreement provides that "[i]n any dispute that arises over the performance of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs." | Ex. G (Settlement Agreement, ¶ 8). |
| 101. | Plaintiff alleges that StayWell breached the License Agreement by failing to pay Plaintiff royalties for StayWell's sales of coder products that allegedly contain his Copyrighted Material. | Ex. H (Plaintiff's Mar. 19, 2008 Notice of Production, RW20873 ("StayWell sold ICD-9 products in breach of the amended agreement in October 2005.  Also, subsequently after 12-31-2005 . . . in breach of the amended agreement while it was extended automatically and remained in force."))<br><br>Ex. B (Wang Dep. 2, at 173:11-14).<br>Q:   And so the sales that occurred after Staywell's acquisition of FastMark are in violation of the license agreement; correct?<br>A:   Correct.<br><br>Ex. B (Wang Dep. 2, at 176:16-177:5).<br>Q:   Okay.  So what -- to paraphrase what you just said, The Staywell products -- and the |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

Express Coders and the Smart Coders -- are not identical to your products but they, in your view, incorporate certain features of your products which are the copyrighted material as defined in the license agreement; correct?

A:   Certain features, or we might say as the presentation method.

Q:   And those sales -- because they incorporate the copyrighted materials, as you defined it, and as defined in the license agreement -- those sales would be in breach of the license agreement; all sales?

A:   Correct.

Ex. B (Wang Dep. 2, at 306:10-17).

Q:   It's your view, Dr. Wang, that every product that was sold after the settlement agreement contained your copyrighted material; right?

A:  Yes.

Q:   And you have a claim for royalties for each of those products sold after the settlement agreement; correct?

A:  Yes.

| 102. | Plaintiff bases his unfair competition claim on StayWell's alleged breach of contract | Ex. M (Plaintiff's Supp. Responses to StayWell's First Set of Interrogatories, No. 4. ("StayWell breached said contract in 2005 when it |

| | | |
|---|---|---|
| | | approached AstraZeneca selling competing ICD-9 coder products . . . StayWell violated its contractual obligation to not solicit AstraZeneca.")). |
| 103. | Plaintiff also bases his unfair competition claim on StayWell's alleged infringement | Ex. M (Plaintiff's Supp. Responses to StayWell's First Set of Interrogatories, No. 4. ("not only had StayWell violated its contractual obligation to not solicit AstraZeneca, but . . . StayWell copied Dr. Wang's method of presenting the ICD-9 information in violation of Dr. Wang's copyrights.")). |
| 104. | Dr. Wang's Complaint incorporates the copyright count into the unfair competition claim. | Ex. J (2006 Complaint). |
| 105. | Plaintiff admits that he had no contract with AstraZeneca. | Ex. B (Wang Dep. 2, at 332:13-333:5). Q:  Okay.  And now my question to you is: What contract did you have with AstraZeneca that was interfered with? A:  Well, for year 2006 edition, they -- AstraZeneca's staff, Ms. Berkovitch, contacted me for obtaining estimates of, I believe, two or three orders. Q:  Okay.  And there was an e-mail exchange that you produced in the case where -- A:  Exactly. Q:  Okay.  And -- so you didn't have a contract; |

| | | |
|---|---|---|
| | | you had a request for an estimate; right? |
| | | A:   Correct. |
| | | Q:   Okay.  And you had never got a purchase order with a purchase order number because they never entered into a contract with you for those estimates; correct? |
| | | A:   Correct. |
| | | Ex. B (Wang Dep. 2, at 334:1-12). |
| | | Q:   All right.  So the testimony you just gave me was that you didn't have a contract with AstraZeneca; they had asked for an estimate but then they never entered into a purchase order with you; right? |
| | | A:   Well, they implied that they are ordering. |
| | | Q:   Okay.  But there wasn't an actual legal document that you had signed or -- |
| | | A:   Correct. |
| | | Q:   -- an agreement by them to take an amount certain at a price certain? |
| | | A:   Correct. |
| 106. | With regard to the "wrongful act" element of the tort of intentional interference with economic advantage, Plaintiff bases StayWell's "wrongful act" on a breach of contract claim. | Ex. B (Wang Dep. 2, at 336:7-17).
Q:   Okay.  And so what is the independent wrongful conduct that Staywell committed, as you've asserted in your complaint?
A:   That's the wrongful conduct, because they did not abide by the agreement that Staywell, as |

| | | a successor of FastMark, should not make any sales attempt with AstraZeneca. <br><br> Q:  Okay.  So the independent wrongful conduct that you're referring to in paragraph 27 is Staywell's alleged breach of the license agreement? <br><br> A:  Yes. <br><br> Ex. C (Wang Dep. 3, at 194:3-10). <br><br> Q:  And I asked you if that was the breach of the license agreement and was that the conduct that you were relying on in making this claim.  And do you recall that? <br><br> A:  That is correct. <br><br> Q:  And it is correct that that's the independent wrongful conduct as set forth in Count V? <br><br> A:  Correct. |
| 107. | The License Agreement also provides that "[i]n any action to enforce or interpret this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees from the other party." | Ex. E (Non-Exclusive License Agreement, ¶ 17). |
| 108. | Dr. Wang testified that the Wolfs were easy to deal with. | Ex. B (Wang Dep. 2, at 266:18-21). <br><br> Q:  Were the Wolfs easy to deal with? <br><br> A:  Beg your pardon? |

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

| | | |
|---|---|---|
| | | Q:  Were they easy to deal with?<br><br>A:  At that time, yes. |
| 109. | Even before execution of the License Agreement, Dr. Wang knew that FastMark understood that "Copyrighted Material" did not include formatting. | Ex. B (Wang Dep. 2, at 231:22-232:22).<br><br>Q:  And so you were on notice -- by your own sworn testimony now -- even before entering into the license agreement, that the Wolfs and FastMark had a completely different view of copyrighted material than you had, and you never said anything throughout your relationship with them; correct?<br><br>A:  Well, did he have a complete different view or not, I don't know.  That -- at least he recognized the creation, this product is of value, and he wanted to -- to market it under a license. And so I'm happy to allow him to do that.<br><br>Q:  And you understood from that meeting -- I'm sorry I cut you off.  Did you have more to say?<br><br>A:  No.  Go ahead.<br><br>Q:  You understood from that meeting with Howard Wolf that his understanding of the copyrighted material was the code compilations themselves; correct?<br><br>A:  Just like what he thought it was, a telephone book style publication.<br><br>Q:  And is that a "yes," it was in the code compilations? |

| | | |
|---|---|---|
| | | A:  That's his interpretation, yes.<br><br>Q:  And you knew that even before entering into the agreement?<br><br>A:  Yes. |
| 110. | In fact, Dr. Wang never clarified his position to the Wolfs that his copyright was in format. | Ex. A (Wang Dep. 1, at 92:11-20).<br><br>Q:  Did you have that discussion with the Wolfs, that you believed that your rights included a right in the format and that you owned a copyright in the format?  Did you have that discussion with the Wolfs?<br><br>A:  No.<br><br>Q:  You never told them that?<br><br>A:  I don't need to.<br><br>Q:  Well, I'm not asking if you needed to.  I'm asking did you have the conversation?<br><br>A:  No, I didn't.<br><br>Ex. A (Wang Dep. 1, at 92:23-93:16).<br><br>Q:  At no time in the years that you were dealing with the Wolfs and FastMark that would begin around 1999 to 2003, at no time did you say to them in words or in writing that you believed your copyright included tabs and capital letters and use of columns and alphabetizing and they were not allowed to use those formatting elements in their Quick Coder |

products; is that your testimony?

A:   Correct.


Ex. A (Wang Dep. 1, at 109:9-20).

Q:   Now, going back to the License Agreement that's in front of you -- well, if it wasn't necessary then, why was it necessary in 2004?

A:   Just to remind them what they supposed to obey or any subsequent imitators what's protected by this copyright.  And this is based on counsel's recommendation.

Q:   Because they didn't understand it before. FastMark didn't understand that for all the years that they were licensing your copyrighted material that you were claiming to own the design, they didn't understand that before, did they?

A:   Correct.


Ex. B (Wang Dep. 2, at 207:25-208:12).

Q:   When, before you put it in a legal notice attached to your products, after your relationship with FastMark had ended -- when, before that, did you ever tell FastMark the minutia of the formatting elements that you claim was part of the copyrighted material?

A:   No, I didn't.

Q:   Okay.  At any time before you put it in your legal notice, your testimony here under oath is you never told the Wolfs about your claim to own these formatting elements that's part of the copyrighted material?

A:   No, I didn't.


Ex. B (Wang Dep. 2, at 211:19-212:25).

Q:   And you never said in those letters, did you, that you wanted to be very clear that your copyrighted material was not only code compilations -- which was secondary, as you say -- but was actually primarily in the formatting elements; you never told them that then, did you?

A:   No, I didn't.


Ex. B (Wang Dep. 2, at 252:16-21).

Q:   And even in the amended license agreement, you didn't take this opportunity to clarify with Howard that in the definition of "copyrighted material" that it would include your formatting elements?

A:   No.


Ex. B (Wang Dep. 2, at 262:12-21).

Q:   And, still, there's no mention of a format

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

that you claimed to own in the presentation style of the coder product; correct?

A:   Correct.

Q:   And you didn't -- you didn't clarify or correct him and say, "You know, the copyrighted material is not only in the content and the code compilations, but in the presentation style"; you didn't say that to him.

A:   No.

///

///

///

///

///

///

///

6203777

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

**THE STAYWELL COMPANY'S PROPOSED CONCLUSIONS OF LAW**

Defendant and Counter-Plaintiff The StayWell Company, a division of MediMedia USA, Inc., ("StayWell" or "defendant"), by and through its undersigned counsel, files its Proposed Conclusions of Law in conjunction with its Motion for Summary Judgment and would respectfully show the Court as follows:

1.    A motion for summary judgment must be granted when the evidence demonstrates that "there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

2.    Once the moving party has satisfied its threshold burden of demonstrating the absence of a genuine issue of fact for trial, the burden shifts to the opposing party, who must then introduce evidence of specific facts proving there remains a genuine material issue for trial.   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); FED. R. CIV. P. 56(e).

3.    The opposing party may not rely on mere allegations or denials of the adverse party's pleadings.  FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

4.    The opposing party's burden to demonstrate a genuine issue of material fact increases when the factual context renders the plaintiff's asserted claim or defense implausible.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

5.    When the nonmoving party fails to make a showing sufficient to establish evidence of an element essential to its case, the complete failure of proof concerning the essential element necessarily renders all other facts immaterial and a summary judgment is warranted.  *Rotec Indus., Inc. v. Mitsubishi Corp*., 215 F.3d 1246, 1250 (Fed. Cir. 2000).

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

6. StayWell is entitled to summary judgment on Dr. Wang's claim for copyright infringement (Count One) because it has proven that one or more essential elements of the plaintiff's cause of action cannot be separately established.

7. StayWell is entitled to summary judgment on Dr. Wang's claim for breach of contract (Counts Two and Three) because it has proven that one or more essential elements of the plaintiff's cause of action cannot be separately established.

8. StayWell is entitled to summary judgment on Dr. Wang's claim for intentional interference with contractual relations (Count Four) because it has proven that one or more essential elements of the plaintiff's cause of action cannot be separately established.

9. StayWell is entitled to summary judgment on Dr. Wang's claim for intentional interference with prospective business advantage (Count Five) because it has proven that one or more essential elements of the plaintiff's cause of action cannot be separately established.

10. StayWell is entitled to summary judgment on Dr. Wang's claim for unfair competition and deceptive trade practices (Count Six) because it has proven that one or more essential elements of the plaintiff's cause of action cannot be separately established.

11. StayWell is entitled to summary judgment on all of Dr. Wang's claims because it has proven the affirmative defense of settlement and release, which bars recovery.

12. "A release is an abandonment of a claim that might otherwise be enforced; it constitutes a defense to the assertion of a claim." *McCray v. Casual Corner, Inc.*, 812 F. Supp. 1046, 1048 (C.D. Cal. 1992).

13. Settlement agreements, like consent judgments, reflect an agreement by hostile litigants on more than just contract terms; they reflect a compromise of contested

1  legal positions in matters that are the subject of litigation. *See, e.g., Dinesol Bldg. Prod.,*

2  *Ltd. v. Tapco Int'l Inc.*, 201 Fed. Appx. 764, 767 (Fed. Cir. 2006).

3       14.    General releases are enforceable.  *Winet v. Price*, 4 Cal. App. 4th 1159,

4  1173.

5       15.    Waivers of California Civil Code section 1542 are enforceable.  *Winet*, 4

6  Cal. App. 4th at 1168.

7       16.    Under California law, a settlement release is governed by contract

8  principles.  *Howard v. America Online Inc.*, 208 F.3d 741, 747 (9th Cir. 2000).

9       17.    Courts must look first to the contractual language to determine and give

10  effect to the parties' intentions.  *Winet*, 4 Cal. App. 4th at 1166.

11       18.    Parole evidence of intent is only admissible to prove a meaning to which

12  the language is reasonably susceptible.  *Id.* at 1167.

13       19.    Dr. Wang released FastMark and its successors and affiliates (including

14  StayWell) from any and all claims (1) arising out of or relating to the circumstances

15  giving rise to or connected with the previous lawsuit; or (2) arising out of or relating to

16  the License Agreement.

17       20.    The Court must give effect to section (ii) of the Settlement Agreement and

18  conclude that the Settlement Agreement releases "any and all claims," including those

19  filed after execution of the Settlement Agreement.  Cal. Civ. Code § 1641; *Elte Inc. v.*

20  *S.S. Mullen, Inc.*, 469 F.2d 1127, 1131 (9th Cir. 1972); *Titan Corp. v. Aetna Casualty &*

21  *Surety Co.*, 22 Cal. App. 4th 457, 473-474, (1994)

22       21.    The Settlement Agreement bars all Dr. Wang's current causes of action.

23       22.    The court in *Security People v. Medeco*, 59 F. Supp. 2d 1040 (N.D. Cal.

24  1999), analyzed a settlement agreement similar to the one at issue here and held it  "only

25  covered claims involving the products at issue in the prior suit, and that this action is for

26  acts of defendant subsequent to the release."  *Security People v. Medeco*, 59 F. Supp. 2d

27  at 1042.

28

23.     An intellectual property owner's agreement not to sue released parties for infringement is enforceable, regardless of when the alleged infringement occurs. *See Marder v. Lopez*, 450 F.3d 445, 451 (9th Cir. 2006); *Lee v. Internet Entertainment Group, Inc.*, 33 Fed. Appx. 886, 887 (9th Cir. 2002); *Dinesol*, 201 Fed. Appx. at 767.

24.     Where one interpretation makes a contract unreasonable or such that a prudent person would not normally contract under such circumstances, but another interpretation equally consistent with the language would make it reasonable, fair and just, the latter interpretation would apply. *Elte, Inc. v. S. S. Mullen, Inc.*, 469 F.2d at 1131.

25.     California Rule of Court 977(a), which prohibits citation or reliance by a court of an unpublished California Court of Appeal decision, is not binding in the federal courts. *Cole v. Doe 1 Thru 2 Officers of the City of Emeryville Police Department*, 387 F. Supp. 2d 1084, 1103 n.7 (N.D. Cal. 2005).

26.     This Court is free to consider a California court's analysis in an unpublished opinion for its persuasive reasoning. *Id.* (citing *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 895 (9th Cir. 1996)).

27.     The Settlement Agreement is broad enough to cover future claims.

28.     Use "of the infinitive tense 'to have' fixes the action in the future." *Fire Insurance Exchange v. HAGD, Inc.*, No. F039989, 2003 WL 1521898 at *4 (Cal. App. 5 Dist. March 25, 2003).   Accordingly, the use of the infinitive tense 'to have' in a settlement agreement releases future claims. *Id.*

29.     The broad wording of the Settlement Agreement releases "future" claims that arise from or directly relate to the parties' previous dispute. *Manzanarez v. Low*, No. A100947, 2004 WL 363325 (Cal. App. 1 Dist. Feb. 27, 2004).

30.     StayWell is entitled to summary judgment on its affirmative claim for attorneys' fees pursuant to the Settlement Agreement—i.e., Count Three of StayWell's

First Amended Answer to Complaint and Counterclaim for Declaratory Judgment and Attorneys' Fees.

31.    To prevail on any copyright infringement claim, the plaintiff must show (1) ownership of a valid copyright; and (2) copying of the original elements of the work by the defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

32.    The format of Rapid Coder lacks the requisite "originality" needed for protection under the Copyright Act.  To display the requisite amount of creativity in the arrangement of a factual compilation, the author must show independent thought and some "minimal level of creativity" to gain protection. *Feist*, 499 U.S. at 358.  The arrangement may not be so mechanical or routine as to require no creativity whatsoever. *Id.* at 362; *Bellsouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 999 F.2d 1436, 1443-1444 (11th Cir. 1993).  The arrangement of the ICD-9 codes in Rapid Coder can be described as nothing but "logical" and "expected," and thus, is not entitled to copyright protection.

33.    The format aspects of the Rapid Coder that Dr. Wang seeks to protect are merely trivial or functional parts of the work, and thus not copyrightable.  "Words and short phrases such as...*titles*...[and] mere variations of typographic ornamentation, lettering, or *coloring*" are not subject to copyright protection.  37 C.F.R. § 202.1 (West 2007).

34.    Trivial elements of compilation and arrangement are not copyrightable since they fall below the threshold of originality.  *U.S. v. Hamilton*, 583 F.2d 448, 451 (9th Cir. 1978)

35.    Wang's attempt to claim copyright protection over the titles, coloring, and other format elements included in his Rapid Coder fails as a matter of law because they are simply functional aspects of the factual compilation.

36.    The law provides no copyright protection when the idea and the expression of the idea are inseparable and merged.  This is known as the idea-expression merger

doctrine.  *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir. 1984).

37.   Sometimes—and in particular with the arrangement and format of factual compilations—subsequent authors wishing to express the same ideas can often only chose from a very narrow range of expression for the idea.  *Id.*

38.   It is not the intent of copyright protection to require a subsequent author to design around a previous work such that the resulting arrangement and format becomes unusable for its intended purchasers.  *See Cooling Sys.*, 777 F.2d at 492.

39.   To prevent this improper outcome, the similarity necessary "may have to amount to verbatim reproduction or very close paraphrasing before" the arrangement of a factual work will be deemed infringed.  *Id.*

40.   Some courts have even gone so far as to require "bodily appropriation of expression" to find copyright infringement of a factual work's format and layout when the work consists of largely uncopyrightable (factual) elements.  *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989) (citing *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 576 (9th Cir. 1987)).   This is sometimes referred to as "limited" or "thin" copyright protection.  *Id.*

41.   The protection a copyright affords is against copying, not against any possible infringement caused when an independently created work coincidentally duplicates other material.  *Roth Greeting Cards v. United Card Co.*,  429 F.2d 1106, 1110 (9th Cir. 1970).

42.   The copied material must be something more than what 'must unavoidably be produced by anyone who wishes to use and restate' the facts that form the greater part of the work.  *Cooling Sys. and Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 492 (9th Cir. 1985) (reversed on other grounds) (citing *Landsberg*, 736 F.2d at 489)

43.   Medical coders, in order to remain functional, have a very limited amount of ways in which they can be produced and displayed.

44.   The formatting features of coder products are textbook examples of *scenes a faire* for medical coders (that is, forms of expression that are indispensable or standard in expressing the particular idea of medical coders).   *See Black's Guide, Inc. v. Mediamerica, Inc.*, No. C-90-0819, 1990 WL 169141 (N.D. Cal. Aug. 15, 1990).

45.   Because the format of Rapid Coder is all but "inevitable," allowing Dr. Wang to claim a copyright in the format would close off the medical coder market not only to StayWell, but to any subsequent producer.   *See id.* at *5.   As a result, only a single method of expressing the idea exists, and the merger doctrine precludes Dr. Wang's claim of infringement.

46.   Should the Court deny StayWell's motion for summary judgment on Dr. Wang's copyright infringement cause of action, it should find as a matter of law that the standard for copyright infringement applicable to "thin" copyrights is warranted.   The "thin" copyright standard requires the products to be virtually identical to one another in order for a trier of fact to find infringement.   When Courts apply the limiting doctrines, subtracting the unoriginal elements, plaintiff can be left with only a 'thin' copyright, which protects against only virtually identical copying. *ETS-HOKIN v. Skyy Spirits Inc*., 323 F.3d 763, 766 (9th Cir. 2003).

47.   To prevail on a copyright infringement claim based on a "thin" copyright, a plaintiff must prove that the products are virtually identical.   *Apple Computer, Inc. v. Microsoft Corp*., 35 F.3d 1435, 1444 (9th Cir. 1994) ("When the idea and its expression are indistinguishable or merged, expression will only be protected against nearly identical copying."); *ETS-HOKIN*, 323 F.3d at 766.

48.   StayWell could not and did not breach the License Agreement by selling ExpressCoder® and SmartCoder® to AstraZeneca.   Good faith and fair dealing covenants do not require parties to a non-exclusive license to refrain from developing and selling competing products.   *See, e.g., Conan Props., Inc. v. Mattel, Inc.*, 712 F. Supp. 353, 365 (S.D.N.Y. 1989); *New Paradigm Software Corp. v. New Era of*

*Networks, Inc.*, No. 99Civ.12409 2002 WL 31749396 at \*4 and \*\*14-15 (S.D.N.Y. 2002).

49.     Plaintiff cannot sustain a claim for copyright infringement because the License Agreement authorizes StayWell's alleged use of Plaintiff's Copyrighted Material.  A plaintiff who has granted a non-exclusive license to a licensee waives the right to bring a copyright infringement claim against the licensee for an alleged breach within the scope of the license agreement.  *See Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999)

50.     In such cases, the plaintiff can only sue for breach of contract.  *Id.; see also Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998).

51.     A plaintiff can only sustain a claim for copyright infringement in addition to the breach of contract cause of action by showing that  the disputed terms are license restrictions that define the scope of the license, *and* that the defendant's offending act exceeded the scope of the license.  *See Sun Microsystem*, 188 F.3d at 1122; *Netbula v. Bindview Dev. Corp.*, 516 F. Supp. 2d 1137, 1151 (N.D. Cal. 2007)

52.     When the dispute is over an independent contractual covenant, rather than a license restriction, the plaintiff's infringement claim must fail because such a dispute is unrelated to the scope of the license and is rather a mere breach of contract dispute.  *See Sun Microsystems*, 188 F.3d at 1121.

53.     Courts have consistently found that license terms regarding royalty payments are contractual covenants, not conditions to the license.  *See, e.g, Kabehie v. Zoland*, 102 Cal. App. 4th 513, 528 (2002); *Sybersound Records, Inc. v. UAV Corp*., 517 F.3d 1137, 1152 (9th Cir. 2008); *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998).

54.     Assuming StayWell used Plaintiff's Copyrighted Material, StayWell's alleged use of the Copyrighted Material was an act *within* the scope of the License Agreement.

55.     Because the License Agreement authorizes StayWell to sell Plaintiff's Copyrighted Material, according to Plaintiff, StayWell has been exercising its right sell Plaintiff's Copyrighted Material with every sale of its SmartCoder and ExpressCoder products.

56.     In *Peer Int'l. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1338-39 (9th Cir. 1990), the Ninth Circuit found that the license authorized the defendants' use of the copyright, and any use of the copyright by the defendant while the license was in effect "was not an act of infringement entitling the plaintiffs to statutory damages." *Id.* at 1339.

57.     Unfair competition law in California prohibits any "unlawful, unfair or fraudulent business act or practice."   California Business and Professional Code, § 17200 *et seq.*

58.     Plaintiff's unfair competition claim fails as a matter of law to the extent that claim relies on breach of contact as the underlying unlawful act.   In California, mere breach of contract cannot constitute an "unlawful" business practice pursuant to section 17200.  *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008); *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638, 645 (2008).

59.     Unfair acts among competitors means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws . . . " *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

60.     Fraudulent acts are ones where members of the public are likely to be deceived.  *See Nat'l Rural Telecomm. Co-op. v. DIRECTTV, Inc.*, 319 F. Supp. 2d 1059, 1077-78 (C. D. Cal. 2003).

61.     Reading the term 'unlawful' in the UCL to include any breach of contract under the common law would give every plaintiff alleging breach of contract in a

6203777

THE STAYWELL COMPANY'S PROPOSED STATEMENT
OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SACV06-813 ODW (JTLx)

California court a corresponding cause of action for injunctive relief under the UCL.  *In re Microsoft Corp. Antitrust Litigation*, 274 F. Supp. 2d 747, 750 (D. Md. 2003).

62.    Plaintiff's unfair competition claim should also be dismissed because it repeats or relies upon Plaintiff's infringement claim.  Even if the Court does not dismiss Plaintiff's copyright infringement claim, the unfair competition cause of action is still preempted by the Copyright Act.

63.    The Copyright Act will preempt an unfair competition claim if that claim gives rise to rights equivalent to copyright protection.  17 U.S.C. § 301(a) (1998); *see also Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998).

64.    When a plaintiff incorporates by reference the paragraphs setting forth its copyright claim in cause of action for unfair competition, this is further evidence supporting a finding of preemption.  *See id.*

65.    A plaintiff must prove five elements to prevail in a claim for intentional interference with contractual relations: 1) a *valid contract between plaintiff and a third party*; 2) defendant's knowledge of this contract; 3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; 4) actual breach or disruption of the contractual relationship, and 5) resulting damages. *See Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55 (1998).

66.    Because Plaintiff never had a contract with  AstraZeneca for StayWell to interfere with, his claim for intentional interference with contractual relations must be dismissed.

67.    The Court should dismiss Plaintiff's claim for intentional interference with prospective business advantage because Plaintiff has failed to show that StayWell committed any "wrongful conduct."

68.    The five elements that a plaintiff must prove to prevail in a claim for intentional interference with prospective business advantage are: (1) An economic relationship between the plaintiff and a third party, with a probability of future economic

157

benefit to the plaintiff; (2) The defendant's knowledge of this relationship; (3) Intentional and wrongful conduct on the part of the defendant, separate from the interference itself, designed to interfere with or disrupt the relationship; (4) Actual disruption or interference; and (5) Economic harm to the plaintiff as a proximate result of the defendant's wrongful conduct. *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 713 (2007) (citations omitted).

69.    A plaintiff alleging intentional interference with prospective business advantage must prove that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (citation omitted).

70.    An act is "independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1159.

71.    A party to a contract, however, cannot base a tort claim for intentional interference with prospective business advantage on acts that constitute breach of the contract. *See JRS Prod., Inc. v. Matsushita Elec. Corp. of America*, 115 Cal. App. 4th 168, 180 (2004)

72.    The term "compilation" is defined by the Copyright Act as  "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101 (2005).

73.    When a dispute arises over the meaning of contract language, the court must decide whether the disputed language is "reasonably susceptible" to varying interpretations.  *See Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 980 (2006) (citations omitted).

74.    Whenever possible, the court should determine whether the contract is reasonably susceptible to a party's interpretation "solely from the written provisions of

the contract." *Nat'l Cas. Co. v. Sovereign Gen. Ins. Servs., Inc.*, 137 Cal. App. 4th 812, 818 (2006); see also Cal. Civ. Code § 1638  ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity").

75.    The California Supreme Court has defined a release as the "abandonment, relinquishment or giving up of a right or claim to the person against whom it might have been demanded or enforced ... and its effect is to extinguish the cause of action" *Pellett v. Sonotone Corp.*, 26 Cal. 2d 705, 711 (1945).

Dated:  April 28, 2008            AKIN GUMP STRAUSS HAUER & FELD LLP


                                 By_____/s/ Chad A. Stegeman_____
                                           Karen C. Corallo
                                           Chad A. Stegeman
                                 Attorney for Defendant and Counter-Plaintiff
                                 THE STAYWELL COMPANY, A DIVISION OF
                                        MEDIMEDIA USA, INC.